1   UNITED STATES BANKRUPTCY COURT

2   EASTERN DISTRICT OF NEW YORK

3   Case No. 13-74398-reg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   STANLEY ABRAHAM AND AMY ABRAHAM,

7            Debtors.

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9   ADV. PROC. NO.: 13-08165-reg

10  In the Matter of:

11  JANET STUART,

12            Plaintiff,

13  v.

14  STANLEY ABRAHAM,

15            Defendant.

16  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

17                  United States Bankruptcy Court

18                  Alfonse M. D'Amato Federal Courthouse

19                  290 Federal Plaza

20                  Central Islip, New York 11722

21                  March 10, 2015

22                  10:05 a.m.

23  B E F O R E :

24  HON ROBERT E. GROSSMAN

25  U.S. BANKRUPTCY JUDGE

1     [2] Trial on ADJ Summons and Notice of Pre-Trial Conference

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Transcribed by:  Sherri L. Breach

1    A P P E A R A N C E S :

2    LAW OFFICE OF GREGORY MESSER, PLLC

3         Attorneys for Plaintiff

4         26 Court Street, Suite 2400

5         Brooklyn, New York 11242

6

7    BY:  JOEL GAFFNEY, ESQ.

8

9    BRIAN MCCAFFREY, P.C.

10        Attorneys for Defendants

11        88-18 Sutphin Blvd., 1st Floor

12        Jamaica, New York 11435

13

14   BY:  BRIAN MCCAFFREY, ESQ.

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  -- presiding.

3              THE COURT:  Please be seated.

4              THE CLERK:  The matters on Stuart versus Abraham.

5              THE COURT:  Okay.  Let's go.

6              THE CLERK:  Can I have appearances, please?

7              THE COURT:  And no witness -- there won't be any

8     witnesses other than the people who are here?

9              MR. MCCAFFREY:  Yes, Your Honor.

10             THE COURT:  Okay.  So there's nobody to be

11    excluded because everybody's a party?

12             MR. MCCAFFREY:  Correct.

13             MR. GAFFNEY:  Actually, Your Honor --

14             MR. MCCAFFREY:  Well --

15             MR. GAFFNEY:  -- Amy Abraham is not a party and I

16    would like her to be excluded during --

17             MR. MCCAFFREY:  Right.  She's --

18             MR. GAFFNEY:  -- her husband's testimony.

19             MR. MCCAFFREY:  She's not a defendant.  She's the

20    defendant's wife.  But she's also --

21             THE COURT:  Is she here?

22             MR. MCCAFFREY:  -- a joint debtor.  Yes.

23             THE COURT:  Oh, I didn't see her.  I didn't --

24             MR. GAFFNEY:  I -- she's not a defendant.  I would

25    like her to be excluded during her husband's testimony.

1          MR. MCCAFFREY:  I would prefer that she stay, but

2    I'm not going to make too much of an objection to it.  I

3    don't -- she is a joint debtor and her -- I think that --

4          THE COURT:  The theory is that she and her husband

5    haven't -- don't know what they're going to say.  I mean,

6    what --

7          MR. GAFFNEY:  There's no -- there's no claim

8    against her husband in this adversary proceeding.  It was

9    brought solely against Stanley Abraham.  It's seeking relief

10   solely against Stanley Abraham.  Amy Abraham is receiving

11   her discharge regardless.

12         THE COURT:  All right.  We'll exclude her.

13         MR. MCCAFFREY:  Okay.

14         THE COURT:  It's easier than arguing --

15         MR. MCCAFFREY:  It just means you have to --

16         THE COURT:  -- about it.

17         MR. MCCAFFREY:  -- wait outside and let everyone

18   else testify.  That way you won't have heard the other

19   testimonies.

20         MS. ABRAHAM:  Okay.

21         MR. MCCAFFREY:  That's all.

22         THE COURT:  She doesn't have to go now.

23         MR. GAFFNEY:  No.

24         THE COURT:  Okay.  Let's go.  Who is -- your case?

25         MR. GAFFNEY:  I have -- just wanted to hand up a

1    copy of the exhibits.

2              THE COURT:  I know we have some differences on

3    admissibility to certain exhibits.

4              MR. MCCAFFREY:  Yes.

5              THE COURT:  So the exhibits that you're not -- you

6    don't have problem with will all be admitted without

7    objection, correct?

8              MR. MCCAFFREY:  Right.

9              THE COURT:  And then when we get to those exhibits

10   for which there are issues, we'll deal with them

11   individually.

12             MR. MCCAFFREY:  Okay.

13             THE COURT:  All right.

14             MR. GAFFNEY:  Yes.

15             THE COURT:  You can make brief opening statements

16   or not.  I mean, I've read the papers.  There's no jury

17   here.  If you want to tell me what it's about, that's fine,

18   or else we can just get started.

19             MR. GAFFNEY:  I don't see any reason to waste the

20   Court's time with opening statements.  I think you --

21             THE COURT:  Okay.  I'll give you the opportunity

22   when it's your turn.

23             MR. MCCAFFREY:  Okay.

24             THE COURT:  Your case.

25             MR. GAFFNEY:  Your Honor, for the plaintiff's

1    first witness I'm going to call --

2              THE CLERK:  Can -- can you please state your name

3    for the record?

4              MR. GAFFNEY:  I apologize.  Joel Allen (ph)

5    Gaffney from the Law Office of Gregory Messer appearing for

6    the plaintiff, Janet Stuart.

7              THE CLERK:  Sir, can I have your appearance, also?

8              MR. MCCAFFREY:  Brian McCaffrey appearing for the

9    defendant, Stanley Abraham.

10             MR. GAFFNEY:  Plaintiff's first witness is Stanley

11   Abraham.

12             THE COURT:  Okay.

13             THE CLERK:  Can you please raise --

14             MR. ABRAHAM:  Yes.

15             THE CLERK:  -- your right hand?

16                 STANLEY ABRAHAM, WITNESS, SWORN

17             THE CLERK:  Can you please state and spell your

18   name for the record?

19             THE WITNESS:  Stanley Abraham, S-T-A-N-L-E-Y,

20   Abraham A-B-R-A-H-A-M.

21             THE CLERK:  Okay.  Can you please be seated?

22             THE WITNESS:  Sure.

23             THE CLERK:  Thank you.

24             MR. GAFFNEY:  Your Honor, may I have permission to

25   treat this witness as hostile?

1                THE COURT:  Yeah.

2    DIRECT EXAMINATION

3    BY MR. GAFFNEY:

4    Q    Mr. Abraham, you have a bachelor's degree, right?

5    A    Sorry.

6    Q    You have a bachelor's degree?

7    A    I do.

8    Q    And you got that from the State University of New York,

9    right?

10   A    SUNY Old Westbury.

11   Q    SUNY which?

12   A    Old Westbury.

13   Q    What's your degree in?

14   A    Finance.

15   Q    So you have a bachelor's degree in finance?

16   A    Correct.

17   Q    When did you earn it?

18   A    2005, I believe.

19   Q    When did you open your first business?

20   A    I don't recall, maybe -- I don't recall.

21   Q    Was it before or after you graduated from SUNY?

22   A    I believe it was after.

23   Q    What was the nature of your first business?

24   A    It was so long ago I don't recall it.

25   Q    And you're a -- you're a licensed real estate salesman

1    now, right?

2    A    Yes.

3    Q    A real estate --

4    A    I'm a --

5    Q    -- broker?

6    A    -- broker.

7    Q    And as part of your duties for that your job is to find

8    buyers for properties and find sellers who are interested in

9    selling to people who want to buy; is that right?

10    A    Right.  I would help people buy and sell their

11    property.

12    Q    Do you mostly represent sellers or buyers?

13    A    It varied.  I mean, it was both, a little bit of both.

14    Q    Commercial or residential?

15    A    I did a little bit of both.

16    Q    In front of you you have a book of exhibits, the

17    admissibility of which has been agreed between counsel.  Can

18    you please open up to the tab marked Joint Exhibit A?

19        (Pause)

20    Q    Twelve pages in you'll find a page titled, Schedule B.

21    Can you please turn to that?

22    A    The one that says, personal property.

23    Q    Schedule B, personal property.  Yes.

24    A    Okay.

25    Q    Did you read this document before you signed your

1  petition?

2  A    I did.

3  Q    Is this a true and accurate copy of the Schedule B that

4  was filed with your initial voluntary petition?

5  A    I believe -- I believe so.  I think in this one -- this

6  was the initial one that we had filed?

7  Q    That's what the docket says.

8  A    Right.  Yeah.  I think we had amended this, correct?

9  Q    But this one was the first one you filed?

10  A    Oh, right.

11  Q    The day you commenced your bankruptcy case you

12  commenced it by filing a petition with attached schedules, a

13  statement of financial affairs and declarations, right?

14  A    Right.

15  Q    And before that was filed you signed the declarations

16  on the petition and --

17  A    Yes.

18  Q    -- gave them to your attorney?

19  A    Yes.

20  Q    And you authorized him to sign the voluntary petition

21  for you?

22  A    Right.

23  Q    With the information that was in this petition?

24  A    Right.

25  Q    On the day you signed -- signed the petition --

1    A    Right.

2    Q    -- filed the petition?  Turn to the next page, line 13.

3    Line 13 is labeled, stock and interests in incorporated an

4    unincorporated businesses itemized.

5    A    Right.

6    Q    What did you list there in your initial petition?

7    A    It says -- shows an X there, none.

8    Q    What does that X signify? Does it signify that you're

9    representing you have none?

10   A    Right.  Yeah.

11   Q    I would like you now to turn towards the end of this

12   document.  There's a -- I apologize.  There's not page

13   numbers on the document, but it's a document labeled,

14   statement of financial affairs.  It's about halfway through

15   the document.

16   A    Where -- where would I find this?

17   Q    It's about halfway through the document.  It's right

18   after a document that says, declaration concerning debtors'

19   schedules, and it's right before the list of your creditors.

20   A    Okay.  Yes.  I'm there.

21   Q    Okay.  Question 1 says, income from employment or

22   operation of business, right?

23   A    Correct.

24   Q    And it asks you to state the gross amount of income the

25   debtor has received from employment, trade or profession, or

1    from operation of the debtors' business, including part-time

2    activities and so on during the two years before the

3    bankruptcy was filed; is that right?

4    A    Okay.

5    Q    What does line 1 of your statement of financial affairs

6    list for income for your wife in 2013?

7    A    Eighteen-thousand.

8    Q    Do you know -- do you remember what date you filed your

9    bankruptcy petition?

10   A    August, I believe, of 2013.

11   Q    So half of 2013 had passed when you filed this?

12   A    Right.

13   Q    What was your -- what was your wife's monthly income?

14   A    I think at that -- it was about -- her gross income was

15   maybe --

16   Q    Yeah.

17   A    -- 6,000 and change.

18   Q    $6,000 a month?

19   A    I think, yes, 65 or 64.  I'm not sure exactly.

20   Q    And so in August of 2013 you represented in your

21   bankruptcy petition that to year to date her income had been

22   $18,000 even though she was making $6,500 a month?

23   A    Right.  I mean, I don't know exactly.  I don't remember

24   -- recall what I had told my attorneys at the time.  But

25   then we had amended it because, you know, it wasn't correct.

1   Q    You amended your statement of financial affairs?

2   A    I believe the attorneys did so.

3   Q    Do you remember when you amended your statement of

4   financial affairs?

5   A    I'm not sure.

6   Q    It was June of last year, wasn't it?

7   A    I'm not sure.  I don't -- I really don't --

8   Q    But it was after this adversary proceeding was brought

9   objecting to your discharge on the basis of false statements

10  in your statement of financial affairs, wasn't it?

11  A    To be honest with you I don't recall.  I don't remember

12  when we did it.

13  Q    You don't remember when you filed an amendment?

14  A    I don't.

15  Q    Did you read the statement of financial affairs before

16  you signed it, before you filed your petition?

17  A    I did.

18  Q    Did you --

19  A    I looked --

20  Q    -- understand it?

21  A    Yeah.  For the most part, yeah.

22  Q    Turning to later in the statement of financial affairs,

23  question number 18.

24       (Pause)

25  A    Uh-huh.

1    Q    Question number 18 asks you to list all corporations

2    that you've been an officer, a director, or a managing

3    member of for the last six years before your bankruptcy

4    petition.  What did you list in question 18 on your

5    statement of financial affairs?

6    A    It doesn't show any.

7    Q    It is -- is the box marked none filled in?

8    A    Yes.

9    Q    Going down to question 19, question 19 asks you to

10   disclose the identity of bookkeepers and accountants who,

11   within two years preceding the bankruptcy, have kept or

12   supervised the keeping of books of account for the debtor.

13   Did you mark the box none in question 19?

14   A    Yes.  I mean, I personally didn't do this.  It was my

15   attorneys that did this, so I didn't -- you know, I can't

16   remember if I told them.  So I just -- I don't know how it

17   was not put in.

18   Q    That -- that's fine, Mr. Abraham.  Turn to the end of

19   the statement of financial affairs, the last page.  Do you

20   see it says, declaration under penalty of perjury by

21   individual debtor?

22   A    Sorry.  Where am I looking?

23   Q    It's the last page of the statement of financial

24   affairs, two pages after the one we were just talking about.

25   A    Right.

1    Q    And on this document it shows an S/ representing an

2    electronic signature, but that signature is a representation

3    from your attorney that you've signed this document --

4    A    Right.

5    Q    -- is that right?

6    A    Right.

7    Q    Did you sign this document?

8    A    Yes.

9    Q    Did you read this document before you signed it?

10   A    I did, maybe not as thorough as I should have.

11   Q    But you did read it?

12   A    Yeah.

13   Q    Did you understand it?

14   A    For the most part.

15   Q    I just have one more --

16   A    But --

17   Q    -- question about this document.  You're going to have

18   to go back a little bit.

19   A    Could I just -- in this same document, in 20 -- in

20   Number 21 it does list the corporations here.

21   Q    Oh, let's talk about paragraph 21, then.  Paragraph 21

22   opens with, "If the debtor is a partnership, list the nature

23   and percentage of partnership interests of each member of

24   the partnership."  Are you a partnership?

25   A    No.  I mean, I'm the owners of Amstan (ph), Amstan Real

1    Estate, and Asian Foods I have a partner.

2    Q    But are you a partnership or are you an individual?

3    A    I'm an individual.

4    Q    That's what I thought.  Let's turn back to Schedule C.

5    It follows right after Schedule B which we were looking at

6    before.  It's still part of Exhibit A.

7    A    Oh, okay.  Part of Exhibit A?  Schedule B?

8    Q    C.

9    A    C.

10    (Pause)

11    Q    It says, Schedule C property claimed as exempt.

12    A    Uh-huh.

13    Q    Do you know what this -- what this schedule lists?

14    A    I'm assuming just the assets.

15    Q    But, I mean -- what I mean is do you know why assets

16    are listed in this schedule?

17    A    No.

18    Q    No?  You don't know what function claiming an exemption

19    has?

20    A    Meaning to exempting myself?  I'm not sure exactly.

21    Q    Well, a Schedule C lists property that you have claimed

22    as exempt from the bankruptcy estate.

23    A    Okay.

24    Q    When you file a bankruptcy petition it creates an

25    estate that a trustee administers for the benefit of your

1    creditors.

2    A    Okay.

3    Q    You filed this schedule to exempt property out of that

4    saying under whatever statutory law you've listed in the

5    schedule this property belongs to you, not the bankruptcy

6    estate and can't be used to satisfy the debts of your

7    creditors.

8    A    Okay.

9    Q    Look at the second entry.  It says, land, a quarter

10   acre of land, lot 12, block 49 in Ocala Park Estates, Ocala,

11   Florida 34482.  What statutory section does it say provides

12   an exemption for that property in the schedule?

13   A    I'm sorry.  Say that again.

14   Q    For the second entry it lists a statutory provision

15   that gives you an exemption in that property.  What

16   provision does it say there?

17   A    I'm not following you.  I mean, when you --

18   Q    Does it say 11 U.S.C. --

19   A    Oh, right.  Okay.

20   Q    -- Section 522 --

21   A    Is that --

22   Q    -- (d)(5)?

23   A    Yes.

24   Q    Do you know what 11 U.S.C. Section 522(d)(5) is?

25   A    No.

1    Q    You don't know what it provides for?

2    A    No.

3    Q    Did you ask your attorney before you signed your

4    schedules?

5    A    I -- I mean, I didn't ask them what that means.

6    Q    Do you know how much property you're allowed to exempt

7    under 522(d)(5)?

8    A    I believe it was property with -- you can -- up to,

9    between a joint couple, 350,000 or something like that.

10    Q    Okay.  Who owns that quarter acre of land, you or your

11    wife?

12    A    I own that.

13    Q    You?  Not jointly with your wife?

14    A    No.  I mean, with --

15    Q    Who owns the other -- the second one, the other quarter

16    acre?

17            THE COURT:  Hold it.  Hold it.  Hold it.  Were you

18    going to finish that answer?

19            THE WITNESS:  With these properties I had

20    mentioned to my attorneys I don't need to keep it.  You can

21    liquidate it and, you know, take whatever you can from that.

22    I didn't want to hold any -- it's not something that I

23    really cared for.

24    Q    But you claimed an exemption in both of these

25    properties, didn't you?

1    A    I guess, but I think I had mentioned that.  I don't

2    know if it was a failure on my part or --

3    Q    Okay.  Well, let's ignore the land in Florida, then.

4         Move down to -- there's a checking account in Chase

5    Bank in Garden City with $1,600 in it.  Is that your account

6    or your wife's account?

7    A    That was our account.  Yes.

8    Q    Your --

9    A    Joint.

10    Q    -- joint account?

11    A    Yes.

12    Q    Okay.  What about the next one ending 2180, is that

13    your account or --

14    A    Joint --

15    Q    -- your wife's account?

16    A    Joint.

17    Q    That's joint.  What about the next one ending in 4831?

18    A    I believe --

19    Q    Is that joint or --

20    A    I believe that was --

21    Q    -- yours?

22    A    -- a joint account as well.

23    Q    I want to refer you back to the Schedule B, question

24    number 2.  You see it lists checking, savings and other

25    financial accounts?

1    A    Uh-huh.

2    Q    Do you see the column that says husband, wife, joint or

3    community?

4    A    Yes.

5    Q    What letter does it say for the first account there,

6    the account ending in 4667?

7    A    It says H.

8    Q    Do you understand what H stands for there?

9    A    Husband.

10    Q    Right.  So in your Schedule B you're representing that

11    the 4667 account belongs to you --

12    A    Okay.

13    Q    -- not your wife; is that right?

14    A    Okay.  Yeah.

15    Q    So going back to Schedule C, this first account, 4667

16    account, that belongs to you, not your wife?

17    A    Right.

18    Q    So it's not joint with your wife.  The only two

19    accounts that are joint with your wife are the other two?

20    A    I guess.  I mean, I didn't know, you know.  By looking

21    at it I wouldn't know it like this.  I would have to look at

22    my statements.

23    Q    Okay.  What about on the next page, the BMW?  Who owns

24    the BMW, you or your wife?

25    A    That's -- that was my car.

1    Q    Your car?  Purely yours, not hers at all?

2    A    Sorry.  Say that again.

3    Q    It belongs to you entirely, not to her at all; is --

4    A    Yeah.

5    Q    -- that right?

6    A    Yes.

7    Q    And the same is true for the Ford?

8    A    Correct.

9    Q    What is the amount of the exemption you requested to --

10   you claimed for the BMW pursuant to 522(d)(5)?

11   A    Fifteen-thousand.

12   Q    Fifteen-thousand is the current value of the property

13   without deducting the exemption.  The next column over

14   breaks down the two exemptions you claimed in the BMW.  The

15   bottom one is the one that's for 522(d)(5).  I -- it -- it

16   looks like it says $7,650; is that right/

17   A    I'm -- where are you looking?

18   Q    Schedule C.

19   A    Okay.

20   Q    Is that right?

21   A    Yeah.

22   Q    $7,650 in the BMW pursuant to 522(d)(5)?

23   A    Well, there -- there's two amounts, 7,350 and 7,650.

24   What is that?

25   Q    Right.  And there's two statutes.  There's 522(d)(2)

1    and 522(d)(5).

2    A    Okay.

3    Q    I'll represent to you 522(d)(2) is a federal law that

4    provides an exemption for household vehicle --

5    A    Okay.

6    Q    -- limited to $7,350.

7    A    Okay.

8    Q    For the Ford you claimed all of that exempt under

9    522(d)(5); is that right?

10   A    Right.

11   Q    Okay.  After you filed your bankruptcy petition you

12   were given a notice of a meeting of creditors; is that

13   right?

14   A    Yes.

15   Q    And that meeting of creditors was I believe in

16   September of 2013?

17   A    I think so.

18   Q    And you attended that meeting of creditors, right?

19   A    Right.  Yeah.

20   Q    And my -- the plaintiff, Janet Stuart, was at that

21   meeting of creditors, wasn't she?

22   A    Yes.

23   Q    You saw her?

24   A    Yes.

25   Q    And when your case was called isn't it true that the

1    trustee said there are no creditors here?

2    A    I don't recall that.

3    Q    Well, did any creditors come up to the table with you

4    when you -- when your case was called?

5    A    Actually, I think they did call for somebody to -- if

6    anybody had any objections to stand up, but nobody did.  But

7    I did --

8    Q    What did they say?

9    A    -- see her there.

10   Q    What did they say?

11   A    I don't remember exactly, but I believe they had said

12   someone -- if there were any objections to filing the

13   bankruptcy you could stand up or come forward, but I didn't

14   -- but no one did.

15   Q    But you don't remember exactly what was said?

16   A    I don't remember exactly, but I remember there was a

17   time when he had called for that.

18   Q    But you knew Janet Stuart was there?

19   A    Yeah.  She was there.

20   Q    And you never told the trustee that?

21   A    I didn't know I had to.

22   Q    I'm not suggesting you had to.  I'm just asking if you

23   did.

24   A    No, I didn't tell the trustee.  No.

25   Q    Okay.  I would like you now to turn to the tab marked

1    Joint Exhibit E.  Joint Exhibit E is an amended Schedule B

2    that you filed after your meeting -- meeting of creditors

3    with the trustee; is that right?

4    A    Yeah.

5    Q    And the difference between the amended Schedule B and

6    the original Schedule B is line 13, right?

7    A    Right.

8    Q    And on your amended Schedule B on line 13 you list

9    Amstan, LLC business dissolved; is that right?

10   A    Right.

11   Q    Did you list Amstan Real Estate, LLC on schedule -- on

12   your amended Schedule B?

13   A    I don't see it there.

14   Q    Did you list Ambient (ph) Pharmaceuticals, Inc.?

15   A    I don't see it there.

16          THE COURT:  But you have an ownership interest in

17   both those corporations?

18          THE WITNESS:  I did.  I just -- I mean, I -- like

19   I said, I don't know if I -- I think I had told my attorneys

20   about it.  I just don't know if it was a mistake between us.

21   It was not active, so.

22   BY MR. GAFFNEY:

23   Q    But you have a finance degree --

24   A    Right.

25   Q    -- from the State University of New York, right?

1    A    Right.

2    Q    I would like you now to turn to the tab marked Joint

3    Exhibit N.  That's N as in Nancy.

4        (Pause)

5    Q    Joint Exhibit N is the amended complaint that was filed

6    in this case in March of 2013.  Do you remember receiving a

7    copy of that?

8    A    I had a lot of these documents mailed to me.  I don't

9    remember exactly -- particularly this one, but there were a

10    -- a lot of them mailed and I would just forward it to

11    attorney -- the attorney.

12    Q    So you have no recollection of seeing the amended

13    complaint that was filed against you?

14    A    Like I said, I might -- I mean, a lot of the times when

15    I would receive it I would just give it to my attorneys.  I

16    wouldn't -- I didn't really look at it.

17    Q    I'm going to give -- come back to Joint Exhibit N in a

18    minute, but can you flip, please, to the tab marked Joint

19    Exhibit O?

20        (Pause)

21    Q    Joint Exhibit O is the answer that was filed on your

22    behalf in response to the amended complaint and it contains

23    a series of admissions and denials; is that correct?

24    A    Yeah.

25    Q    Did you authorize your attorney to file this document

1   on your behalf?  Did you read this document --

2   A    Most --

3   Q    -- before it was filed?

4   A    I mean, like I said, there was so many I don't recall.

5   Q    All right.  Turn to paragraph 27 in your -- in what

6   you're looking at now.  This is an answer to the allegation

7   in paragraph 7 of the amended complaint, which I'm going to

8   read to you.  The amended complaint says:

9           "Line 13 of Schedule B lists no stock ownership in

10       any incorporated or unincorporated businesses, but

11       defendant owns stock in businesses on the filing date.

12       Evidence of this is in the schedules themselves as

13       numerous debts owed by Amstan, LLC and Abraham Imports

14       Business are listed on Schedule F."

15          Can you read, please, your response to paragraph

16   27 from your answer?

17  A    You just want me to read what it says here?

18  Q    Yes, please.

19  A    "Defendant disclosed his relationship to both Amstan,

20       LLC and Abraham Imports.  Neither of these entities

21       have any assets or active, nor earning any profits in

22       the past several years and, thus, there is nothing of

23       value to disclose."

24  Q    Can you please show me where on Schedule B in your

25   original petition you disclosed your relationship to both

1   Amstan, LLC and Abraham Imports?  It will be in Joint

2   Exhibit A if you can find it.

3   A    And the -- actually, Abraham -- it's not Abraham

4   Exports (sic).  It was Abramin (ph), but it was -- like I

5   said there was no activity in any of these businesses so it

6   was just --

7   Q    So because there was no activity in these businesses

8   you just decided they didn't need to be listed.  Is that

9   what you're saying?

10  A    No.  It's just like -- like I said there -- I just --

11  it was not active so I just maybe forgot or I don't know if

12  I mentioned it to the attorneys and they just didn't list

13  it.  I don't remember exactly what happened.

14  Q    When did you found Abramin Imports?

15  A    I don't remember.

16  Q    Is Abramin Imports a successor entity from a changed

17  name from a previous entity you owned?

18  A    No.

19  Q    What's the new name of Ambient Pharmaceuticals?

20  A    Asian Foods and Produce Distributors.

21  Q    When did you change the name of Ambient Pharmaceuticals

22  to Asian Foods and Produce Distributors?

23  A    Early in 2013, I believe.

24  Q    What was Abramin Imports supposed to do?

25  A    Abramin, I was trying to -- I was going to import

1    coffee from India, but it just never panned out.

2    Q    When were you doing that?

3    A    This is a long time ago.  I can't remember exactly when

4    I started it.  I mean, I opened the corporation, but I never

5    did anything with it.  I was just researching and trying to

6    figure out -- my cousins actually had a company in India

7    that I thought I could import from, but it just never worked

8    out.

9    Q    Did you ever close the corporation?

10   A    I had asked my accountants to close it, so, I mean, I

11   don't know if they dissolved it, but I never had any

12   accounts or bank accounts or anything with any of these

13   corporations.

14   Q    Who is your accountant?

15   A    Vinad (ph) G. Abraham.

16   Q    Are you related to Vinad Abraham?

17   A    No.

18   Q    How long have you been using Vinad Abraham as your

19   accountant?

20   A    I had -- I used him a very long time.  I started when I

21   was younger and then for a -- for a year few years I think I

22   had -- for a few years I had left him and went to someone

23   else and then I came back to him not too long ago.

24   Q    Do you use him for your personal finances and your

25   businesses?

1    A    For both, yeah.

2    Q    Does he keep books and records for your businesses?

3    A    He does.

4    Q    For all of your businesses?

5    A    Yeah.

6    Q    Did you disclose that on your original petition?

7    A    Disclose what?

8    Q    That Vinad Abraham kept books and records for you and

9    your businesses?

10    A    I don't recall if I did or not.  And, actually, I had

11    mentioned to my attorney that for 2011 and 2012 we didn't

12    file any returns for Amstan Real Estate.  I have  -- I would

13    have to go back and amend it, but it was just not active so

14    we didn't file anything, any returns for that.

15    Q    Okay.  But he still had the books and records, right?

16    A    It was a zero return so there wouldn't be any books.

17    It's just -- you know, I didn't -- we didn't file the tax

18    return.

19    Q    What do you do with your books and records after you

20    file a tax return?

21    A    If I have them I keep -- if I have something I keep it.

22    Q    You keep it or your accountant keeps it?

23    A    I mean, my documents, I would keep it.

24    Q    So you have your books and records?

25    A    What -- when you say books and records what are you

1    referring to, invoices?

2    Q    Well, what I asked you was after you file your tax

3    returns for your businesses, what do you do with the books

4    and records, the supporting documentation that was used to

5    create that return?

6    A    I would keep it.

7    Q    You would keep it?

8    A    Yeah.

9    Q    How long?

10   A    For Amstan, LLC the -- that was one of the active

11   businesses that I had at that time.  I have all the records.

12   I still have it.

13   Q    Let's go back to Joint Exhibit A.  I apologize.  It's

14   very lengthy.  The statement of financial affairs again, at

15   the end of it, it comes right before your list of creditors.

16   Did you find it?

17   A    Uh-huh.

18   Q    Go to question 19, sub-question C.  What does sub-

19   question C ask you to list in your statement of financial

20   affairs?

21   A    Individuals or firms who are in possession of the

22   books.

23   Q    What does that mean to you?

24   A    Exactly what it says.  If --

25   Q    Okay.  How many firms or individuals did you list in

1    answer to that question?

2    A    In this it says none.

3    Q    But you had the books and records?

4    A    Right.

5    Q    Okay.  Let's go back to Joint Exhibit N, paragraph 35.

6    This is another paragraph that you denied in your answer.

7    The paragraph says, "Notwithstanding the declaration

8    described in paragraph 15(b) above, defendant's statement of

9    financial affairs is not true and accurate."

10            15(b) is a description of the declaration under

11    penalty of perjury that follows the statement of financial

12    affairs.  You denied that.  By denying a statement that

13    something is not true and accurate, what do you think that

14    means?

15    A    I didn't agree with it.

16    Q    Does it mean that it is true and accurate?

17    A    What do you -- I'm not understanding what you're

18    saying.

19    Q    If I say that your statement of financial affairs is

20    not true and accurate --

21    A    Right.

22    Q    -- and you deny that, is that a representation that it

23    is true and accurate?

24    A    Right.  Yeah.

25    Q    So your statement of financial affairs, according to

1    your answer, was true and accurate?

2    A    Right.  I mean, like I said, I --

3    Q    But you didn't list your accountant on the statement of

4    financial affairs.

5    A    Okay.

6    Q    And you didn't list yourself as the person holding your

7    books and records.

8    A    Yeah.  That was just -- like I said that's

9    miscommunication between myself and the attorney, I guess.

10   Q    And you declared that your wife year to date had earned

11   $18,000.

12   A    Right.  I believe we put all the --

13   Q    Now you've mentioned several times --

14           THE COURT:  Hold it.  Let him finish.

15           MR. GAFFNEY:  I'm sorry.

16           THE WITNESS:  I believe we put all the paystubs

17   and everything in the -- in the documents, right?  Yeah.

18           MR. GAFFNEY:  There were paystubs.  Yes.

19           THE WITNESS:  Yeah.  So, I mean --

20           MR. GAFFNEY:  I'm not asking you about the

21   paystubs.

22           THE WITNESS:  No. I mean --

23           THE COURT:  Let me ask -- hold it a second.

24           You amended the schedules a year some odd time

25   later; is that right?

1       THE WITNESS:  From the original, yeah.  I don't

2   remember exactly when it was amended, but we -- I believe

3   the attorneys did amend it.

4       MR. GAFFNEY:  Your Honor, I was just about to get

5   to that.

6       THE COURT:  Well, hold on.  Is the amended

7   document you filed true and accurate?

8       THE WITNESS:  I -- I don't remember exact -- I

9   don't remember at all exactly, but it should be to the most

10  part because everything I -- everything that I had --

11      THE COURT:  And is it different from the original

12  that you filed?

13      THE WITNESS:  I believe it includes the

14  corporations and things like that were not originally

15  listed.

16      THE COURT:  Can they both be true and accurate if

17  they're different?

18      THE WITNESS:  No.

19      THE COURT:  So then the original was not true and

20  accurate?

21      THE WITNESS:  Right.  Right.  Right.

22      THE COURT:  Okay.

23  BY MR. GAFFNEY:

24  Q    Turn in your book to the tab marked Joint Exhibit R,

25  please.

1           THE COURT:  Which tab?

2           MR. GAFFNEY:  R.

3   BY MR. GAFFNEY:

4   Q    Mr. Abraham, Joint Exhibit R is an amended schedule --

5   statement of financial affairs that you filed on June 6th,

6   2014.  Do you see question 1?

7   A    Yes.

8   Q    What does it say for your wife's income from

9   employment?

10  A    $86,507.78.

11  Q    Is $86,507.78 different or the same as $18,000?

12  A    It's different.

13  Q    And question 1 also lists $15,129 of income for you in

14  --

15  A    Right.

16  Q    -- 2012, right?

17  A    Right.

18  Q    How much income did you list for yourself in your

19  original statement of financial affairs?

20  A    I don't recall.  Was it zero?

21  Q    It was zero.

22  A    Okay.

23  Q    Let's go look at the other changes you made.  Flip to

24  paragraph 18 or question 18.  And then turn to the page

25  after where it says 18 where the answers are actually

1    listed.  Does this make any sense to you?

2    A    In the -- in the same -- you're saying --

3    Q    Yeah.  The answer to question 18, is that clear?  Do

4    you understand what that's trying to say?

5    A    It's just listing the corporations, correct?

6    Q    I'm not sure.  I'm asking you.

7    A    Yeah.

8    Q    Okay.  The second column asks you to list the last four

9    digits of social security or other tax -- individual

10   taxpayer ID number or the complete EIN.  What's listed in

11   that column for Amstan, LLC?

12   A    It says 5570.

13   Q    But is 5570 for Amstan, LLC?

14   A    No.

15   Q    Is it for Abramin Imports, Inc.?

16   A    No.

17   Q    What is it for?

18   A    That's the last four of my social security.

19   Q    Your social security.  How did you report -- when you

20   filed income taxes for these companies, did they have their

21   own EINs or were they part of your personal tax return?

22   A    Well, the LLC was part of the personal because it was

23   -- it's an LLC.

24   Q    But the corporation wasn't.

25   A    Right.

1    Q    The corporation --

2    A    But like I said Abraham --

3    Q    -- had EIN, right?

4    A    -- Abramin Imports I haven't filed anything in God

5    knows how long.  It's been very long because it was just

6    sitting there.

7    Q    But did Abramin Imports, Inc. have an employer

8    identification number issued by the IRS?

9    A    I think it did.  I'm not sure if I ever went that far.

10    Q    Under the column of address, what address is that?

11    A    That's the address of the Amstan -- the Subway that I

12    owned under Amstan, LLC.

13    Q    Okay.  And on question 19, sub-question A, you list

14    Vinad G. Abraham, CPA --

15    A    Right.

16    Q    -- at 4 Marietta Court, Syosset, New York 11791 as the

17    accountant that you've used since 11/2012.

18    A    Right.

19    Q    Who did you use as an accountant before November of

20    2012?

21    A    I believe it was still Vinad Abraham.

22    Q    Okay.  Turn the next -- to the next page, sub-question

23    C.

24           THE COURT:  Hold it one second.  Amstan, LLC never

25    filed a tax return?

1          THE WITNESS:  It did.  It closed -- I was evicted

2     actually in November of 2012 from that store.  So --

3          THE COURT:  So what did it file -- counsel asked

4     you whether it had an EIN number.

5          THE WITNESS:  It does.

6          THE COURT:  But it's not 5570.

7          THE WITNESS:  No.  That's my social security.  I

8     don't know.  That was just like they said.  I don't know --

9          THE COURT:  So the EIN number for Amstan, question

10    18, doesn't appear.

11         THE WITNESS:  The EI -- that's not the correct --

12    no.

13         THE COURT:  All right.

14         MR. GAFFNEY:  Okay.

15    BY MR. GAFFNEY:

16    Q    I thought you said that it was part of your personal

17    tax return?

18    A    It is filed -- I believe it is filed with my personal.

19    Q    But it had an EIN?

20    A    But it has its own EIN number.

21    Q    Okay.  Do you know that EIN?

22    A    I don't.

23    Q    All right.  Turning to the next page 19, sub-question

24    C, this is the same question --

25         THE COURT:  Hold it.  Hold it.  I got to ask.  You

1   showed on these schedules that you received about 16,000 in

2   income from that entity.

3           THE WITNESS:  From Amstan, LLC.  Correct.

4           THE COURT:  So that entity did business.

5           THE WITNESS:  It did.  Yes.  It was a retail

6   store, a Subway franchise.

7           THE COURT:  And so how did it file -- not file a

8   tax return?

9           THE WITNESS:  No.  No.

10          THE COURT:  You would get a K-1 from it, correct?

11          THE WITNESS:  I don't know how it works, but

12  because it's an LLC he -- they file it in the same -- I

13  think it's a -- I don't -- I think -- if you have the tax

14  returns you can show him --

15          THE COURT:  Yeah.  But you get -- it's a K-1 and

16  it should show all the income and that then becomes part of

17  you.

18          THE WITNESS:  Right.

19          MR. MCCAFFREY:  Your Honor --

20          THE WITNESS:  I mean, my accountants --

21          MR. MCCAFFREY:  May I just --

22          THE WITNESS:  -- did file --

23          MR. MCCAFFREY:  -- I want to interrupt just to

24  clarify --

25          THE COURT:  No.  No.

1          MR. MCCAFFREY:  -- a technical point.  I have the

2     2012 tax returns that I had planned on introducing.

3          THE COURT:  Okay.

4          MR. MCCAFFREY:  It wasn't filed as K-1.  It was an

5     S corporation as an LLC.  I can't speak as fully on it, but

6     I can --

7          THE COURT:  Where -- well, Amstan is an LLC.  It's

8     not an S corp.

9          MR. MCCAFFREY:  That's right, Your Honor, but

10    whether a corporation or an LLC can -- either can choose to

11    elect to be a C as for tax return filing.  And I don't want

12    to act as an expert here, but I have researched and spoken

13    with the accountant, they can file either as an S or a C,

14    not a corporation, let's say, but for purposes of tax

15    returns, yes.

16          And so there's a -- an income and expense sheet as

17    a S corp., even though it's an LLC, and that's represented

18    in Mr. Abraham's tax returns for Amstan, LLC.  And that's

19    the way his accountant did it and I spoke with another

20    accountant.  They said that's the proper way to do it.

21          THE COURT:  And he was the sole owner of the LLC?

22          MR. MCCAFFREY:  Correct.

23          MR. GAFFNEY:  My understanding was that single

24    member LLCs can be taxed disregarded entities, too.

25          THE COURT:  No.  Just --

1          MR. MCCAFFREY:  Because he's a single member.

2   That further explains --

3          THE COURT:  That's okay.

4   BY MR. GAFFNEY:

5   Q    Question 19(c) asks you to list all firms or

6   individuals who at the time of the commencement of this case

7   were in possession of the books and accounts -- books of

8   account and records of the debtor.  What did you list there?

9   A    Where is this?

10  Q    Question 19(c).

11  A    Yeah.  It says, none.

12  Q    But you had records, right?

13  A    I do.

14  Q    Question 21(a) says, "If the debtor is a partnership

15  list the name and percentage of partnership interest of each

16  member of the partnership," and you said, "see attached,"

17  and there's an attached schedule, right?

18  A    Right.

19  Q    And that schedule lists Amstan, LLC, Amstan Real

20  Estate, and Asian Food and Produce.

21  A    Where do you see that?

22  Q    It's at the back.  We're still on Exhibit R.

23  A    Okay.  Yeah.

24  Q    There are some typewritten sheets that are attached to

25  the back of that document?

1    A    Right.

2            THE COURT:  It's the last page --

3            MR. GAFFNEY:  Right.

4            THE COURT:  -- of the exhibit.

5            THE WITNESS:  Okay.

6            MR. GAFFNEY:  21(a).

7    BY MR. GAFFNEY:

8    Q    It lists Amstan, LLC, Amstan Real Estate, and Asian

9    Food and Produce, right?

10   A    Right.

11   Q    Does it list Abramin Imports?

12   A    No, it doesn't.

13   Q    Now not to belabor the point you also filed a second

14   amended statement of financial affairs on June 12th, 2004.

15   You'll find that at Joint Exhibit S.  Is there a difference

16   between this document and the document we were just looking

17   at?

18   A    I'm not sure.  I would have to look through it all.

19   Q    I see one.  Go to question 18.  There's a complete EIN

20   number now.  Is that the EIN for Amstan, LLC, for Abramin

21   Imports, or for Ambient Pharmaceutical?

22   A    I don't know by looking at it.  I would have to go back

23   and look at my tax --

24   Q    And Ambient Pharmaceutical wasn't listed on the last

25   document we -- we looked at either, was it?

1    A    Right.

2    Q    Or, no, actually maybe it was.  I don't remember.

3    Yeah.  It wasn't.  So you filed in this case a total of

4    three different statements of financial affairs; is that

5    right?

6    A    Yeah.

7    Q    And they're all different?

8    A    It looks that way.  Yeah.

9    Q    So is it fair to say that at least two of them are not

10    true and accurate?

11    A    Right.

12         MR. GAFFNEY:  I don't have any further questions

13    for this witness.

14         THE COURT:  Any cross?

15         MR. MCCAFFREY:  Yes, Your Honor.

16         THE COURT:  Okay.

17    CROSS-EXAMINATION

18    BY MR. MCCAFFREY:

19    Q    Mr. Abraham, do you have any intent --

20         THE COURT:  Can you go up to the podium, please?

21         MR. MCCAFFREY:  Oh, sorry.

22    BY MR. MCCAFFREY:

23    Q    Mr. Abraham, has it ever been your intent to deceive or

24    defraud this Court in any way?

25    A    Never.

1   Q    Have you done your best or have you --

2            MR. GAFFNEY:  Objection.  Leading.

3            MR. MCCAFFREY:  Well, I'm cross-examining.  I

4   don't --

5            THE COURT:  Let him finish the question before we

6   object to it.

7            MR. MCCAFFREY:  I'll withdraw that and just ask --

8   BY MR. MCCAFFREY:

9   Q    Have you made reasonable efforts to disclose all of

10  your assets and liabilities to this Court and to the trustee

11  that was appointed to oversee your case?

12  A    Yes.

13           MR. GAFFNEY:  Again, Your Honor, leading.  This is

14  his witness.

15           THE COURT:  Yeah.  I want to hear the answers.

16  Overruled.

17           THE WITNESS:  Yes.  Whatever I had I had given to

18  your office.

19  BY MR. MCCAFFREY:

20  Q    Did -- did you have any earnings in the six -- you --

21  when did you file the Chapter -- this Chapter 7 bankruptcy

22  case roughly?

23  A    I believe it was August of -- I don't remember exactly

24  -- August of 2013.

25  Q    Okay.  And did you personally have any earnings in the

1    six months prior --

2    A    No.

3    Q    -- to that period?

4    A    No.

5    Q    No?  And did your wife work during that --

6    A    She was working.

7    Q    Do you believe that would -- that information was

8    disclosed to the Court, your --

9    A    Yes.

10    Q    -- wife's income?

11    A    Yes.

12    Q    Okay.  What was Amstan, LLC?

13    A    It was a Subway franchise.

14    Q    And when did that open?

15    A    The actual corporation was opened I think back in 2008,

16    but it was just not being used, and since I had it I bought

17    the Subway under that corporation.

18    Q    And what happened to the Subway restaurant?

19    A    It was just --

20            THE COURT:  Can you hang on one second?  Did you

21    just say that you had no earnings within six months of the

22    filing of bankruptcy?

23            THE WITNESS:  Yeah, before the bankruptcy, yeah.

24            THE COURT:  So when you -- on one of your amended

25    schedules where you show you earned $15,129 --

1                THE WITNESS:  That was in --

2                THE COURT:  -- from Amstan --

3                THE WITNESS:  -- 2012.  My last day in Amstan was

4    November 2012, 11/20 is when I was evicted.  So I had earned

5    that -- during that year.  I had taken -- I would pay myself

6    by check.

7                THE COURT:  And your wife's income was from what

8    entity?

9                THE WITNESS:  She worked for a different -- she

10   worked for Monarch Realty Holdings.  It's another company,

11   none of my companies.

12               THE COURT:  Do you have anything to do with

13   Monarch?

14               THE WITNESS:  No, not at all.

15               THE COURT:  Any relative of yours have anything to

16   do with Monarch?

17               THE WITNESS:  No, none.

18               THE COURT:  Post-filing have you earned any money

19   from any of these companies?

20               THE WITNESS:  No.  From these companies, no.

21               THE COURT:  Did you earn any money from anything?

22               THE WITNESS:  Not -- no.  Only -- I mean, you're

23   saying after filing?

24               THE COURT:  Do you earn any money today?

25               THE WITNESS:  Yeah.  Now, I mean, I'm doing -- I'm

1   trying to -- like I said I was telling you I'm trying to do

2   wholesale through this company of like rice products.  So I

3   haven't really earned anything significant --

4              THE COURT:  And you own that company?

5              THE WITNESS:  Yeah.  I have a partner in it.

6              THE COURT:  Well, if you've never earned any money

7   for the years leading up -- where did you get the money to

8   start a company?

9              THE WITNESS:  My partner.

10             THE COURT:  So you contributed no money to it?

11             THE WITNESS:  No.

12             THE COURT:  And how much do you own of the

13  company?

14             THE WITNESS:  50/50.  It was -- I mean, my contact

15  and ideas and he was -- he just came on board as the

16  financial --

17             THE COURT:  So he put up all the money?

18             THE WITNESS:  Yeah.  He -- he put in the money.

19             THE COURT:  Okay.  I'm just curious.  Why did he

20  put up all the money for somebody who's never earned any

21  money?

22             THE WITNESS:  He's a friend of mine and we -- you

23  know --

24             THE COURT:  Yeah.  But you have a track record

25  that shows you don't earn a penny.

1            THE WITNESS:  Yeah.

2            THE COURT:  You've been completely unable to earn

3    any money according to you for a number of years.  Why is

4    the guy backing you in a business?

5            THE WITNESS:  I mean, he believed that we could

6    make it work.

7            THE COURT:  Why?  You've never earned -- you've

8    never successfully done anything?

9            THE WITNESS:  I know.  I don't know.  He just --

10   he believed in me.  I guess he just wanted to see it happen.

11   He was looking to diversify.  He's in the cell phone

12   business and he's just looking to diversify.  So he came in

13   with me.  He wanted to try something new.

14           THE COURT:  Because you have a good track record?

15           THE WITNESS:  No, not really track record, but,

16   you know, he didn't really look at my track record.  He's a

17   friend of mine and he just came in as a friend, I guess.

18           THE COURT:  So your friend -- how much did he

19   invest?

20           THE WITNESS:  Total I would have to look at the

21   exact numbers, maybe close to like $60,000 or more.

22           THE COURT:  And does the business make money?

23           THE WITNESS:  We make -- not -- we're not

24   profitable yet, but we look to be hopefully.

25           THE COURT:  Do you have a house?

1            THE WITNESS:  I do.  Yeah.

2            THE COURT:  What's your mortgage payments?

3            THE WITNESS:  Right now it's 2,300 and change.

4    It's -- we had to do a modification.

5            THE COURT:  Does that include taxes?

6            THE WITNESS:  Yeah.  We -- we're not living in the

7    home right now.  We're renting our house because we couldn't

8    really afford it when we were living there.

9            THE COURT:   When did you buy it?

10           THE WITNESS:  I bought it in 2006 or -- yeah,

11   2006.

12           THE COURT:  So where did you get the money to keep

13   paying the mortgage when you went through bankruptcy?

14           THE WITNESS:  We didn't.  That's why we had to do

15   the modification.  We weren't paying it for several --

16           THE COURT:  Were you renting it when you went

17   through bankruptcy?

18           THE WITNESS:  Yeah.  I believe -- we rented this

19   in --

20           THE COURT:  So where's the income from that rental

21   shown on your schedules?

22           THE WITNESS:  I don't know.  Is it -- did you list

23   that?

24           THE COURT:  No.  I can tell you it's not there.

25           THE WITNESS:  When did we file this -- when did I

1    -- no.  Actually, I rented this in 2014.

2             THE COURT:  Oh, so you --

3             THE WITNESS:  Yeah.  So --

4             THE COURT:  So how did you pay for the mortgage

5    when you weren't renting it?

6             THE WITNESS:  I mean, we would always -- I mean,

7    there were some things we could pay, some things we

8    couldn't, and we weren't -- like I said we were not

9    consistent paying our mortgage.  We had to do a

10   modification.

11            THE COURT:  But if you had no income, how do you

12   choose what you're paying?

13            THE WITNESS:  Well, my wife had income.  She was

14   working.

15            THE COURT:  So her $85,000 paid for the BMWs and

16   the house --

17            THE WITNESS:  Well, the BMW didn't have a loan on

18   it.  There was no loans on my car.

19            THE COURT:  How did you buy it?

20            THE WITNESS:  That -- my mother-in-law when we

21   first got married she -- my in-laws bought it as a gift for

22   us.

23            THE COURT:  Okay.

24   BY MR. MCCAFFREY:

25   Q    Speaking of the cars, Mr. Abraham, Mr. Gaffney asked

1    you about them.  And he -- it was pointed out in the

2    schedules that they're both listed as yours, as the husband,

3    and you own them, right?

4    A    Right.

5    Q    The titles are in your name?

6    A    Yes.

7    Q    Does your wife use one of those cars?

8    A    No.

9    Q    No?

10   A    The BMW I use and the other one is a van.

11   Q    What is the van used for?

12   A    It's not being used.

13           THE COURT:  Who bought those for you?

14           THE WITNESS:  The van was also like my in-laws and

15   every -- they just gave me, you know --

16   BY MR. MCCAFFREY:

17   Q    When you had the Subway restaurant, were you earning

18   money?

19   A    Just that little money that I had taken.  Whenever I

20   could deposit a check I would, but for the most part, no.

21   Q    What's the corporation that you're currently doing this

22   rice importing business under now?

23   A    Asian Foods and Produce.

24   Q    Had that been known by another name previously?

25   A    Yes.  Ambient Pharmaceuticals and Services.

1            MR. MCCAFFREY:  Your Honor, this is one of the not

2    agreed upon exhibits that I would like to offer into

3    evidence.  And I'll try to lay the foundation for it first,

4    but I just wanted to bring that to the Court's --

5            THE COURT:  What exhibit number?

6            MR. MCCAFFREY:  -- attention.  I submitted it to

7    the Court in my --

8            THE COURT:  Right.

9            MR. MCCAFFREY:  -- separate package as --

10            MR. GAFFNEY:  Is it Exhibit C?

11            MR. MCCAFFREY:  Yes.  Defendant's Exhibit C.

12            THE COURT:  C?

13            MR. MCCAFFREY:  C.

14            THE COURT:  Okay.

15            MR. MCCAFFREY:  There -- there are three different

16    printouts from the Department of State.  The first one I

17    would ask to focus on -- may I approach the witness?

18            THE COURT:  Sure.

19    BY MR. MCCAFFREY:

20    Q    Mr. Abraham, do you recognize this?

21    A    Yes.

22    Q    Can you tell the Court what it is?

23    A    Asian Foods and Produce Distributors.

24    Q    Whose company is that?

25    A    It's myself and a partner.

1   Q     Okay.

2           MR. MCCAFFREY:  And, Your Honor, I would ask it to

3   be accepted into evidence --

4           THE COURT:  I'm trying to find it.  What --

5           MR. MCCAFFREY:  I'm sorry.  It's --

6           THE COURT:  The first one I have is Amstan, LLC.

7           MR. MCCAFFREY:  Yes.  So it should be --

8           MR. GAFFNEY:  It's the third one, Your Honor.

9           MR. MCCAFFREY:  -- the third one back.

10          THE COURT:  What about the first one, are you

11  going to introduce that?

12          MR. MCCAFFREY:  I intend to introduce all three of

13  them in a day, Your Honor.

14          THE COURT:  All right.

15          MR. MCCAFFREY:  I don't mean to go out of turn,

16  but --

17          THE COURT:  We'll go to the third.

18          MR. MCCAFFREY:  -- we've been focusing on Asian.

19          THE COURT:  Did -- did Asian Food --

20          MR. GAFFNEY:  Your Honor --

21          THE COURT:  Did this entity exist prior to the

22  time you filed bankruptcy?

23          MR. MCCAFFREY:  Yes.  From -- reading from the

24  record it shows that it was converted, if you will, from

25  Ambient which existed as of September 30th, 2011 and it

1    changed names to Asian Foods and Produce Distributors on May

2    17th, 2013 approximately before filing.

3            THE COURT:  So the entity in which his friend

4    invested was -- was Ambient, not Asian.  Asian is the

5    successor to Ambient.  Is that what you're saying?

6            MR. MCCAFFREY:  Asian is the successor to Ambient.

7    Yes.  However --

8            THE WITNESS:  He -- no.  He invested in the Asian

9    Food and -- Ambient, there was nothing happening with both

10    Ambient or Asian Foods and then --

11            THE COURT:  Is Asian a new entity or is it a

12    successor entity?

13            THE WITNESS:  No.  It's a -- it -- the name of

14    Ambient Pharmaceuticals and Services was changed to --

15            MR. MCCAFFREY:  I think the proper term is

16    successor.

17            THE WITNESS:  Successor.  Right.

18            MR. MCCAFFREY:  It changed.

19            THE WITNESS:  Right.

20            THE COURT:  What's your objection?

21            MR. GAFFNEY:  I -- actually, I wanted to stand up

22    to let you know I have no objection to this --

23            THE COURT:  I would think --

24            MR. GAFFNEY:  -- any of these documents.

25            THE COURT:  I would think that.

1          MR. GAFFNEY:  If they want -- if he wants them

2    admitted into evidence, it's fine.

3          THE COURT:  Yeah.  No.  I would like them in the

4    record myself.  So, yes, they'll be admitted.

5       (Defendant's Exhibit Number C admitted)

6    BY MR. MCCAFFREY:

7    Q    When did Asian Foods and Produce Distributors begin to

8    do business in a profitable way, if at all?

9    A    Well, it's not profitable, but we started December of

10   2013.  Yeah.  But it's -- I mean, it's still not profitable.

11   Q    When you filed the bankruptcy in August of 2013 --

12         THE CLERK:  We're getting static over the system.

13   Can I shut it down?  I -- I hear static.  I don't know if

14   it's getting picked up.

15         MR. MCCAFFREY:  I hear it myself.

16         THE COURT:  Excuse me.

17         MR. MCCAFFREY:  I said I hear it myself.

18         MR. GAFFNEY:  I've been hearing it off and on.

19         THE CLERK:  It could be the papers.  Can you take

20   --

21         THE COURT:  Move the papers away.

22         MR. MCCAFFREY:  Oh, okay.  Is that better?

23         THE CLERK:  A little better, yes.

24         THE COURT:  All right.  Let's go.

25         MR. MCCAFFREY:  All right.

1    BY MR. MCCAFFREY:

2    Q    What was the status of Ambient Pharmaceuticals and

3    Services when you filed the bankruptcy?

4    A    It was just an idea.  We didn't do anything with it.

5    Q    Did it ever make any money?

6    A    No.  It never operated at all.

7    Q    Referring, which is also Exhibit C, Your Honor, within

8    the Division of Corporations printouts to Abramin Imports.

9            MR. MCCAFFREY:  I don't know if it's necessary to

10    go through the format with the witness, Your Honor.  If the

11    Court would just take notice that next to where it says,

12    "current entity status" it says "inactive" and "dissolved by

13    proclamation as of January 27th, 2010."

14            THE COURT:  Is your argument that the company

15    existed on the date that the petition was filed, but was

16    inactive, or the company didn't exist?

17            MR. MCCAFFREY:  That it did not exist.

18            THE COURT:  So if it didn't exist, why do you need

19    -- what's the purpose of --

20            MR. MCCAFFREY:  Well, he was -- it was -- he was -

21    - on the hostile direct it was questioned, I believe, Your

22    Honor, Abramin Imports, and it seems to be -- I mean, the

23    nature of the proceeding is to find out, I think, in

24    essence, whether or not Mr. Abraham has intentionally --

25            THE COURT:  But clearly he did own it at least up

1    till January 27th, 2010.

2             MR. MCCAFFREY:  Yes, Your Honor.  And I believe

3    the statement of financial --

4             THE COURT:  All right.  We'll let it in.  We'll

5    admit it.

6             MR. MCCAFFREY:  -- affairs did require him to

7    disclose this thing for six years.

8             THE COURT:  Right.

9             MR. MCCAFFREY:  However, I -- well, I'll say --

10   we'll save that for our closing statement.

11            THE COURT:  Well --

12            MR. MCCAFFREY:  I'm just trying to -- I'm bringing

13   up certain points, Your Honor.

14            THE COURT:  You want to admit all of Exhibit C,

15   correct?

16            MR. MCCAFFREY:  Yes.

17            THE COURT:  And counsel has no objection, then.

18            MR. MCCAFFREY:  Okay.  Yes.

19            THE COURT:  So all of Exhibit C is in.

20            MR. MCCAFFREY:  Okay.

21            THE COURT:  Once all of Exhibit C is in, the

22   witness has already testified that he owns these things and

23   they weren't on his schedules.  I'm not sure what's left

24   here.  What's left here?  What's left to this 727 case?

25            MR. MCCAFFREY:  Okay.

1              THE COURT:  I mean, I'll let you go on asking him

2      questions.  I'm not in my own mind sure what we're doing

3      now.

4              MR. MCCAFFREY:  Well -- all right.  Just to answer

5      Your Honor's question, I don't know, you know, about

6      turnovers, maybe saving it for an introductory statement or

7      ending statement.

8              THE COURT:  You don't have to save it.  It's a

9      simple question.  I've written decisions on it --

10             MR. MCCAFFREY:  I don't think --

11             THE COURT:  -- which hold --

12             MR. MCCAFFREY:  I'm trying to establish -- and

13     I'll -- so I'll say it in an oral --

14             THE COURT:  Just say it.

15             MR. MCCAFFREY:  -- form.

16             THE COURT:  Just say it.

17             MR. MCCAFFREY:  That Mr. Abraham -- there are

18     mistakes on the petition.  Quite frankly -- and much to my

19     chagrin and I tried to do very well.  I think we were

20     implementing the best case at the time -- there were

21     mistakes.  I looked to correct them.  I think in no way,

22     shape or form has Mr. Abraham or his wife ever intentionally

23     with any intent to deceive this Court withheld anything.  He

24     has no further assets than what he has disclaimed.  He was

25     not working.  He -- as Mr. Gaffney astutely pointed out,

1    yes, he has a business degree and he's failing and failing

2    over and over again, hence his bankruptcy filing.

3          THE COURT:  But as a matter of fact now both

4    parties have agreed, or at least the record reflects --

5    forget what you agree -- that there were three amendments --

6    two amendments to the original petition.  The original was

7    completely lacking, then there was a second amendment which

8    was partially lacking, and then the third one which maybe

9    full or not.

10          But as a matter of law, the fact that he filed

11   under oath schedules that were false and misleading as

12   admitted and as part of the record.  He knowingly signed it,

13   wasn't in a comma.  He signed it.  He is a man who has a

14   degree so he has some relative intelligence.  He admitted he

15   read it, maybe not as well, but he read it.  I wrote the

16   Nazzarro (ph) decision in Desabier (ph) and the Arique (ph)

17   decision which seem to me to be directly on point.

18          So I'm trying to figure out why there's anything

19   left in this case.

20          MR. MCCAFFREY:  Your Honor also wrote the

21   Rockstone (ph) decision in which Your Honor said that it

22   held, ruled, and I think it was in the part of the holding

23   and not a dictum that it has to have -- in order to be not

24   dischargeable it has to be an intent to deceive and fraud or

25   a complete reckless and cavalier disregard.  And I'm here to

1    make the case that Mr. and Mrs. Abraham, or specifically the

2    defendant, did no such thing.

3            THE COURT:  I understand that.  So --

4            MR. MCCAFFREY:  And --

5            THE COURT:  -- do you --

6            MR. MCCAFFREY:  -- in the Rockstone case the man

7    had three Viper cars worth hundreds of thousands of dollars

8    in his garage.  Mr. Abraham is a young man, you know, trying

9    to make his way and then -- and really we're here --

10            THE COURT:  I'm not -- sir, I'm not saying what

11   the answer is.

12            MR. MCCAFFREY:  Okay.

13            THE COURT:  I'm just saying that for the issue

14   before the Court there are no issues left other than for me

15   to determine on the record from the record whether this is a

16   case that fits within Nazzarro or not because there are no

17   issues anymore as to whether or not because there are no

18   issues anymore as to whether or not what was -- that the

19   schedules were false.  There's no issue he read them.

20   There's no issue he signed them.  There's no issue that he

21   did it multiple times.  There's no issue he consulted with

22   counsel.

23            So the question for the Court is whether I believe

24   from the record that that demonstrates something that's

25   liable under 727 or not.  But I don't think there's a lot

1    else to do in this case.  There's no purpose in the 523

2    really, depending on what I do on the 727.

3            MR. MCCAFFREY:  Okay.

4            THE COURT:  Would you agree?

5            MR. GAFFNEY:  I would agree with that if you rule

6    in my favor on the 727, but obviously I would like to

7    conduct my case in chief --

8            THE COURT:  No.  I --

9            MR. GAFFNEY:  -- on that point.

10            THE COURT:  I understand that.  But I'm just

11    laying the groundwork here.  The only issue on the 727 is

12    whether I believe that this -- that he operated in a manner

13    that is -- which is (indiscernible) over 727.  The

14    underlying facts are all established now.  There's no

15    question about the petition.  There's no question about the

16    schedules.  There's no question about whether he signed it.

17    There's no question what he knew.  None of those are issues

18    anymore.  It's all in the record.  There's no question that

19    he owned the entities that weren't disclosed.

20            So the only question is whether I believe that

21    this debtor did that in a manner that fits within the

22    statute of 727 or not.  There's no factual questions left.

23    There's not even questions of law left.  I just have to make

24    that decision.

25            MR. MCCAFFREY:  I agree as -- it's a pretty blank

1   on the canvas.  However, I would like to reiterate just --

2   and I know that Your Honor is astutely listening to all the

3   proceedings.  But that when we use say, for instance,

4   disclosure, maybe something wasn't put in the right place,

5   but in his original statement of financial affairs under

6   Article -- excuse me -- under paragraph 21 Amstan, LLC,

7   Amstan Real Estate, and Asian Foods were all disclosed.

8   Their existence wasn't hidden.  It was in a wrong paragraph.

9          You know, I -- my plea to the Court is that it's a

10  mistake, but not one that was intentionally meant to

11  deceive, hide assets, or -- you know, because he has any

12  nefarious intent here.

13          THE COURT:  All right.  I got that.  I understand

14  that's the position that you guys have, that he did it but

15  he didn't mean it.  So I don't need any more on the 727.

16          MR. MCCAFFREY:  Well -- but if I may, just --

17          THE COURT:  You can finish building whatever

18  record you want.

19          MR. MCCAFFREY:  For the record, I --

20          THE COURT:  That's fine.

21          MR. MCCAFFREY:  -- you know, also because we --

22  well, as Your Honor stated, I think that the 2011 and '12

23  tax returns were part of the joint exhibits, although I just

24  want to - -for housekeeping I think the book that I had

25  gotten from Mr. Gaffney --

1          MR. GAFFNEY:  Was sent out before I got those from

2    you.

3          MR. MCCAFFREY:  Okay.  So I just wanted to make

4    sure that they are part of the Court's record as a joint

5    because I know that I sent them in my defense exhibits which

6    --

7          THE COURT:  What exhibit will it be?

8          MR. MCCAFFREY:  That would be the --

9          MR. GAFFNEY:  Exhibit Y.

10         MR. MCCAFFREY:  That would be Y and it's marked as

11   Y, but it --

12         THE COURT:  I have Y.  I have the tax returns.

13         MR. MCCAFFREY:  Okay.  Yeah.  The tax returns --

14         THE COURT:  And all these exhibits are coming in

15   now without objection, correct?

16         MR. GAFFNEY:  Not all of them.  I object to

17   Exhibits A and B --

18         THE COURT:  Well, sir, if you -- when you have a

19   -- your direct case are you going to put anybody on other

20   than this witness?

21         MR. MCCAFFREY:  Earlier I was planning on calling

22   Amy Abraham, and she's --

23         THE COURT:  If not, we'll go through the exhibits

24   now.  If you intend to call somebody else, I'll go through

25   it when you put your own case on.

1          MR. MCCAFFREY:  I would still like to call Amy

2    Abraham.

3          THE COURT:  All right.  That's fine.  So we'll

4    wait on the exhibits -- on your exhibits.

5          MR. MCCAFFREY:  Okay.

6          THE COURT:  But we have admitted now Exhibit C

7    without objection --

8          MR. MCCAFFREY:  Right.

9          THE COURT:  -- so that's part of the record.

10          MR. MCCAFFREY:  And Y is clearly there, the tax

11    returns.  So I don't want to belabor the Court, but

12    continuing with the pattern that we have at the moment, Your

13    Honor, I would like to point out to the Court through the

14    witness or directly to Your Honor that within these tax

15    returns, particularly the 2012 tax return, is listed in

16    Schedule C, profit and loss from business, Amstan, LLC.

17    These tax returns were provided to Mr. Mendelsohn (ph), the

18    Chapter 7 trustee.

19          I know I make that statement.  Now I -- I can't

20    completely verify that.  I asked Mr. Mendelsohn to verify

21    that.  He said he doesn't keep a direct record and he's not

22    allowed to keep tax returns so he can't overtly confirm

23    that.  I asked him to potentially put a letter onto the ECF.

24    As he stated to me that was his -- it's his -- no debtor

25    goes through and gets a discharge without him having seen

1    their prior two year tax returns.  But he declined.  I

2    thought it best not to go through -- look to subpoena him to

3    come here today.

4            But, again, I stated this on behalf of my client

5    for the purpose of revealing to the Court that, you know,

6    his income, his wife's income, his assets and liabilities

7    were all disclosed to the trustee and, therefore, you know,

8    via the trustee to this Court.

9            MR. GAFFNEY:  Your Honor, just for the purpose of

10   maintaining the record I would like to enter an objection to

11   Mr. Mendelsohn's testimony.  It's inadmissible hearsay.

12           THE COURT:  It's not for any value.  I mean, it

13   can't be for the truth of it.  So that's your view of what

14   Mr. Mendelsohn may or may not think, but I don't know what

15   that means.

16           I'm trying to figure out on these tax returns,

17   just looking at it briefly --

18           MR. MCCAFFREY:  2011 --

19           THE COURT:  -- it shows --

20           MR. MCCAFFREY:  -- or '12?

21           THE COURT:  2012.  That's the most recent?

22           MR. MCCAFFREY:  Yes.  Well, that -- for the

23   record, yes.

24           THE COURT:  He filed 2013?

25           MR. MCCAFFREY:  He has.  I have them.

1              THE COURT:  And yet that's not part of this?

2              MR. MCCAFFREY:  Well, no, it wasn't asked for.  We

3      filed in August --

4              THE COURT:  All right.

5              MR. MCCAFFREY:  -- 2013.

6              THE COURT:  It shows on line 14 a loss of

7      $231,683.  For businesses that weren't doing any business

8      how could you lose that much money?  What's that loss

9      represent if there was no business going on?

10             MR. MCCAFFREY:  Well, to do my best at it, Your

11     Honor, you know, I --

12             THE COURT:  I don't think you're the one to ask --

13             THE WITNESS:  That was --

14             THE COURT:  -- about the tax return.

15             THE WITNESS:  That -- I believe that what they

16     need -- did was because I was being -- I had lost the store,

17     so all the loan that was on that -- on that place, the 200

18     -- it was 235,000 or 231,000 at the time.  That was -- I

19     believe that's what that 231 loss is because I was evicted

20     in November of 2012.

21             THE COURT:  You took as a loss the loan you didn't

22     pay?

23             THE WITNESS:  I don't know exact -- I have to

24     confirm with my accountant, but I believe he --

25             THE COURT:  But where else would you lose

1        $231,000?

2                  THE WITNESS:  Yeah.  That --

3                  THE COURT:  If you say you had a business that

4        wasn't doing any business.

5                  THE WITNESS:  Right.  I mean, it was -- when you

6        say it wasn't -- it was doing business, but it was just a

7        loss -- I had lost money there.

8                  THE COURT:  Which business was this that was doing

9        business?

10                 THE WITNESS:  Amstan, LLC, the Subway franchise.

11                 THE COURT:  But you weren't -- you got no money

12       from it?

13                 THE WITNESS:  Right.  I mean, that's --

14                 THE COURT:  So that the whole -- the loss was an

15       operating loss?  What was the loss from?

16                 THE WITNESS:  I don't know how he categorized it.

17       I don't -- I would have to talk to him about it.  But --

18                 THE COURT:  You don't know that?  Okay.

19                 Now you also show on line 38 --

20                 THE WITNESS:  Is it --

21                 THE COURT:  -- 100,000 --

22                 THE WITNESS:  -- is it in here that I could look

23       at, in the book?

24                 MR. GAFFNEY:  Not in that book, no.

25                 THE WITNESS:  No?

1          THE COURT:  Oh, give him your -- it's your

2    exhibits.

3          MR. MCCAFFREY:  Yeah.  Let me give him the

4    exhibit.

5       (Pause)

6          THE WITNESS:  In Form 4797, I think it says -- I

7    think that's where it's showing that loss, the Subway

8    franchise.

9          THE COURT:  What?

10         THE WITNESS:  In the Form 4797 in the tax return.

11         MR. MCCAFFREY:  It's about eight pages in.

12         THE COURT:  So your wife reported income, gross

13   income in 2012 of $70,700 --

14         THE WITNESS:  On the --

15         THE COURT:  -- according to your tax returns and

16   her W2s, and her employer was Convermat (ph) Corporation --

17         THE WITNESS:  Right.

18         THE COURT:  -- Great Neck.

19         THE WITNESS:  Convermat.

20         THE COURT:  What does that have to do with

21   Monarch?

22         THE WITNESS:  So what happened, they -- she had --

23   she's -- she worked for Monarch.  She was being paid from

24   Convermat Corporation, but now they switched over.  They're

25   paying her now from Monarch Realty.  It's both the same

1    owners of the companies.  Convermat is their main business

2    and their real estate division is Monarch Realty.  I believe

3    -- they wholesale paper or tissue paper or something like

4    that.

5            THE COURT:  Okay.  When did you open this Subway

6    -- that Subway approximately?

7            THE WITNESS:  It was April of 2010.

8            THE COURT:  So for 2011 you showed a total loss of

9    $13,000 from it.

10           THE WITNESS:  In 2011?

11           THE COURT:  And in 2012 you showed 200-and-some-

12   dod-thousand-dollar loss.

13           THE WITNESS:  I -- yeah.  I mean, I don't know how

14   my account did it, but I don't know if it's --

15           THE COURT:  You don't know how your accountant did

16   it?

17           THE WITNESS:  Yeah.  When he says the losses, I

18   think that's because I lost the place when I was evicted.

19           THE COURT:  No.  If you look within the schedules

20   it will show the itemized losses from royalties and

21   everything -- or expenses.

22           And in 2011 you're Stanley Abram (sic), correct?

23           THE WITNESS:  Abraham, yes.

24           THE COURT:  Abraham.  You showed an income of

25   $587,977.

1           THE WITNESS:  The gross on the store, yes.

2           THE COURT:  No.  This is your tax return.

3           THE WITNESS:  Yeah, for Amstan, LLC?  Are you

4    looking at the --

5           THE COURT:  I don't know what it's for.

6           THE WITNESS:  -- profit and loss?

7           THE COURT:  I can't keep up with this.  I can't

8    tell you what it's from.

9           MR. MCCAFFREY:  This is --

10          THE COURT:  You showed an ultimate loss of 13 --

11   you had --

12          MR. MCCAFFREY:  Your Honor, if I may --

13          THE COURT:  -- gross income of 352,000 in 2011.

14          MR. MCCAFFREY:  If I may, the debtor and his wife

15   filed a joint tax return in 2011.  This is just the Schedule

16   C profit and loss statement --

17          THE COURT:  Right.

18          MR. MCCAFFREY:  -- for the business.  Okay.

19          THE COURT:  But there's still $582,000 from the

20   business.  Your petition and schedule show the most you ever

21   made was 15,000.

22          THE WITNESS:  I mean, that's gross income.  I

23   think what you're talking about is the next -- what I --

24          THE COURT:  I --

25          THE WITNESS:  -- was able to --

1          THE COURT:  I understand that.

2          THE WITNESS:  -- take home.

3          THE COURT:  So it shows wages of 66,000.  That's

4   not you even though it's in your tax return?

5          THE WITNESS:  Where is that?

6          MR. MCCAFFREY:  Line 26.

7          THE WITNESS:  Oh, the wages were employees that

8   were working there.

9          THE COURT:  Okay.  It's part of the record.  Well,

10  it may or may not be part of the record.  Is there an

11  objection to this coming in?

12         MR. MCCAFFREY:  No.  This was --

13         MR. GAFFNEY:  No.  This was part of the joint

14  exhibits.

15         THE COURT:  Oh, okay, good.

16         MR. MCCAFFREY:  As Y.

17         THE COURT:  So it's part of the record so I'll

18  deal with it.

19     (Pause)

20         THE COURT:  Okay.  You can continue.

21  BY MR. MCCAFFREY:

22  Q    Mr. Abraham, do you own any of the real property other

23  than what was listed in your petition?

24  A    No.

25  Q    And that is the file -- the house --

1   A    My house.  Yeah.

2   Q    -- in New Hyde Park?

3   A    And there was two lots of land in Florida that I had

4   bought.

5   Q    Have you ever owned any other real property?

6   A    No.

7   Q    Do you own any vehicles other than the two listed on

8   your petition?

9   A    No.

10  Q    Do you have any other assets of substantial value --

11  A    No.

12  Q    -- paintings, stocks --

13  A    No.

14  Q    -- bonds, cash in your house?

15  A    No.

16      (Pause)

17          MR. MCCAFFREY:  Your Honor, I have no further

18  questions of Mr. Abraham at this juncture considering trying

19  to -- that we're focusing on the same -- as your -- on the

20  727 issue of the case.

21          THE COURT:  All right.  That's what -- if there's

22  a -- if you want to call him in your case, you can call him.

23          MR. MCCAFFREY:  Okay.

24          THE COURT:  It's a little --

25          MR. GAFFNEY:  I have a --

```
 1              THE COURT:  -- disjointed, but you can have cross

 2    --

 3              MR. GAFFNEY:  I have a brief follow up.

 4              THE COURT:  -- or redirect.  I'm sorry.

 5    REDIRECT EXAMINATION

 6    BY MR. GAFFNEY:

 7    Q    Just so that the record is clear, the corporation that

 8    you use now for your import business that you're trying to

 9    do with your partner, that's the Asian Foods and Produce?

10    A    Asian Foods and Produce, correct.

11    Q    Which is the same entity as Ambient Pharmaceutical,

12    right?  It --

13    A    Yeah.  It was --

14    Q    -- just changed the name?

15    A    I just changed the name.  Right.

16    Q    And Ambient Pharmaceutical was founded in 2011?

17    A    Right.

18    Q    And the name change occurred in May of 2013, right?

19    A    Correct.

20    Q    When did your partner give the money?

21    A    I think it was in January -- January -- December or

22    January of -- January of 2014, I believe.

23    Q    When did he tell you he was going to give you the

24    money?

25    A    Around that same time we were -- you know, we were --
```

1    like I said with Ambient we wanted to do the pharmaceutical

2    packaging, but it never panned out.  We never did anything

3    with it, and then we had talked about maybe doing this

4    business, you know, and we were doing kind of some research

5    on trying to find people who can supply rice and then I --

6    you know, I had approached him around that time.

7    Q    How long did it take you to work out the details of the

8    membership agreement?

9    A    Not long.  I mean, it was --

10   Q    Two months?

11   A    Like I said he was my friend so it was within the same

12   time -- time frame.

13   Q    Two months, three months, less?

14   A    Probably less, yeah.  I mean, I think I approached him

15   around the same time we started actually operating.

16   Q    Did you claim your interest in Asian Foods and Produce

17   as exempt on your Schedule C?

18   A    I'm not sure.  I don't know.

19   Q    Well, the record reflects that you didn't?

20   A    I didn't or I did?

21   Q    Yeah.  You -- you can take a look.  It's in Joint

22   Exhibit A.

23           THE COURT:  Have him look at it, please.

24       (Pause)

25           THE WITNESS:  Where am I looking?

1          MR. GAFFNEY:  Look at Schedule C.

2          THE WITNESS:  Okay.

3    BY MR. GAFFNEY:

4    Q    Tell me where it lists Asian Foods and Produce as an

5    exempt asset.

6    A    I don't see it listed there.

7    Q    Huh?

8    A    I don't see it listed there.

9    Q    That's because it's not.

10   A    Okay.

11   Q    And that's because that -- that schedule was generated

12   automatically by a computer program that takes information

13   from your Schedule B and allows you to assign exemptions to

14   it.

15          Go back to your Schedule B, line 13.  Does it list

16   Asian Foods and Produce there?

17   A    No, it doesn't.

18   Q    When did you rent your house?

19   A    I think it was March of 2014 or --

20   Q    Is that -- that's when the tenants moved in?

21   A    March or April, yeah.

22   Q    How long was it on the market?

23   A    I mean, it wasn't very long.  I just asked around.  I

24   wanted somebody we knew so that, you know, we didn't run

25   into any issues.

1   Q    So the tenants are friends of yours?

2   A    They're -- I mean, I know them from someone that goes

3   to my church, and then my partner actually recommended them.

4   Q    When did you and your wife decide that you needed to

5   rent the house out?

6   A    I think it was the beginning of that year.  We were

7   kind of debating on what we should do.

8   Q    Okay.

9           MR. GAFFNEY:  I have nothing further.

10           THE COURT:  All right.  You can step down.

11           MR. MCCAFFREY:  Your Honor, may I just ask one

12   follow up question of the witness to clarify?

13           THE COURT:  One.

14           MR. MCCAFFREY:  Thank you.

15   RECROSS-EXAMINATION

16   BY MR. MCCAFFREY:

17   Q    Did your partner give you money for Asian Foods?  Can

18   you clarify that statement?  What does it mean that he gave

19   you money?  What happened -- you said your partner invested

20   money.

21   A    He invested.  Correct.

22   Q    What -- be more particular.  What was the nature of

23   that?

24   A    He invested into the business for 50 percent of the

25   business.

1    Q    And how -- what transpired?  Did money go into your

2    personal account?

3    A    No.  Everything is in the business.

4    Q    The business account?

5    A    Yes.

6    Q    Is he a signatory on the account?

7    A    Yes.

8    Q    All right.

9              MR. MCCAFFREY:  No further --

10             THE COURT:  You owned 100 percent of the business,

11   correct?

12             THE WITNESS:  I own -- no.  No.  We're 50/50.

13             THE COURT:  To start you owned 100 percent --

14             THE WITNESS:  Yeah.

15             THE COURT:  -- of the business.

16             THE WITNESS:  Initially.

17             THE COURT:  He gave you or he contributed capital

18   to the business --

19             THE WITNESS:  Right.

20             THE COURT:  -- and he got 50 percent of the

21   business.

22             THE WITNESS:  Correct.

23             THE COURT:  Therefore you sold 50 percent of the

24   business.

25             THE WITNESS:  Right.

1            THE COURT:  Thank you.

2            THE WITNESS:  Okay.  Should I --

3            THE COURT:  You can sit down.

4            THE WITNESS:  Oh.

5            THE COURT:  Do you have any other witnesses, sir?

6            MR. GAFFNEY:  Yes, Your Honor.  The plaintiff

7      calls the plaintiff, Janet Stuart.

8            THE COURT:  All right.  You can have Ms. Abrams

9      come back in.

10           MR. MCCAFFREY:  I'll --

11        (Pause)

12           THE CLERK:  Can you please stand and raise your

13     right hand?

14                 JANET STUART, WITNESS, SWORN

15           THE CLERK:  Can you please state and spell your

16     name for the record?

17           THE WITNESS:  Janet Stuart, J-A-N-E-T S-T-U-A-R-T.

18           THE CLERK:  Okay.  You can sit down, ma'am.  Thank

19     you.

20     DIRECT EXAMINATION

21     BY MR. GAFFNEY:

22     Q    Good morning, Ms. Stuart.

23     A    Good morning, sir.

24     Q    I was going to ask you your name and address, but the

25     clerk just did so we'll move on.

1              Ms. Stuart, how old are you?

2    A    Seventy-eight years old.

3    Q    What's your level of education?

4    A    Masters' Degree from Columbia University in public

5    health.

6    Q    When did you get your masters' degree?

7    A    1979.

8    Q    Are you working now?

9    A    No, sir.

10   Q    Are you retired?

11   A    Yes.

12   Q    When did you retire?

13   A    2001 --

14   Q    What was --

15   A    -- January.

16   Q    I'm sorry.

17   A    January 2001.

18   Q    What was the last job you had before you retired?

19   A    Director of nursing.

20   Q    Where?

21   A    At Greater Harlem Nursing Home.

22   Q    How long were you at that position?

23   A    About three to five years.

24   Q    Do you know the defendant, Stanley Abraham?

25   A    Yes, I do.

1   Q    How do you know him?

2   A    I was introduced to him by his father-in-law.

3   Q    Who is his father-in-law?

4   A    Thomas John.

5   Q    Was Thomas John his father-in-law at the time that he

6   introduced him to you?

7   A    No.  They weren't married yet.

8   Q    Who weren't married?

9   A    Mr. Abraham and --

10  Q    And his wife?

11  A    -- his wife.

12  Q    Do you know when they got married?

13  A    2006 during the summer.

14  Q    Were you at the wedding?

15  A    Yes, I was.

16  Q    How many people were at the wedding?

17  A    I guess about 200, 250.

18  Q    How did you know Thomas John?

19  A    I met Thomas John in 2001 through a family friend.

20  Q    And what would -- how would you describe the nature of

21  your relationship with Thomas John?

22  A    It was a friendly relationship --

23  Q    Did you ever --

24  A    -- and a business --

25  Q    -- lend him money?

1    A    Yes, I did.

2    Q    When did you first lend him money?

3    A    May 2001.

4    Q    Did he pay you back?

5    A    The first seven years he did.

6    Q    When did he stop paying you back?

7    A    2008 to 2010.

8    Q    Did there ever come a time when you lent money to the

9    defendant?

10   A    Yes.

11   Q    When?

12   A    August -- September 23rd, 2009.

13   Q    Are you sure that's the right date?

14   A    July 21st, 2009.

15   Q    How much did you lend him?

16   A    $50,000.

17   Q    Why did you lend him $50,000?

18   A    Well, he asked me to loan him $75,000.

19   Q    Who asked you?

20   A    Stanley Abraham.

21   Q    How did he ask you?

22   A    Pardon me.  Excuse me.

23   Q    How did he ask you to lend him money?

24   A    By talking to me.

25   Q    Did he call you?

1    A    Yes.

2    Q    When?

3    A    It was the -- about the middle of July 2009.

4    Q    And what did he tell you about the money?

5    A    I asked him what for.  He said he wanted to extend his

6    real estate.

7    Q    And so you lent him $50,000?

8    A    Yes.

9    Q    How did you pay it to him?

10   A    Would you rephrase that, please?

11   Q    In what form did you give him $50,000?

12   A    It was a banker's check from me to him.

13   Q    Ms. Stuart, I would like you now to flip in the binder

14   in front of you to Joint Exhibit N?

15   A    What exhibit, please?

16   Q    N as in Nancy.

17   A    Now this document has already been entered into the

18   record as an exhibit.  I would like you to just turn to the

19   end of the document.  There's a section marked Exhibit B,

20   one page.  Do you recognize this document?

21   A    Yes, I do.

22   Q    What is it?

23   A    It's a cashier's check to Stanley Abraham from me for

24   $50,000.

25              THE COURT:  What was the interest rate?

1          THE WITNESS:  I did not charge interest.  It is

2    our custom --

3          THE COURT:  Did you charge Mr. John interest?

4          THE WITNESS:  Yes.

5          THE COURT:  How much did you charge him?

6          THE WITNESS:   At first, Your Honor, he said it --

7    I could -- he will pay $20,000 -- 20 percent.  And I said,

8    no.  That's a lot.  He says, okay, 15.  I says, no, ten

9    percent.  If you want -- you know, when you pay me back if

10   you want to add ten percent that would be alright.

11         THE COURT:  Other than Mr. John and Mr. Abraham

12   here, did you ever loan any money to anybody else?

13         THE WITNESS:  Yes, to my friends --

14         THE COURT:  To your friends?

15         THE WITNESS:  -- to my family.

16         THE COURT:  Do you charge them interest?

17         THE WITNESS:  No.  It's our custom, Your Honor.

18         THE COURT:  Excuse me.

19         THE WITNESS:  It is our custom.  When we lend

20   money you pay back the amount you're loaned.  If you decide

21   you want to give some extra, fine.  But I don't ask for it.

22         THE COURT:  Do you ever get extra?  Do people just

23   voluntarily give you more money back?

24         THE WITNESS:  Some times, some family member.

25         THE COURT:  Has anybody never -- ahs anybody other

1    than this debtor not paid you?

2              THE WITNESS:  Yeah.

3              THE COURT:  So you loan money at no interest to

4    people who may or may not pay you back.  Is that what you

5    do?

6              THE WITNESS:  That's correct because I don't ask

7    for interest.

8              THE COURT:  Is there anything in writing that

9    reflects this loan?

10             THE WITNESS:  Your Honor, excuse me.  Which loan

11   are we talking about?

12             THE COURT:  The loan to this debtor, Mr. Abraham,

13   75,000, is there anything you have in writing that shows

14   that he owes you the money?

15             THE WITNESS:  Nothing other than the cashier's

16   check.

17             THE COURT:  And the other folks who don't pay you

18   back, do you sue them?

19             THE WITNESS:  No.

20             THE COURT:  What do you do, do you just forget it?

21             THE WITNESS:  Well, the other person was $250.

22             THE COURT:  But other than the $250, have you ever

23   loaned more than $75,000 to anybody?

24             THE WITNESS:  Yes.

25             THE COURT:  What's the most you ever loaned to

1    anybody?

2              THE WITNESS:  To Thomas John it's $1,086,27.

3              THE COURT:  One-million?

4              THE WITNESS:  Yes, over a period of two years.

5              THE COURT:  And you didn't charge any interest on

6    that?

7              THE WITNESS:  No.  He's the one that decided he

8    wanted to pay interest.  I just wanted my money back.

9              THE COURT:  And he demanded to pay you more money

10   than you wanted?

11             THE WITNESS:  Yeah.  He said he would pay

12   interest.

13             THE COURT:  So you have a million -- this -- these

14   are your funds, nobody else's, correct?

15             THE WITNESS:  No.  These are all my funds,

16   everything.

17             THE COURT:  Okay.

18   BY MR. GAFFNEY:

19   Q    Let's go off of that.  Ms. Stuart, how did you earn

20   those funds?

21   A    I worked several jobs.  I would work a regular job, you

22   know, a seven to 7 p.m. job and at the same time I taught at

23   Long Island University, and then I opened a school that I

24   taught at, and I make jewelry.  I do stain glass and a

25   couple of other things that I earn money from.  I didn't'

1   have debts because my mortgage was paid.  My house was put

2   -- fully paid, and I got money from my husband.

3   Q    How long were you working before you retired?

4            THE COURT:  Well, I -- I'm not real interested in

5   how she got the money.  You really don't have to establish

6   that.  I don't -- that's -- she's not the issue here.  The

7   -- when you loaned the money to this debtor, Mr. Abraham,

8   did he show you any history of ever being successful in

9   anything?

10           THE WITNESS:  No.  I didn't ask for a history.  As

11  far as I know he was doing fine.

12           THE COURT:  And you didn't ask for any collateral?

13  You didn't ask for a mortgage or a note or anything?

14           THE WITNESS:  No, Your Honor.  I -- he worked at

15  the same real estate that I worked at so I know he was

16  getting a salary or, you know, selling houses or whatever

17  else he was doing.

18           THE COURT:  And no lawyer was involved in any of

19  these transactions?

20           THE WITNESS:  No.

21           THE COURT:  Was there anybody else present when

22  you gave him the money or when you made the deal, whatever

23  the deal was?

24           THE WITNESS:  I gave his father-in-law, Thomas

25  John, the check of $50,000 to give to Mr. Abraham.  I called

1    and asked him if he got it.  He said yes.

2              THE COURT:  Okay.

3    BY MR. GAFFNEY:

4    Q    Ms. Stuart, was this check cashed?

5    A    Yes.

6    Q    How do you know?

7    A    Because at the back of the check -- I have the copy.

8    It was check -- it was cashed July 22nd, 2009.

9    Q    And do you recognize the signature on the back of that

10   check?

11   A    Yes, sir.

12   Q    Whose is it?

13   A    It's Stanley Abraham's.

14   Q    Now this $50,000, was that the only amount that you

15   lent Mr. Abraham?

16   A    No, sir.

17   Q    How much did -- how much did you lend him in total?

18   A    $25,000 more.

19   Q    When did you lend him the additional $25,000?

20   A    It was August the 3rd, 2009.

21   Q    Why did you lend him the additional $25,000?

22   A    Because originally he requested 75,000 and that 25 was

23   the balance of the 75.

24   Q    Did he ask you for it?

25   A    Yes.

1    Q      When?

2    A      Towards the end of July.

3    Q      How did you pay the 25,000?

4    A      He gave me his account number at Citibank and I

5    transferred the $25,000 there.

6    Q      Can you flip back in the exhibit in front of you two

7    pages to Exhibit A?  Backwards, the other direction, yeah.

8    Is this the record of the wire transfer going out of your

9    account?

10   A      Yes.  It's an account wire transfer notification.

11            THE COURT:  Let's see if we can speed this up a

12   little.  Do you guys stipulate that this -- Ms. Stuart gave

13   your client -- and I use that term loosely -- 70 -- he

14   received $75,000 from her?

15            MR. MCCAFFREY:  Received.  We recognize the

16   transaction, yes.

17            THE COURT:  And to date no monies have been paid

18   back?

19            MR. MCCAFFREY:  My client has not paid Ms. Stuart

20   any money.

21            THE COURT:  Okay.

22            MR. MCCAFFREY:  But my position is that --

23            THE COURT:  Well --

24            MR. MCCAFFREY:  -- my client --

25            THE COURT:  -- that's a different question.  I'm

1    just -- factually, there's no issue that Ms. Stuart gave

2    your client -- transferred --

3              MR. MCCAFFREY:  Transferred.

4              THE COURT:  -- I'll use that word -- to your

5    client $75,000.  And that as of this date your client hasn't

6    paid back any of that 75.  Whether he was required to or not

7    is a separate issue.  But you stipulate that he got it and

8    hasn't paid her back any money yet.

9              MR. MCCAFFREY:  Yes.

10             THE COURT:  Okay.

11   BY MR. GAFFNEY:

12   Q    Ms. Stuart, according to the terms of your agreement

13   with Mr. Abraham, when was he supposed to pay you back?

14   A    September 2009.

15   Q    What did you do when he hadn't paid you back?

16   A    I saw him at the office and I asked him for my money.

17   Q    And what did he say?

18   A    He doesn't know me.  He doesn't know why I'm asking him

19   for money.  He didn't get -- doesn't have any money from me.

20             THE COURT:  He said he doesn't know you?

21             THE WITNESS:  Yes.

22             THE COURT:  Wasn't he the one that asked you for

23   the money?

24             THE WITNESS:  Yes.

25   BY MR. GAFFNEY:

1    Q    Weren't you at his wedding?

2    A    Pardon me.

3    Q    Weren't you at his wedding?  You were at his --

4    A    Yes.  Yes.

5    Q    -- wedding, right?

6    A    Yes.  I used to see him all the time at the office.

7                THE COURT:  What office?  Hold it.  What office?

8                THE WITNESS:  The real estate office where he

9    worked and where I worked.

10                THE COURT:  You both worked at the same real

11    estate firm?

12                THE WITNESS:  Yes.

13                THE COURT:  What firm was that?

14                THE WITNESS:  What did they call it, American

15    Gardens -- American Gardens --

16                THE COURT:  So in 2009 he worked in this real

17    estate office?

18                THE WITNESS:  Yeah.  He was there.  He had an

19    office there.

20                THE COURT:  What did he do?

21                THE WITNESS:  I was supposed to sell real estate.

22                THE COURT:  Excuse me?

23                THE WITNESS:  I was a real --

24                THE COURT:  Not you, him.  Do you know what he

25    did?

1          THE WITNESS:  Well, he was a broke -- a mortgage

2    broker.  That's what he said.

3          THE COURT:  Okay.

4    BY MR. GAFFNEY:

5    Q    Who owned that real estate company?

6    A    Thomas John, his --

7    Q    Thomas John is the defendant's --

8    A    -- his father-in-law.

9    Q    -- father-in-law.  Did you ever sue Thomas John and the

10   defendant?

11   A    Yes, I did.

12   Q    When?

13   A    This was in 2010.

14   Q    2010?

15   A    2010 I hired an attorney.  So it would be about -- I

16   think I hired the attorney around March and the three

17   defendants got letters from my attorney regarding the loan.

18          THE COURT:  When you sued him had you stopped

19   working there?

20          THE WITNESS:  Yes.  I stopped working in 2001.

21          THE COURT:  No.  You said you were in the real

22   estate office in 2009.

23          THE WITNESS:  Yeah.

24          THE COURT:  When did you stop working at that real

25   estate office?

1          THE WITNESS:  Around about 2011.

2          THE COURT:  And when you stopped work was the

3    debtor still working there?

4          THE WITNESS:  Yeah.

5          THE COURT:  So he had an office and he was working

6    in 2011?

7          THE WITNESS:  By that time I -- no.  That time

8    they had moved to Hillside Avenue.  The office was at

9    Hillside Avenue and he had --

10          THE COURT:  But to your knowledge --

11          THE WITNESS:  -- a desk there.

12          THE COURT:  -- he was still working there?

13          THE WITNESS:  Yeah.

14          THE COURT:  Okay.

15    BY MR. GAFFNEY:

16    Q    How much did you demand from Sammy Abraham in the state

17    lawsuit in 2010?

18    A    $75,000.

19    Q    Did there ever come a time that you learned of the

20    bankruptcy filing?

21    A    When I received a notice from the bankruptcy clerk's

22    office that there was a creditors' meeting.

23    Q    When was the creditors' meeting?

24    A    It was September 26, 2013 I think.

25    Q    Did you attend that meeting?

1   A    Yes, I did.

2   Q    What time was --

3           THE COURT:  2000 -- I didn't' hear her.  2000

4   what?

5           MR. GAFFNEY:  '13.

6           THE WITNESS:  Yeah.

7           THE COURT:  Hadn't he filed bankruptcy in 2012

8   also?

9           MR. GAFFNEY:  He filed in -- well, he did file in

10  2012, but I -- that case was dismissed for failure to file

11  schedules.

12          THE COURT:  And the lawsuit was commenced in what

13  year?

14          MR. GAFFNEY:  2010.

15          THE COURT:  So at some point in 2012 that lawsuit

16  was stayed?

17          THE WITNESS:  Yeah.  It was stayed.

18          MR. GAFFNEY:  I would suppose it would be, yes.

19  But I don't think that -- I don't think that that previous

20  case included any schedules or a list of creditors.  I don't

21  believe that Ms. Stuart ever --

22  BY MR. GAFFNEY:

23  Q    Ms. Stuart, were you ever notified of the 2012

24  bankruptcy?

25          THE COURT:  It doesn't matter.  That's not the

1    point.

2              THE WITNESS:  No.

3              THE COURT:  Now his -- did you sue Mr. John as

4    well?

5              THE WITNESS:  Yes, all three defendants.  It's --

6              THE COURT:  What happened to that case because

7    that's not stayed by the bankruptcy?

8              THE WITNESS:  Well, it's stayed by the Court in

9    Queens.  We asked that it would be stayed so I could

10   continue with the bankruptcy case.

11             THE COURT:  Okay.

12   BY MR. GAFFNEY:

13   Q    Did you attend the creditors' meeting?

14   A    Yes, I did.

15   Q    What time was it?

16   A    I think it was at 9:30.  I got there about 8, 8:30.

17   Q    And where was it?

18   A    It was in this building on the lower floor.

19   Q    Was the defendant there when you arrived?

20   A    Not as soon as I arrived, no.

21   Q    But he did eventually arrive?

22   A    Yes.

23   Q    Did he see you there?

24   A    Yes.

25   Q    How do you know?

1    A    Because when he saw me he looked to his wife and said,

2    Janet is here.

3    Q    Where were you sitting?

4    A    I was sitting in the second row of benches near the

5    table where the trustee would sit.

6    Q    Was the Abrahams' case the first one called?

7    A    No.  I think there --

8    Q    How many cases were --

9    A    -- other cases.

10    Q    -- called before his, do you remember?

11    A    I don't recall the amount, but there were other cases.

12    Q    What happened when the Abrahams' case was called?

13    A    When the case was called the Abrahams went to the table

14    and the trustee said there are no witnesses.  I didn't say

15    anything because he's a judge.  I'm not going to interrupt a

16    judge and I did not know what the procedures were because I

17    had never been to Bankruptcy Court.  So I sat there and

18    listened to what was going on and decided, Your Honor, that

19    after the case I would go to the clerk's office and find out

20    what was the procedure that -- from then on.

21            And they told me I can get the forms to fill out

22    and it's $293.  I paid it.  I took the forms home with me

23    and I came back October the 11th and I gave them the forms

24    and they were filed then.  They stamped it and it was filed

25    then.

1             THE COURT:  Is this a no asset case?

2             MR. GAFFNEY:  According to the docket, yes.

3             MR. MCCAFFREY:  Yes, Your Honor.  There were no

4    discovery of assets.

5             THE COURT:  So she never had to file a proof of

6    claim.  Okay.  All right.  Go ahead.

7             THE WITNESS:  Pardon me.

8             THE COURT:  Nothing.  Go ahead.

9    BY MR. GAFFNEY:

10   Q    Ms. Stuart, if you had had the opportunity, is there

11   anything you would have told the trustee at the meeting?

12   A    Yes.

13   Q    What would you have told him?

14   A    I would have told the trustee that they owed me $75,000

15   and I had not been repaid.  I'm still waiting to get my

16   money.

17   Q    Would you have told him about -- had you seen -- had

18   you read the bankruptcy petition at that point?

19   A    I think it was just two sheets of paper I got from the

20   clerk inviting me to the meeting and just a few pages and it

21   said I didn't have to attend, but I thought I should and I

22   did attend.

23   Q    Ms. Abraham (sic), in your binder can you please turn

24   to Exhibit Tab F?

25   A    Excuse me.

1          THE COURT:  Counsel, are you trying to establish

2     what she would have told somebody months ago?  What's the

3     point of the question?

4          MR. GAFFNEY:  The point of the question is that

5     the debtor knew that there were creditors there and when the

6     trustee says there are no creditors there, it -- it at least

7     speaks to his intent when he conceals that fact from the

8     trustee by not speaking up.

9          MR. MCCAFFREY:  Your Honor --

10         MR. GAFFNEY:  Well, there's nothing the witness

11     can --

12         MR. MCCAFFREY:  Your Honor, that's not the way it

13     proceeds in the 341.  The trustee says, are there any

14     creditors present.

15         THE COURT:  Hold it.  Do you have an objection?

16     Raise it.  What's --

17         MR. MCCAFFREY:  That's -- I'm -- pardon me.

18     That's my objection as to the content of the statement and

19     the factual --

20         THE COURT:  Is it hearsay, is it -- give me some

21     objection.  I don't want a speech.

22         MR. MCCAFFREY:  Well, I believe what I'm objecting

23     to is -- it's -- it would be hearsay.  Mr. -- well, Mr.

24     Gaffney is now testifying to events that happened in a room

25     that he was not in.  So it's --

1          THE COURT:  Well, I'm not sure he's doing that.

2     But I don't think that --

3          MR. MCCAFFREY:  I don't want to interrupt you, but

4     --

5          THE COURT:  What -- I'm not sure that it's

6     relevant to me whether the debtor sitting at a 341 should or

7     shouldn't advise a trustee that some party who is suing him

8     is there.  I don't know what that -- a lot of other things

9     in this case -- because we've already established that we

10    have petitions, schedules that are false, the question being

11    did he intend something.  We already have testimony that he

12    got the 75,000.  We already have testimony that none of it

13    was -- without regard to whether it should have been paid

14    back because that will be counsel's issue -- the money has

15    gone back to this person.  We have testimony that there's

16    nothing to document any of this.

17          So I think that it may cloud the record

18    unnecessarily to develop a line of questions about what a

19    person would have said at a point in time.  She sued him so

20    we know what she thinks.  She sued him prior to the time

21    they had filed bankruptcy and now she's bringing a complaint

22    saying it's non-dischargeable.  I'm not worried about what

23    her view is.  Whether she would have raised that to Mr.

24    Mendelsohn or not I don't know the point because you

25    ultimately did bring the complaint.  It's not that your time

1    ran out and you didn't bring it.  The complaint was brought

2    on a timely basis in this case.  So I don't know that it's

3    that relevant to me the fact that she did not speak at the

4    341 or that it would have been as relevant if she said I did

5    speak and complaint to Mr. Mendelsohn then.  I'm not sure

6    that that converts any -- the debtor's intent one way or

7    another.

8            MR. MCCAFFREY:  It only seems to want to rub a

9    little dirt on the debtor for something he wasn't obligated

10   to do.

11           THE COURT:  You're ahead of the game.  You really

12   don't want to add anything right now.

13           MR. GAFFNEY:  Well, Your Honor, if I may, the

14   point that I wanted to invoke was speaking to the 727 issue;

15   that the issue of the debtor's intent and I think the Court

16   should be looking at the totality of the circumstances with

17   respect to the debtor's --

18           THE COURT:  Well, as a legal --

19           MR. GAFFNEY:  -- composure and behavior during --

20           THE COURT:  -- term totality of the circumstances

21   is to decide what the legal standard is for the 727.  But

22   the 727 has to do with the filing in -- of what he put down

23   in the petition.  The record reflects what we've just said

24   and it reflects that your client feels what she believes

25   which is encompassed in her complaint.  The fact that she

1    would have reiterated those things to the trustee I accept -

2    - everybody accepts that.  If she had another chance she

3    would stand up and tell the -- tell the story of the 341.

4    I'm not sure that colors one way or another what the legal

5    standard is, at least as this Court views it, the role of a

6    debtor in a 727.  It has nothing to do with the 523.

7            MR. GAFFNEY:  Yeah.

8            THE COURT:  So I don't -- I mean, I would -- I'm

9    not sure of the relevance of it.  I think you border on

10   hearsay problems.  So I think you just go through that.  In

11   other words, I want to end the questioning on that issue

12   about what she would have done at a 341 had she been asked

13   because I think by -- if we were dealing with a question

14   about whether you can file the complaint and the time -- if

15   we were a year passed --

16           MR. GAFFNEY:  Right.

17           THE COURT:  -- closing the 341, then I understand

18   it.

19           MR. GAFFNEY:  I mean, Your Honor --

20           THE COURT:  But for this purpose I don't think you

21   need it.

22           MR. GAFFNEY:  -- Your Honor, it -- just if I may,

23   the defendant has by counsel raised on several occasions in

24   hearings before this case the fact that the debtor has

25   technically been issued a discharge.  This action was

1    brought before the discharge deadline, but due to an error

2    in checking the boxes it only alleged a 523 claim --

3              THE COURT:  But testimony is not going to change

4    that.  That's an issue I have to deal with.

5              MR. GAFFNEY:  Okay.

6              THE COURT:  I mean, it's not all unusual or -- I

7    mean, when a complaint is on the record no discharge should

8    be grant.

9              MR. GAFFNEY:  But the complaint was only alleging

10   523 at the time, so that's why I think the discharge was

11   granted.

12             THE COURT:  But then the Court granted an

13   amendment to the complaint.  We'll deal with that.  Okay.

14   But I don't think that this testimony goes to that issue at

15   all.

16             MR. GAFFNEY:  Okay.  In that case I'll move on,

17   Your Honor.

18   BY MR. GAFFNEY:

19   Q    Ms. Abraham, did you --

20   A    Stuart.

21   Q    I am -- I apologize profusely.  Ms. Stuart --

22   A    Yes.

23   Q    -- did you ever receive notice of the defendant's

24   September 4th, 2012 bankruptcy case?

25   A    No.

1    Q    Did you ever receive notice of his November 20, 2012

2    bankruptcy case?

3    A    No, sir.

4            MR. GAFFNEY:  I have nothing further.

5        (Pause)

6    CROSS-EXAMINATION

7    BY MR. MCCAFFREY:

8    Q    Good morning, Ms. Stuart.

9    A    Good morning.

10   Q    My name is Brian McCaffrey.  I think you and I have met

11   before here in the courtroom and your attorney's office,

12   correct?

13   A    I'm sorry.  I didn't hear you.

14   Q    You and I have met before here in the -- in this

15   courthouse?

16   A    Yes.  Yes.  Yes, we have.

17   Q    Ms. Stuart, including the $75,000 that you say Stanley

18   Abraham is indebted to you for, you say that the total

19   amount owed to you in your complaint in the State Court and

20   in your complaint in this case is roughly $1,118,000; is

21   that correct?

22   A    Originally, yes.

23   Q    Well, has it changed?

24   A    It has changed because there were credit cards that

25   Thomas John used and did not pay me for a total of $154,000.

1    And there was -- I had to borrow $175,000.  There were late

2    fees, bank fees and --

3              THE COURT:  Hold it.  Whose credit cards were

4    these?

5              THE WITNESS:  Mine.

6              THE COURT:  How did he use your credit cards?

7              THE WITNESS:  Because he would borrow money from

8    the credit cards to begin with.

9              THE COURT:  Well, he -- they were your credit

10   cards?

11             THE WITNESS:  They were my credit cards.

12             THE COURT:  Did you give them to him?

13             THE WITNESS:  At first, yes.  I loaned them to

14   him.  But they were -- he kept using them and I didn't know.

15             THE COURT:  And he ran up a balance of $175,000?

16             THE WITNESS:  $154,000 and change.

17             THE COURT:  On how many credit cards?

18             THE WITNESS:  Thirteen.

19             THE COURT:  You had thirteen credit cards --

20             THE WITNESS:  Yes.

21             THE COURT:  -- that you let somebody use --

22             THE WITNESS:  Because I did not -- first, our

23   friend -- family friend, Sing Modi (ph), told me that Mr.

24   John is very credible.  He has integrity.  He's honest, and

25   other people were letting him use their credit cards and --

1           THE COURT:  Credit card interest rate --

2           THE WITNESS:  -- if I would do it.

3           THE COURT:  -- is higher than a loan shark.

4           THE WITNESS:  I didn't know.

5           THE COURT:  So who borrows off of credit cards if

6    you're an honest, credible businessman?  Did you ever think

7    about this?

8           THE WITNESS:  No, sir.  I just trusted Sing Modi

9    and Thomas John.

10          THE COURT:  Did they ever pay you back that --

11          THE WITNESS:  What -- they were paying it all

12   along and then they stopped paying it, and then all the fees

13   and they kept using the credit cards and they --

14          THE COURT:  Didn't the credit card companies come

15   after you?

16          THE WITNESS:  No.  When I found out I started

17   paying because I did not want to damage my credit.  See, I

18   did not use credit cards and at that time, you know --

19          THE COURT:  So you don't believe in using credit

20   cards, but you had 13 credit cards.

21          THE WITNESS:  Yeah.

22          THE COURT:  Why did you have 13 credit cards?

23          THE WITNESS:  Because they were given to me.  They

24   used to send --

25          THE COURT:  But you don't use credit cards.  Why

1   did you take 13 credit cards?

2              THE WITNESS:  But when I traveled, you know, we

3   would -- I would use a credit card for the plane ticket and

4   the hotel, but that was rarely, you know.  If I took cash I

5   would pay cash.  But I -- you know, those cards were given

6   to me because I had no debt and when I had debt I paid on

7   time.  I had a good record.  So I was entrusted with the

8   cards.

9              THE COURT:  Okay.  None of that -- I'll tell you

10   both.  None of this makes any sense to me.

11             THE WITNESS:  I know.

12             THE COURT:  I don't know -- I'm not talking to you

13   right now.

14             I don't know what's going on here, but the theory

15   that somebody is putting out hundreds of thousands or a

16   million dollars with no interest, that $175,000 is run up on

17   a credit card.  Now I'm not sure what that has to do with

18   this debtor, but go ahead.  I don't get it.  I've seen a lot

19   of things and I know this doesn't make any sense.  So I know

20   I'm not getting the right story from any of them.  None of

21   this makes any sense.

22             THE WITNESS:  Your Honor --

23             THE COURT:  Ma'am, please don't.  And I think the

24   727 is probably what I'm going to focus on, but let's

25   continue to go if you want.

1          MR. MCCAFFREY:  I'll try to be as brief as

2    possible, but we would like to get a few points on the

3    record --

4          THE COURT:  It's okay.

5          MR. MCCAFFREY:  -- Your Honor.

6    BY MR. MCCAFFREY:

7    Q    So I just want to clarify the question.  Ms. John (sic)

8    you're -- various --

9    A    Stuart.

10   Q    -- venues in the State Court here you're suing for --

11   all right -- as you've added more fees roughly a $1,200,000;

12   is that generally correct?

13   A    Would you please state that?

14   Q    $1,200,000 is that close to the number you're saying

15   you're owed total?

16   A    $1,200,027 to Thomas John.

17   Q    And --

18   A    $75,000 to Mr. Abraham.

19   Q    Is the $75,000 that you state Stanley Abraham owes you

20   included in that larger number?

21   A    No.

22   Q    It's above and beyond?

23   A    It's -- yes.

24   Q    Well, then, we have to take --

25          THE COURT:  So you have a -- hold it one second.

1    You have a $1,250,000 give or take in cash outstanding

2    today?

3              MR. GAFFNEY:  It's not outstanding.  I -- those

4    were my savings except for the --

5              THE COURT:  No.  But you sued somebody for a

6    million some odd dollars, that means you lost -- somebody

7    owes you a million dollars --

8              THE WITNESS:  Yes.

9              THE COURT:  -- which means you had to have a

10   million to give it to them.

11             THE WITNESS:  Yes.

12             THE COURT:  So you --

13             THE WITNESS:  Loaned.

14             THE COURT:  -- had a bank account that had

15   whatever it had in it --

16             THE WITNESS:  Yes.

17             THE COURT:  -- and it now has a 1,200,000 less --

18             THE WITNESS:  Yes.

19             THE COURT:  -- right?

20             THE WITNESS:  Yes, Your Honor.

21             THE COURT:  Okay.

22   BY MR. MCCAFFREY:

23   Q    I guess it will take a little time, but then I'm going

24   to have to ask you to be sure on the record, ma'am, that

25   this $75,000 is in addition to the claims that you're making

1    against Thomas John because --

2    A    Yes.

3    Q    -- the record doesn't reflect that, ma'am.  The State

4    Court filings here all reflect and the promissory note that

5    you signed -- and I'll go through them one by one -- all

6    reflect that the $75,000 is included within the total

7    outstanding claim that you say you have.  So before I go

8    through piece by piece of the amended complaint, the initial

9    complaint, the amended summons of the complaint, and

10   additionally amended complaint that's been amended five or

11   six times here and in the State Court are you sure that the

12   $75,000 that you claim against Mr. Abraham is not included

13   in the total outstanding sum?

14   A    The $75,000 that Mr. Abraham owes me is separate from

15   the $1,200,027.

16           MR. MCCAFFREY:  I'll try to be as brief as

17   possible, but I have to do what I have to do on the record,

18   Your Honor.

19           THE COURT:  What's -- but we have checks --

20           MR. MCCAFFREY:  Yes, but --

21           THE WITNESS:  Yes.

22           THE COURT:  -- as part of the record going to your

23   client.

24           MR. MCCAFFREY:  Yes, and I'll focus on that to --

25   for the Court, but --

1        THE COURT:  Well, I'm trying to figure out what's

2    the difference whether she sues them both for the money to

3    you.

4        MR. MCCAFFREY:  She can, but -- well, I'll make --

5        THE COURT:  Unless you argue that --

6        MR. MCCAFFREY:  -- this statement and then I'll go

7    ahead with the witness is that, for instance, the promissory

8    note that is part of Exhibit C which is the plaintiff's

9    response to the defendant's notice for discovery and I would

10   ask you --

11   BY MR. MCCAFFREY:

12   Q    Would you please look at that, Ms. Stuart, Exhibit Z?

13       MR. GAFFNEY:  She doesn't have it?

14       MR. MCCAFFREY:  It's not there.

15       MR. GAFFNEY:  None of the ones that you --

16       THE COURT:  Well, the witness testified before

17   that there was no note, promise or any written agreement on

18   this debt.

19       MR. MCCAFFREY:  Well, she's incorrect.  The --

20       MR. GAFFNEY:  No.

21       THE WITNESS:  No.

22       MR. GAFFNEY:  The promissory note he's referring

23   to has nothing to do with Stanley Abraham and I object to

24   representation that it does.

25       THE COURT:  I'll look at which -- which exhibit is

1    it?

2            MR. MCCAFFREY:  Your Honor, I'm trying to flow

3    along, but there will go --

4            THE COURT:  No.  Just tell me which exhibit it is.

5    Is it Exhibit C?

6            MR. MCCAFFREY:  Well, it's Exhibit Z as in Zebra.

7            THE COURT:  Z.

8            MR. MCCAFFREY:  That would be in the -- yes.  In

9    mine -- in the --

10           THE COURT:  I got it.

11           MR. MCCAFFREY:  -- defendant's --

12           THE COURT:  I got it.

13           MR. GAFFNEY:  It's about two-thirds of the way

14   through.

15           THE COURT:  In the plaintiff's response --

16           MR. GAFFNEY:  It looks like this, Your Honor.

17           MR. MCCAFFREY:  About two-thirds of the way

18   through, yes.  It's a -- well, page 55, Your Honor.  They're

19   Bate stamped on the top left.

20           THE COURT:  I don't have any Bate stamps

21   unfortunately.

22           MR. MCCAFFREY:  It's not showing?

23           THE COURT:  Not in Exhibit Z they're not.

24           MR. GAFFNEY:  They're at the top left.  Some of

25   them are over -- are printed over.

1          THE COURT:  Oh, exhibit -- oh, okay.  I've got

2     some.  What number?

3          MR. MCCAFFREY:  55.

4          THE COURT:  Okay.

5          MR. MCCAFFREY:  55 is a bit obscured, but --

6          MR. GAFFNEY:  But 54 and 56 are legible.

7          THE COURT:  This is between American Gardens

8     Company and Janet Stuart.

9          MR. MCCAFFREY:  Right.

10         THE COURT:  What does that have to do with this

11    case?

12         MR. MCCAFFREY:  Well, American Garden and Stuart,

13    as Ms. Abraham (sic) testified a moment ago is Thomas Johns'

14    corporation, correct?

15         THE COURT:  What does that have to do with this

16    debtor?

17         MR. MCCAFFREY:  Your Honor, as I'll -- well, then

18    I'll --

19         THE COURT:  I'm just asking.

20         MR. MCCAFFREY:  Okay.  Okay.  Okay.  Mr. Abraham

21    didn't receive the money.  Ms. Stuart has had a long ongoing

22    relationship with his father-in-law, Thomas John.

23         THE COURT:  That's fine.  You can ask her about

24    that.

25         MR. MCCAFFREY:  And the money that was given --

1          THE COURT:  Sir, I got that.

2          MR. MCCAFFREY:  Okay.

3          THE COURT:  But what does the promissory note --

4     what evidentiary value is this promissory note in this case?

5          MR. MCCAFFREY:  Well, one, that there is a

6     promissory note and that Mr. John did agree to pay back Ms.

7     Stuart and they are in agreement that he borrowed money from

8     her.  And coupled with all of the other court filings from

9     Ms. Stuart, that $75,000 is --

10         THE COURT:  Okay.  So for purposes --

11         MR. MCCAFFREY:  -- encompassed.

12         THE COURT:  -- of establishing that Mr. John or

13    his company owed Ms. Stuart under a June 4th, 2010 note

14    solely for the purpose of establishing that --

15         MR. MCCAFFREY:  Well, that and beyond, but I need

16    time to go beyond, Your Honor, and it will be more clear

17    when I call Mr. Abraham.

18         THE COURT:  Now you object to the introduction of

19    this for that purpose?

20         MR. GAFFNEY:  For the purpose of demonstrating an

21    obligation from American Gardens Company or Thomas John, no.

22    There's no objection.

23         THE COURT:  I'll let it in for that purpose.  So

24    for that purpose and that purpose alone we'll let it in.

25         MR. MCCAFFREY:  Well, do you -- does counsel

1    object -- I am trying to, you know, streamline it, but then

2    I have -- I -- she's making -- the record reflects that

3    through her own claims, her verified complaints, for

4    instance at --

5              THE COURT:  Well, the complaint is part of my

6    record, isn't it?

7              MR. MCCAFFREY:  Yes, Your Honor.  But it's thick

8    and I need to --

9              THE COURT:  Yeah.

10             MR. MCCAFFREY:  -- hallucinate (sic) page by page

11   --

12             THE COURT:  But that's part of this --

13             MR. MCCAFFREY:  -- of the testimony.

14             THE COURT:  -- record already.

15             MR. MCCAFFREY:  We have Joint Exhibit I, that was

16   in the larger bounded trial book, Joint Exhibit I, which is

17   the verified complaint, Stuart versus John, Abraham and

18   Alexander.  And if I reference to --

19             THE COURT:  But just tell me what you're trying to

20   establish by all of this.

21             MR. MCCAFFREY:  That the monies lent -- two

22   things.  One that -- and ultimately Mr. Abraham was a

23   conduit momentarily and briefly from the -- of the $75,000

24   it went to him and right out to his father-in-law, and I

25   have other evidence that I'm going to introduce when I call

1    him that has been objected to as the Citibank accounts.

2            THE COURT:  Well, what he did with the money is

3    one thing.  Is the issue whether Ms. Stuart knew that she

4    was loaning it to somebody else and never expected to be

5    repaid by this debtor?

6            MR. MCCAFFREY:  That would be more precisely the

7    issue.

8            THE COURT:  Ask her.

9            MR. MCCAFFREY:  Yes.  I mean --

10            THE COURT:  That's the -- the issue you're --

11    there's no question your client got the money.  Your

12    argument is he was a --

13            MR. MCCAFFREY:  Conduit.

14            THE COURT:  All right.  Take that.  What he

15    thought he was is probably less relevant than what Ms.

16    Stuart believed.

17            MR. MCCAFFREY:  All right.

18            THE COURT:  So that's where you want to get to.

19    BY MR. MCCAFFREY:

20    Q    What did you lend -- you say you lent money to Stanley

21    Abraham twice, in July and in August of 2009.

22    A    Yes.

23    Q    The first time $50,000, the second time $25,000.  What

24    do you think that loan -- you state it's a loan, correct?

25    A    It is a loan.

1    Q    And you expect it to be paid back?

2    A    Yes.

3    Q    When?

4    A    September.

5    Q    So you were going to lend him money in July and in

6    August and he was going to pay you back $75,000 in

7    September.

8    A    Yes.

9    Q    What -- and how did you expect that to happen?  What

10   expectations did you have, other than the fact that you

11   expected to be paid back, how did you expect to be paid

12   back?  What -- what did you think the money was going to --

13   for?

14   A    Exactly what he told me.

15   Q    What was that exactly?

16   A    That he wanted to expand his real estate.

17   Q    Stanley Abraham told you that?

18   A    Yes.

19   Q    And he asked you for money?

20   A    Yes.

21   Q    When?

22   A    July and in August.

23   Q    Please tell me what transpired.  Did he send you a

24   letter?  Did he call you?  Did he bump into you on the

25   street?

1    A    Telephone call.

2    Q    Stanley Abraham called you once?  How many times?

3    A    He called me about the middle of July.  I wrote the

4    check in --

5    Q    Well, what did he say when he called you?

6    A    That he would like to borrow -- he knew I was lending

7    money to his step-father and he -- his father-in-law and he

8    would like me to loan him $75,000.

9    Q    And so you wrote a check?

10   A    Yeah.

11   Q    Was that the extent of the conversation?

12   A    I asked him what for.

13   Q    And he said?

14   A    Real estate.

15   Q    Real estate?  Just those two words?

16   A    He's expanding his real estate.

17   Q    Three words.  Anything else?

18   A    That was enough for me.  I knew him.  I trusted him.

19   Q    Expanding his real estate.  Let's say for a moment that

20   Stanley John (sic) did not only receive, as we agreed by --

21   into his account, but kept and used that money.  And let's

22   say he used that money for -- but we don't know what he used

23   the money -- if -- for a moment, just assuming that he did

24   keep it and use it for his own personal self, what --

25            MR. GAFFNEY:  Objection.  Lack of personal

1    knowledge.  Speculation.  Non-expert witnesses --

2              THE COURT:  I don't even know what the question is

3    yet.

4              MR. GAFFNEY:  Non-expert witnesses can't respond

5    to hypotheticals.

6              THE COURT:  He hasn't finished the question yet.

7              MR. MCCAFFREY:  I really need to do that.

8    BY MR. MCCAFFREY:

9    Q    Were there things that you would have approved of and

10   things you would have disapproved of for his use of the

11   money?

12   A    He said real estate.

13   Q    Okay.  So let's assume for a moment that he did use it

14   for real estate, what's your objection?

15   A    The objection is that I was not repaid.

16   Q    Is it possible that you not be repaid?  Did you have

17   him sign a promissory note to you?

18   A    No.

19   Q    Did you take any other forms of collateral, anything to

20   secure future payment?

21   A    No.

22   Q    So you took a risk?  That fair, ma'am?

23   A    I expected to be repaid.

24   Q    But is it fair --

25   A    That's --

1    Q    -- to say that you took a risk?

2    A    Well, now, yes.  At the time, no.

3    Q    At the time you thought --

4    A    I would be repaid.

5    Q    -- there was absolutely no risk in that transaction?

6    A    That's right.

7    Q    A hundred percent that you would be repaid.

8    A    Yes.

9    Q    Is anything a hundred percent, ma'am?

10            THE COURT:  Move on.

11            Let me make sure.  Is it your argument that your

12    client got the money and used it, but used it in a manner

13    that was consistent with the understanding, or is it your

14    argument that the client never got it.  He was just a

15    conduit.  You first told me he was a conduit --

16            MR. MCCAFFREY:  Correct.

17            THE COURT:  -- right?  So then he didn't get any

18    benefit or use any of these funds for his own benefit?

19            MR. MCCAFFREY:  Correct.  As I said, though,

20    thinking hypothetically that --

21            THE COURT:  So that Mr. John could testify if he

22    were here that he received the 75,000?

23            MR. MCCAFFREY:  Yes.

24            THE COURT:  But he's not here?

25            MR. MCCAFFREY:  No.  Mr. John has, to be candid

1    with the Court other problems.  I requested his presence and

2    so did my debtors.  But --

3              THE COURT:  Do we have an affidavit from him?

4              MR. MCCAFFREY:  That wouldn't be admissible, Your

5    Honor, would it?

6              THE COURT:  I'm asking.

7              MR. MCCAFFREY:  No, I don't.  I'm sorry.

8              THE COURT:  Okay.

9              MR. MCCAFFREY:  I don't do -- but, no, I do not.

10   And that's the reason, you know --

11             THE COURT:  So your client is testifying that that

12   75,000 that went into his bank account immediately

13   transferred to his father-in-law?

14             MR. MCCAFFREY:  Correct, Your Honor.  And when I

15   call Mr. Abraham again I intend to introduce statements for

16   this large time period showing that very transaction; that

17   it went -- that the funds went -- that --

18             THE COURT:  Well, I -- but the whole thing --

19             MR. MCCAFFREY:  -- went right out.

20             THE COURT:  Another part of this that makes no

21   sense.  She is outstanding a million some odd dollars to the

22   father-in-law.  Why -- if he wanted the money, he just could

23   have gotten it.  Why did he need this debtor to -- to be in

24   this deal at all?

25             MR. MCCAFFREY:  There seemed to be a time where

1   Mr. John, amongst his problems, had problems with bank

2   accounts and asked Mr. -- his son-in-law, Mr. Abraham, much

3   to his chagrin today, realizing the trouble that it's

4   caused, allowed him to use his bank account and take monies

5   from -- from different sources than --

6          THE COURT:  Who was allowed to use whose bank

7   account?

8          MR. MCCAFFREY:  Mr. John was allowed to use Mr.

9   Abraham's account.  Well, use to the degree that Mr. Abraham

10  was assisting his -- Mr. John, his father-in-law, in certain

11  --

12         THE COURT:  So Mr. Johns took money out of Mr.

13  Abraham's account?

14         MR. MCCAFFREY:  -- financial transactions.  I

15  don't say that he took it.  Mr. Abraham wrote the checks to

16  him upon his request.

17         THE COURT:  Which I don't understand because he's

18  telling me he never made any money for years.

19         MR. MCCAFFREY:  Well, it wasn't -- because it

20  wasn't his money.  But -- I mean, this goes back to 2009,

21  Your Honor.  And the money was not his.

22         But also, Your Honor, I don't want to -- lest I

23  forget is that even if the Court were to conclude that Mr.

24  Abraham did retain Ms. Stuart's $75,000, let's just say for

25  a moment he did, if he --

1          THE COURT:  It's really simple.  He's here.

2          MR. MCCAFFREY:  -- if he invested in --

3          THE COURT:  Sir --

4          MR. MCCAFFREY:  -- the --

5          THE COURT:  -- there's no jury.  He's here.  He

6    knows, did he take the money and use it or did he give it

7    all to this father-in-law.  What's your argument, which one

8    of those two?  It can't be both.   Which one of those is the

9    right -- is the answer?

10          MR. MCCAFFREY:  What I -- what I've stood by in

11   the beginning; that he -- it wasn't -- a week later it was

12   gone.  It went right to his father-in-law.  I have the

13   checks to prove it.  It went out, out, out, out.  It was

14   never his.  He didn't use it.  He didn't use it for his

15   Subway.

16          However, I am arguing in the alternative that even

17   if he did use it for this Subway it doesn't -- that doesn't

18   mean that he defrauded Ms. Stuart and that she has a right

19   for a claim of fraud against him.  If she did lend him money

20   and --

21          THE COURT:  That's kind of for me to decide.  But

22   I'm trying to figure out what the argument -- is the

23   argument that -- Ms. Stuart claims that she gave your client

24   the money because he was going to use it in real estate,

25   period.  The complaint says he didn't use it in real estate.

1    He used it to open a Subway --

2            MR. MCCAFFREY:  Correct.

3            THE COURT:  -- right?

4            MR. MCCAFFREY:  Yes.

5            THE COURT:  Did he open a Subway?

6            MR. MCCAFFREY:  He did open a Subway.

7            THE COURT:  Where did he get the money to open the

8    Subway?

9            MR. MCCAFFREY:  Well, as he testified earlier he

10   borrowed it from his parents.

11           THE COURT:  At the same time that he was giving

12   his father-in-law the money he borrowed it from him?

13           MR. MCCAFFREY:  Well, it wasn't his money, Your

14   Honor.  He didn't have the money.

15           THE COURT:  Okay.  Look, this is just consistent

16   with the rest of this.  Let's move on.  I mean, I don't know

17   what you guys are talking -- I can't figure out.  I've sat

18   on cases for years.  Nobody is telling the truth here,

19   nobody.  Don't say anything.  None of them.  And if you guys

20   don't understand that, then you've got other issues.

21   They're not telling the truth.  He's not and I don't think

22   she is.  I don't know what they did, but it wasn't what I'm

23   being told.

24           So all I know is that the 75,000, part of a

25   million some odd thousand that somehow this woman decided to

Page 122

1  loan to somebody for no interest for whenever they bother to

2  pay me back and you can use my 13 credit cards even though I

3  don't have any credit cards.  And this gentleman who is

4  saying, I never make any money, but I manage to live and

5  then I rent my house out and I have my two cars, but my

6  father-in-law did it, but my father-in-law takes the money

7  out of my account so I don't use it.

8              I've sat on hundreds of these.  This makes no

9  sense at any level, any level.  Go on.  Let's continue.

10      (Pause)

11              MR. MCCAFFREY:  All right.  Briefly, 14.  Your

12  Honor --

13  BY MR. MCCAFFREY:

14  Q   Ms. Stuart, I will draw your attention to the

15  supplemental summons and amended verified complaint in the

16  State Court action.  It was defendant's Exhibit A at your

17  deposition.  It is --

18              MR. GAFFNEY:  Your Exhibit D, right?

19              MR. MCCAFFREY:  Pardon me.

20              MR. GAFFNEY:  It's your Exhibit D?

21              MR. MCCAFFREY:  Say it again.

22              MR. GAFFNEY:  She doesn't have that.

23              MR. MCCAFFREY:  She doesn't have that?  All right.

24  Let me --

25              THE COURT:  Guys, it's 12:30.  We'll take a break

1    till one.  Come back then.

2         (Recess taken at 12:31 p.m.; resume at 1:13 p.m.)

3              THE CLERK:  -- presiding.

4              THE COURT:  Okay.  Where are we?

5              Please take the stand again.  You're still under

6    oath, ma'am.

7              THE WITNESS:  Yes.

8         (Pause)

9              MR. MCCAFFREY:  Ms. Stuart --

10             Your Honor, may I approach the witness?  I have

11   what's marked as Exhibit D to the defendant's --

12             THE COURT:  Okay.

13             MR. GAFFNEY:  Your Honor, just before we go on,

14   the plaintiff has no objection to the admissibility of this

15   document.  So as far as foundation we can skip that.

16             THE COURT:  This is -- let's just make sure we --

17   this is the supplemental summons and amended complaint?

18             MR. MCCAFFREY:  Yes.

19             THE COURT:  Okay.

20             MR. GAFFNEY:  This is in the State Court --

21             THE COURT:  That will be admitted without

22   objection.

23             MR. MCCAFFREY:  I'm going to use my copy with Ms.

24   Stuart as I --

25   CROSS-EXAMINATION (Resumed)

1   BY MR. MCCAFFREY:

2   Q    Ms. Stuart, do you recognize this document? Well,

3   perhaps I'll retract that as far as the foundation has been

4   played and no objection --

5            This is a supplemental summons and amended

6   verified complaint, correct, Ms. Stuart, where you're the

7   plaintiff and you're suing Stanley Abraham and Thomas John

8   and Atima (ph) Alexander?

9   A    Yes.

10  Q    Okay.

11           MR. GAFFNEY:  Your Honor, may I just give the

12  witness one of my copies so that counsel can return to the

13  podium?

14           THE COURT:  Thank you.

15       (Pause)

16  BY MR. MCCAFFREY:

17  Q    Ms. Stuart, please turn to page 3, paragraph 11.  So

18  paragraph 11, it says, ma'am, and correct me if I'm wrong,

19  "In addition, the Defendant John requested that the

20  plaintiff issue checks in the names of the defendants, Atima

21  Alexander and Stanley Abraham," correct?

22  A    Yes.

23  Q    So -- and you're the plaintiff in this.  And so you're

24  saying that Mr. John directed you to write checks in Stanley

25  Abraham's name, correct, at least in that statement?

1    A    Yes.

2    Q    And if you would please turn to page 7.  At the bottom

3    of the page it's captioned, sixteenth cause of action.  Do

4    you see it, ma'am?  And beginning on the second sentence it

5    says, "on or about July 21" --

6              THE COURT:  Do you have it, Ms. Stuart?  Do you

7    have what he's talking about?

8              THE WITNESS:  Yes.  Yes, I do.

9              THE COURT:  Okay.

10   BY MR. MCCAFFREY:

11   Q    "On or about July 21, 2009 plaintiff loaned money by

12   check to the Defendant John and Stanley Abraham in the

13   amount of $50,000"?

14   A    Yes.

15   Q    Does that refer to the $50,000 check that you wrote to

16   Stanley Abraham?

17   A    Yes, it does.

18   Q    Okay.  But you notice here, ma'am, it says that you

19   lent money to the defendants -- well, it says Defendant John

20   and Stanley Abraham.  John and Stanley.  So did you lend it

21   only to Stanley based on your conversations with him that he

22   was going to use it for real estate investments or did you

23   lend it to Stanley and Mr. John?

24   A    I lent -- loaned it to Stanley Abraham and I think

25   during that time there might have been a check to Thomas

1    John as well --

2          THE COURT:  I'm a little confused on that --

3          THE WITNESS:  -- that July.

4          THE COURT:  -- what counsel just pointed out to

5    you, the sixteenth cause of action.

6          THE WITNESS:  Yes.

7          THE COURT:  With the understanding that the monies

8    would be repaid with interest.  You testified that you don't

9    charge interest.

10          THE WITNESS:  I also testified that Thomas John

11    said he would pay me ten percent interest even though I did

12    not ask for interest.

13          THE COURT:  So you do charge interest?

14          THE WITNESS:  Well, if I was given the -- at the

15    beginning when I started loaning him money I did not ask for

16    interest.  When he gave me the promissory note, I think it

17    was June 2nd, 2009 or '10, he said, you know, he'll give me

18    ten percent interest.

19          THE COURT:  So there's no interest due.  You would

20    say there's no interest due from this debtor on the 75,000.

21          THE WITNESS:  There is no interest due.

22          THE COURT:  He owes nothing.  He would owe no --

23          THE WITNESS:  No.

24          THE COURT:  -- interest on that?

25          THE WITNESS:  No.  No.  No interest, Your Honor,

1    to the Abrahams.

2            THE COURT:  Okay.

3    BY MR. MCCAFFREY:

4    Q    Ms. Stuart, earlier -- clarify that.  You've loaned

5    over a million dollars you say and, quite frankly, in the

6    paperwork it seems you have to Stanley -- excuse me -- to --

7    yes, to Thomas John.  He's an investor.  Isn't the reason

8    you lent him the money to get a return on your money,

9    interest, a benefit above and beyond the initial investment?

10   A    No.  When I loaned the money I just wanted my money

11   back.  I did not ask for interest.  As I explained earlier,

12   our custom is not to charge interest.  When we loan money

13   you pay back the amount you borrowed.

14   Q    So you didn't want anything beyond just the base of the

15   amount of money back?

16   A    I just wanted my money back, what I loaned.

17   Q    And you will --

18           THE COURT:  So -- hold on a second.  So to you all

19   of these transactions have no tax consequences.  Your tax

20   returns would never show any money being earned; is that

21   right?

22           THE WITNESS:  That's right.

23           THE COURT:  And the million dollars is all your

24   money?  You didn't get that -- no piece of that was given to

25   you by anybody else?

1             THE WITNESS:  No, sir.  That's all my money.

2             THE COURT:  You're not pooling anybody else's

3    funds here?

4             THE WITNESS:  No, sir.

5             THE COURT:  What do you do with the cash when it's

6    not loaned out, where does it sit?

7             THE WITNESS:  It sits in the bank and --

8             THE COURT:  Do you earn on it?

9             THE WITNESS:  -- in investments.

10            THE COURT:  Do you earn interest on your money?

11            THE WITNESS:  I don't take any money out.

12            THE COURT:  When it sits in the bank do you earn

13    interest on it?

14            THE WITNESS:  Yes, but it's very little money I

15    have in the bank.  What there were -- there were

16    investments.

17            THE COURT:  Outside of the million-two that you

18    have outstanding to Mr. --

19            MR. MCCAFFREY:  John.

20            THE COURT:  -- John, how much money do you have in

21    the bank now?

22            THE WITNESS:  On my checking account --

23            THE COURT:  All accounts.

24            THE WITNESS:  All accounts.  I think I have about

25    ten or $15,000.

1                    THE COURT:  And you have no brokerage accounts, do

2        you?

3                    THE WITNESS:  What are brokerage accounts?

4                    THE COURT:  What's a -- did you invest it -- do

5        you have any stocks --

6                    THE WITNESS:  No.  I --

7                    THE COURT:  -- bonds?

8                    THE WITNESS:  -- stopped that.

9                    THE COURT:  So your total assets now other than

10       the money you've loaned to these people is $15,000?

11                   THE WITNESS:  Yeah.  Around about that, but I also

12       have, what do you call them, investments.  I don't know how

13       to explain that.  While I was working I had a Roth IRA.

14                   THE COURT:  A what?

15                   THE WITNESS:  A Roth IRA.

16                   THE COURT:  Right.  How much is in your Roth IRA?

17                   THE WITNESS:  It was $53,000.  And that was

18       changed --

19                   THE COURT:  So you -- you had about a million-

20       three, a million-four in total liquid assets.  You hand Mr.

21       John over time and this debtor close to a million-two with

22       basically no security, no interest in getting any interest.

23       You take a full risk as to whether they'll pay you, and then

24       it leaves you with about $15,000.  Is that what you're

25       testifying to?

1          THE WITNESS:  Your Honor, the money I loaned to

2     them I did not see it as a risk because there were a lot of

3     real estate properties.  So if I didn't --

4          THE COURT:  But what would the difference be?  You

5     didn't take an interest in any of these real estate

6     properties?  You don't --

7          THE WITNESS:  No, but if --

8          THE COURT:  -- have a mortgage?

9          THE WITNESS:  -- there were so -- if I took them

10    to court and they had to sell real estate to pay me --

11         THE COURT:  So you gave somebody --

12         THE WITNESS:  -- I felt that --

13         THE COURT:  -- money without a note contemplating

14    having to sue them in court?  Who would ever do that?  I

15    don't -- I don't know.

16         THE WITNESS:  Well, if I sued them in court and I

17    won the case and I didn't see why I wouldn't win the case

18    and they didn't think it will come to court.  They would --

19    to sell a building --

20         THE COURT:  And you had great faith in Mr. John,

21    correct --

22         THE WITNESS:  Yes, sir.

23         THE COURT:  -- and this debtor?

24         THE WITNESS:  Yes.

25         THE COURT:  And he needed 13 credit cards to run

1    up $170,000 and you had great faith in the guy?

2            THE WITNESS:  It was $154,000.

3            THE COURT:  Sorry.  $154,000.

4            THE WITNESS:  Yeah.

5            THE COURT:  And you had great faith in his ability

6    to repay you?

7            THE WITNESS:  The first seven years he was paying

8    the credit cards, whatever he used.  After that I found out

9    that, you know, they weren't paying it and that's why it ran

10   up the debt because nobody was paying.

11           THE COURT:  All right.  It's your testimony, not

12   mine.

13   BY MR. MCCAFFREY:

14   Q    Ms. Stuart, page 8, please, under where it says,

15   nineteenth cause of action.

16   A    Yes.

17   Q    The second sentence says, "On or about August 3rd, 2009

18   plaintiff loaned money by bank wire to Defendant John in the

19   amount of $25,000."  Now that's of the same date, August

20   3rd, 2009 for the wire transfer that you say and I concede

21   is documented to have gone to Stanley Abraham.  But in the

22   complaint you say you were lending the money to Mr. John.

23   A    There were two wires, one to Thomas John and one to

24   Stanley Abraham.

25   Q    Well, that hasn't -- that's not on the record before

1    the Court.  There's --

2    A    I know it's not --

3    Q    -- only one wire on August 3rd.

4    A    -- it's not said there.  But on the same page, number

5    33, on the same date, August 3rd, 2009, Thomas John got

6    $25,000.  So one might have been a check and that's a

7    mistake here on --

8    Q    Well, I do see that, ma'am.  You're right.  Paragraph

9    33 and 34 are identical.  However, both of them state that

10    the money went to Defendant John.

11    A    It's an error.

12    Q    And I would just bring to your attention that at page

13    15 --

14    A    Page 15.

15    Q    -- is your oath stating that the contents of the

16    petition are true and correct?

17    A    Yes.

18    Q    Is that your signature?

19    A    That's my signature.  You know, there were many errors

20    on this that -- you know, it went back and forth to my

21    attorney to make corrections.

22    Q    All right.  I see many errors this morning.

23              MR. MCCAFFREY:  I have no further questions for --

24              THE COURT:  You say you sent this to your

25    attorney?

1          THE WITNESS:  Yes.  My attorney typed this up.

2          THE COURT:  I thought I asked you this morning

3   whether you used a lawyer to do these transactions and you

4   said no?

5          THE WITNESS:  A lawyer?

6          THE COURT:  An attorney.  I asked you if you used

7   an attorney on these transactions and you said no.

8          THE WITNESS:  What do you mean by the

9   transactions, the money -- the checks I wrote there was no

10  attorney there, but in court --

11         THE COURT:  Okay.

12         THE WITNESS:  -- but suing them, yes, the --

13         THE COURT:  All right.

14         THE WITNESS:  -- attorney --

15         THE COURT:  We have --

16         MR. MCCAFFREY:  Actually, I have just one further

17  question, Your Honor.

18  BY MR. MCCAFFREY:

19  Q    Exhibit Z as in zebra, that's in the joint --

20  A    Do I have a Z?  I don't think I have a Z.

21       (Pause)

22         THE COURT:  I don't have a Z.  Oh, yeah, I do.

23         MR. MCCAFFREY:  That's in the defendant's, Your

24  Honor.

25         THE COURT:  Yes, I do.

1              MR. MCCAFFREY:  It was in --

2              THE COURT:  It's plaintiff's response to

3      defendant's notice for discovery.

4              MR. MCCAFFREY:  Yes.

5          (Pause)

6      BY MR. MCCAFFREY:

7      Q    Do you recognize this letter?

8      A    Yes.

9              MR. GAFFNEY:  What page are you on?

10             MR. MCCAFFREY:  That's at --

11             THE COURT:  Hold it.  Hold it.  Hold it.  Make

12     sure everybody's --

13             MR. MCCAFFREY:  Yes.

14             THE COURT:  -- got the same place.

15             MR. MCCAFFREY:  56, Bate stamp 56.  It's the back

16     -- it's actually the back of the promissory note.

17         (Pause)

18             MR. MCCAFFREY:  May I proceed, Your Honor?

19             THE COURT:  Please.

20     BY MR. MCCAFFREY:

21     Q    I don't want to belabor you, Ms. Stuart, with reading

22     this entire, what seems to be, two-and-a-half page letter,

23     but is it fair, correct me if I'm wrong, to say that this is

24     a letter that you wrote to Thomas John --

25     A    Yes.

1   Q    -- wherein you state that he owes you the money and at

2   the very first paragraph you stated at a $1,118,364.94.

3   A    Yes.  At that time, June 14th, 2010.

4   Q    Correct.  Well --

5   A    At that time.

6   Q    -- I'm not arguing over the money with you, ma'am.  My

7   question is you wrote this letter to Mr. John and to him

8   alone and you asked him to pay you back the money.  Did you

9   ever write a letter to Mr. Abraham and ask him to pay you

10  back money?

11  A    No, but I --

12  Q    Did you --

13  A    -- spoke with him --

14  Q    When?

15  A    -- and I told him I needed my $75,000.

16  Q    You spoke -- how did that come about?

17  A    I don't understand what you're asking me.

18  Q    Well, you said you spoke to him.  I mean, in --

19  A    Oh --

20  Q    -- within the real estate office, did you have a --

21  A    Yeah.

22  Q    -- phone call?

23  A    Real estate office.

24  Q    And when was that, if you recall?

25  A    That was that September 2009.

1   Q    Any other -- other than bringing actions against

2   Stanley John, any other attempts at regaining the money that

3   you say that you lent to him?

4   A    Yeah.  Every time I saw him, at least two or three more

5   times, I asked him for my money.

6   Q    What -- well, this will be my last question, but what

7   were the -- in general the nature of your -- you said when

8   you would see him.  You saw him.  What events caused you to

9   see him?

10   A    I went to the office.  He was there and I asked him for

11   my money.

12   Q    And what did he say?

13   A    Well, the first time he said he didn't know me.  He

14   didn't owe me any money.  He didn't know who I was.  Later

15   on he said if I need money go sell some real estate or get a

16   job.  Those were his words.

17            MR. MCCAFFREY:  No further questions for Ms.

18   Stuart at this time.

19            THE COURT:  Okay.  Counsel?

20            MR. GAFFNEY:  I don't think I need to redirect,

21   Your Honor.

22            THE COURT:  You can step down.

23            THE WITNESS:  Thank you.

24            THE COURT:  Do you have any further witnesses?

25            MR. MCCAFFREY:  I would like to call --

1           THE COURT:  It's his case.

2           MR. MCCAFFREY:  I'm sorry.

3           MR. GAFFNEY:  No, Your Honor.  At this time the

4    plaintiff rests.

5           THE COURT:  You rest?  Who you going to call?

6           MR. MCCAFFREY:  The defense would like to call Amy

7    Abraham.

8           THE COURT:  All right.

9           THE CLERK:  Can you please stand and raise your

10   right hand?

11                AMY ABRAHAM, WITNESS, SWORN

12           THE CLERK:  Can you please say and spell your name

13   for the record?

14           THE WITNESS:  Amy A-M-Y Abraham, A-B-R-A-H-A-M.

15           THE CLERK:  Okay.  You can sit down.  Thank you.

16           THE WITNESS:  Thank you.

17   DIRECT EXAMINATION

18   BY MR. MCCAFFREY:

19   Q    Ms. Abraham, you heard Ms. Stuart testify that she lent

20   $75,000 to your husband.  Do you know if your husband --

21   it's been established that your husband received it into his

22   bank account.  Do you know if he retained the money, spent

23   it, kept it, used it to his or your benefit?

24   A    No, he did not.

25   Q    What happened to it?

1    A    My father used it.

2    Q    How do you know that?

3    A    Because he's my husband.  I know what he was doing with

4    --

5    Q    Why would a transaction like that occur that Ms. Stuart

6    would give money into your husband's account and then it

7    would go to your father?

8    A    At that time --

9         MR. GAFFNEY:  Objection.  Asking the witness to

10   speculate.

11        THE COURT:  How can she know what Ms. Stuart was

12   thinking?

13        MR. MCCAFFREY:  She may not --

14        THE COURT:  I'll sustain the objection.  Rephrase

15   it.

16   BY MR. MCCAFFREY:

17   Q    How do you know -- so you -- so your testimony is that

18   your husband didn't retain the $75,000?

19   A    He did not use it.  Yes.

20   Q    And how do you know that?

21   A    I know that because he's my husband.  I would know if

22   he used the $75,000.  He told me that the money was coming

23   in so that my father could use it because at that time my

24   father could not use his account.

25   Q    Pardon me?

1    A    Because at that time when Ms. Stuart gave Stanley the

2    money my father could not use his own account.

3    Q    Were there -- was your father conducting any other

4    transactions like that with your husband?

5    A    During the time where he could not use his own account

6    there might have been a couple.  It wasn't something that

7    happened often.  At the time -- if we knew then what we knew

8    now we would have said no, but at the time, you know, we

9    didn't know something like this could happen.

10    Q    Okay.

11                THE COURT:  Does your father owe you -- does your

12    father owe you $75,000?

13                THE WITNESS:  Does he owe -- I mean, I don't look

14    at it like that, that he owes -- we never --

15                THE COURT:  What did you give -- did you give it

16    as a gift?  Why did you give him the money?

17                THE WITNESS:  No.  He used it for his business

18    purposes.  He asked my husband to issue checks so that he

19    could use it --

20                THE COURT:  Did your husband loan it to him, give

21    it to him?  Was it --

22                THE WITNESS:  No.

23                THE COURT:  What?

24                THE WITNESS:  My father told my husband that Ms.

25    Stuart, Janet, was going to wire some money or give him a

1    check and he needed that money.  So Stanley gave him the

2    account information and Ms. Stuart did that, and in --

3                 THE COURT:  You're not answering my question.  My

4    question is it was in your bank account.

5                 THE WITNESS:  Right.

6                 THE COURT:  Since you're testifying about what you

7    know --

8                 THE WITNESS:  Right.

9                 THE COURT:  -- because he's your husband --

10               THE WITNESS:  Right.

11               THE COURT:  -- did you expect to get that 75,000

12   back?

13               THE WITNESS:  It was never -- we never considered

14   it our money.  Why would we get the $75,000 back?

15               THE COURT:  Because it was in your bank account.

16               THE WITNESS:  Right.  And the purpose was to be

17   given to my father to begin with.  We understood that.  So

18   in our mind no one owes us $75,000.  That money was never to

19   be for us to begin with.

20               THE COURT:  Then why was it in your bank account?

21               THE WITNESS:  Because my father asked Janet to

22   issue it in Stanley's name because he couldn't use his own

23   account.

24               THE COURT:  He couldn't use his own account?

25               THE WITNESS:  Right.

1          THE COURT:  Why couldn't he use his own account?

2          THE WITNESS:  He ran into -- I mean, that's why

3     his business took a downfall and I -- from what I remember

4     at that time his bank account was frozen because it was

5     overdrawn.  That's what I remember.

6          THE COURT:  So do you think Ms. Stuart would have

7     loaned him $75,000 if she knew his business was frozen and

8     not working?

9          THE WITNESS:  I don't know.  I don't know if she

10    knew all the details.  I really don't know.

11         THE COURT:  Well, but your husband was the one who

12    asked her for the money.

13         THE WITNESS:  He never asked her for the money.

14    He --

15         THE COURT:  So she's lying?  She's --

16         THE WITNESS:  She's -- one hundred percent.  This

17    whole thing --

18         THE COURT:  Okay.

19         THE WITNESS:  -- is a lie.

20         THE COURT:  So you guys --

21         THE WITNESS:  He has never said more than hello --

22         THE COURT:  I don't know why the trustee has never

23    gone after Mr. -- whatever this person's name is.

24         MR. MCCAFFREY:  John.

25         THE COURT:  I don't understand that, either.  But

1    it was never scheduled.  This receivable -- because I don't

2    know -- if it's not a receivable, then it was a gift

3    basically because the argument that it's not his with no

4    agency agreement, no power of attorney, no anything is as a

5    legal matter quite difficult.

6            So we have the money in his account.  They're not

7    telling me why it went out.  The theory that we inventoried

8    the money so -- because the father couldn't borrow it

9    directly leads one to conclude on that theory that they

10   conspired to defraud this woman of money because they didn't

11   tell her the truth about why they were taking it.

12           So I don't know where anybody's going here.

13   Again, I don't think any of you are telling the truth,

14   frankly, you, you or you.  But working within that framework

15   none of this gets anyplace.  Your argument is that the money

16   was in his account and low and behold he just gave it to his

17   father-in-law because something, but he then had money to

18   build a Subway because he borrowed it from his father-in-

19   law.

20           THE WITNESS:  No.  We didn't borrow money from my

21   father-in-law.

22           THE COURT:  Where did you get the money to do the

23   Subway?

24           THE WITNESS:  The majority was taken through a

25   loan through Capital One Bank.

1           THE COURT:  Then what did you need the 75 -- you

2    didn't' need the 75,000?

3           THE WITNESS:  We didn't.  We didn't use her money,

4    Your Honor.  That's what I'm trying to say.  We never used

5    Ms. Stuart's money.  We never asked for it.

6           THE COURT:  So one of you is lying, either it's

7    you and the debtor or Ms. Stuart.  One of you has to be

8    lying.  Somebody's committing perjury here.

9           All right.  One of the big mistakes people make is

10   you take little problems and you make them into real big

11   ones.  If I find anybody committed perjury I'm going to send

12   it right to the U.S. Attorney's Office and then they'll be

13   on the other side of this building.

14           Keep going.

15   BY MR. MCCAFFREY:

16   Q    Who was the primary breadwinner in your household in

17   the past six years?

18   A    I would say the last several years it would be me.

19   Q    All right.  Did your husband earn -- have earnings in

20   2009 that you recall?

21   A    Yes.  In 2009, yes.

22   Q    What was he doing?

23   A    At that time he was doing real estate, a brokerage.

24   Q    Okay.  Were you using also?

25   A    In 2009, yes, I was.

1    Q    Okay.  And 2010?

2    A    For a portion of 2010, yes.

3    Q    What -- what's that answer to, that you were working or

4    that he was?

5    A    Well, 2010 is when he purchased the Subway.  I believe,

6    if I remember correctly, early 2010 I was still working with

7    my father.  And then I was collecting unemployment.

8              THE COURT:  Well, how much did he borrow from Cap

9    One to start the Subway?

10             THE WITNESS:  I think around 235 or $240,000.

11             THE COURT:  What did he show them as a reason they

12   would loan him money?

13             THE WITNESS:  Because at that time we had

14   excellent credit.  We owned a home and we had great credit,

15   and we had to personally guarantee the loan.

16             THE COURT:  But what did you own that your

17   personal guarantee was worth anything?

18             THE WITNESS:  I guess our house.

19             THE COURT:  And it was not mortgaged?

20             THE WITNESS:  Yes.  We had a mortgage.

21             THE COURT:  How much was the mortgage?

22             THE WITNESS:  About $325,000.

23             THE COURT:  So you're saying Cap One loaned you on

24   a junior position to start a business with somebody who had

25   never been successful in any business?

 1              THE WITNESS:  Right.  And then his parents also

 2     co-signed the loan

 3              THE COURT:  Oh.

 4              THE WITNESS:  Stan's parents.

 5              THE COURT:  Okay.

 6              MR. MCCAFFREY:  And there are proceedings against

 7     Alman (ph) Abraham, Stanley's father, credit basis in State

 8     Court.

 9              THE COURT:  Capital One is a creditor in this

10     case.

11              MR. MCCAFFREY:  No.  Well, yes, absolutely, yes.

12     But they're also, as Ms. Abraham testified, Capital One is

13     also going after his father and mother because they're

14     guarantors on the loan.

15     BY MR. MCCAFFREY:

16     Q    Also, was that the only -- was that the full sum that

17     it cost to start up a Subway?

18     A    No.  The down payment our families gave us.

19     Q    How much was that approximately?

20     A    Not my father.  That was approximately I want to say

21     close to about $100,000.

22     Q    Where are you living now?

23     A    With my in-laws.

24     Q    Why?

25     A    Because it was too hard to manage on just one income so

1    we're renting our home and we moved in with Stan's parents.

2    Q    Why did you file bankruptcy?

3    A    Because we couldn't keep up.  We couldn't keep up with

4    our mortgage payments and all our other payments.

5              THE COURT:  So there's no homestead exemption

6    taken here, correct?

7              MR. MCCAFFREY:  It was, Your Honor.

8              MR. GAFFNEY:  That's not correct.

9              THE COURT:  What?

10             MR. GAFFNEY:  There was.

11             MR. MCCAFFREY:  It was.

12             THE COURT:  How?  They don't live there.

13             MR. MCCAFFREY:  Well, they did at the --

14             THE COURT:  It's a rental property.

15             MR. MCCAFFREY:  They did at the time.  They moved

16   --

17   BY MR. MCCAFFREY:

18   Q    When did you --

19   A    We moved May 2014.

20             THE COURT:  Keep going.

21             MR. MCCAFFREY:  I have no further questions for

22   Ms. Abraham.

23             THE COURT:  Okay.  Do you have any cross?

24             MR. GAFFNEY:  Briefly.

25         (Pause)

1    CROSS-EXAMINATION

2    BY MR. GAFFNEY:

3    Q    Ms. Abraham, do you have a bachelor's degree?

4    A    Yes.

5    Q    In what?

6    A    Marketing.

7    Q    From where?

8    A    Hofstra.

9    Q    When did you earn it?

10   A    2003.

11   Q    Did you read the bankruptcy petition before it was

12   filed?

13   A    I don't remember.

14   Q    Did you sign the bankruptcy petition before it was

15   filed?

16   A    If it required my signature, yes, I'm sure I did.

17   Q    But you don't remember if you read it?

18   A    I don't remember.

19   Q    So would it be safe to say, then, that you don't

20   remember if you understood it either?

21   A    If I don't remember I guess so.  I guess you could say

22   that.

23   Q    You said that you moved out of your house May of 2014?

24   A    Correct.

25   Q    That's when the tenants moved in?

1    A    Correct.

2    Q    How did you find the tenants?

3    A    They were relatives of a friend of ours.

4    Q    How long was the house on the market?  How long were

5    you looking for tenants?

6    A    About a few weeks, maybe a month or so.

7    Q    When did you decide that you needed to rent the house?

8    A    I would say about March of 2014.

9             MR. GAFFNEY:  That's all I have.

10            THE COURT:  What's the amount of the mortgage on

11   the house now?

12            THE WITNESS:  I don't know the exact.  It was

13   modified because we missed payments.  I'm not really sure.

14   I know it went up from the original 325.

15            THE COURT:  What's the house worth?

16            THE WITNESS:  In today's market maybe about 450.

17            THE COURT:  So if you don't have an exemption in

18   this house then the estate should have just sold it.  That's

19   not a question.  It's a statement.

20            Okay.

21            THE WITNESS:  Do I step down?

22            THE COURT:  You can step down.

23            Anybody else?

24            MR. MCCAFFREY:  No, Your Honor.

25            THE COURT:  You rest?

1           MR. MCCAFFREY:  Yes.

2           THE COURT:  All right, guys.  Here's the story.

3   I'm going to get you a decision relatively quickly in this

4   case.  My main focus is the 727 because if I can resolve the

5   727 I don't have to think about the 523.  And, in fact, it

6   may be -- well, I guess if I find that there is no 727, then

7   I would drop down to the 523 and see if I believe that.

8           The problem that I have -- and I've made that

9   clear on the record -- is that I am very, very skeptical of

10  everything I've heard from either side.  The 523 is

11  predicated on -- I know the debtor got money.  I know he

12  received it.  I know it went into his bank account.

13  However, there's no written agreement.  There's no -- it

14  doesn't even seem to be an oral meeting of the minds,

15  leaving aside the parole evidence question, on the loan.

16          The debtor would have me to believe that he was a

17  conduit, which I'm not sure what that even means, and the

18  plaintiff would have me believe that she took essentially

19  100 percent of her savings, the only money she has to live

20  to support children and everyone else, handed it to a person

21  who appears to be a habitual criminal maybe, Mr. John,

22  running up credit cards and everything on her behalf, which

23  also makes no sense, somebody taking out 13 credit cards to

24  hand to somebody else.

25          So I don't know what to make of it.  I'm telling

1    you.  Originally, I had some view of this, but what I'm

2    going to try to do is the 727 is a relatively simple

3    question.  There's no question these schedules were false.

4    There's no question they were misleading.  There's no

5    question he signed them.  There's no question that the

6    debtor knew what he did, both debtors.  They signed them.

7    They're held to be responsible for them, whatever they now

8    claim.

9              And counsel's argument is that the requisite

10   intent, as you believe, necessary for that 727 has not been

11   proven, is not part of the record.  I have the record.  I'll

12   make that decision.  That's really the only variable here.

13             On the 523, we know he got the money and then

14   everything seems to disappear.  Do I believe the story that

15   he got it to give to his father-in-law, no.  Absolutely not.

16   Do I believe he's made no money during all this period of

17   time?  Absolutely not.  But I don't know what he did, so --

18   and do I believe that Ms. Stuart in this cavalier manner

19   handed over a million some odd dollars to a person whose

20   office she was working whose own son-in-law testified that

21   they couldn't use his bank accounts because his properties

22   were frozen or whatever else is going on.

23             Do I believe they moved out of the house to put a

24   tenant in there to move to someplace else even though they

25   could afford to pay the mortgage straight through May 2014

1    or got a mortgage modification?  Do I know what they gave

2    the mod -- to get the mortgage mod?  If they showed he had

3    no income, I don't know how he got the mortgage mod.  So I

4    don't know what they showed the bank.  I don't know what

5    they showed the bank when they took the Cap One loan.

6            But all of that stuff is not in front of me.  That

7    only comes into play with regard to what I think about the

8    intent of the parties.

9            So I'll get the record.  We'll look at it.  We'll

10   get you an answer probably within the next three, four

11   weeks.

12           MR. GAFFNEY:  Do you want proposed findings and --

13           THE COURT:  Yes.

14           MR. GAFFNEY:  -- conclusions?

15           THE COURT:  Yeah.  Again -- yes.  You -- what you

16   agree -- do it the way so what you agree on you show me and

17   what you disagree on you show me.  It can be in one form.

18   Just get together.  Most of the facts here you all agree on.

19   The consequence of those facts is what you disagree.

20   Nobody's disagreeing he got the money.  Their view is he got

21   it as an agent and therefore shouldn't be responsible.

22   Yours is he got it.

23           The 727 is probably very little there that I need

24   from anybody because it's a question of whether the record

25   shows what you believe to be this requisite intent.  I have

1    my own standard and we'll look at it.  So I don't think I

2    need that much on that.  But whatever you want.

3            So I'm not going to get to this for a few weeks,

4    so why don't you do -- get me these proposed findings of

5    fact.  What do you want, a month?

6            MR. GAFFNEY:  That seems reasonable.  Yeah.

7            THE COURT:  A month okay?

8            MR. MCCAFFREY:  Yes.

9            THE COURT:  All right.  Pick a date, month.  When

10   you get it to us, from the time we get it we'll get you

11   answer in a couple of weeks after that.

12           All right.

13           MR. MCCAFFREY:  Yes, Your Honor.

14           THE COURT:  Thank you.

15           MR. GAFFNEY:  Thank you.

16           THE COURT:  Court's adjourned.

17        (Proceedings concluded at 1:50 p.m.)

18

19

20

21

22

23

24

25

1                          I N D E X

2                      T E S T I M O N Y

3

4    WITNESSES                EXAM BY              PAGE        LINE

5    Stanley Abraham          Mr. Gaffney          8           2

6                             Mr. McCaffrey        42          17

7                             Mr. Gaffney          72          5

8                             Mr. McCaffrey        75          14

9

10   JANET STUART             Mr. Gaffney          77          20

11                            Mr. McCaffrey        101         6

12

13   Amy Abraham              Mr. McCaffrey        137         17

14                            Mr. Gaffney          147         1

15

16

17

18                      E X H I B I T S

19   DEFENDANTS'           DESCRIPTION             ID.        EVID.

20   C              Division of Corporation Docs    --         54

21

22

23

24

25

1                  C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    Sherri
          Digitally signed by Sherri Breach
          DN: cn=Sherri Breach, o=Veritext,
7    Breach
          ou, email=digital@veritext.com,
          c=US
          Date: 2015.03.23 10:23:42 -04'00'
8    _____

9    SHERRI L. BREACH

10   AAERT Certified Electronic Reporter & Transcriber CERT*D-397

11

12

13   Date: March 23, 2015

14

15

16

17

18

19

20

21

22   Veritext Legal Solutions

23   200 Old Country Road

24   Suite 580

25   Mineola, New York 11501

| & |
| --- |
| **&**   154:10 |

| 1 |
| --- |

**1**   11:21 12:5 34:6,13
  38:10,15 39:4
  153:14
**1,086,27**   84:2
**1,118,000**   101:20
**1,118,364.94.**   135:2
**1,200,000**   105:11,14
  106:17
**1,200,027**   105:16
  107:15
**1,250,000**   106:1
**1,600**   19:5
**10**   1:21 126:17
**100**   76:10,13 149:19
**100,000**   66:21
  145:21
**101**   153:11
**10:05**   1:22
**11**   17:18,24 124:17
  124:18
**11/20**   45:4
**11/2012**   36:17
**11242**   3:5
**11435**   3:12
**11501**   154:25
**11722**   1:20
**11791**   36:16
**11th**   94:23
**12**   17:10 61:22
  64:20
**12:30**   122:25
**12:31**   123:2
**12th**   41:14
**13**   11:2,3 24:6,8
  26:9 69:10 74:15
  92:5 103:20,22
  104:1 122:2 130:25
  149:23
**13,000**   68:9
**13-08165**   1:9
**13-74398**   1:3
**137**   153:13

**14**   65:6 122:11
  153:8
**147**   153:14
**14th**   135:3
**15**   31:8,10 82:8
  132:13,14
**15,000**   69:21 128:25
  129:10,24
**15,129**   34:13 44:25
**154,000**   101:25
  102:16 131:2,3
**16,000**   38:1
**17**   153:6,13
**170,000**   131:1
**175,000**   102:1,15
  104:16
**17th**   53:2
**18**   13:23 14:1,4
  34:24,24,25 35:3
  37:10 41:19
**18,000**   12:22 32:11
  34:11
**19**   14:9,9,13 30:18
  36:13 37:23 40:5,10
**1979**   78:7
**1:13**   123:2
**1:50**   152:17
**1st**   3:11

| 2 |
| --- |

**2**   2:1 19:24 21:25
  22:3 153:5
**2,300**   48:3
**20**   15:19 82:7 101:1
  153:10
**20,000**   82:7
**200**   65:17 68:11
  79:17 154:23
**2000**   92:3,3
**2001**   78:13,17 79:19
  80:3 90:20
**2003**   147:10
**2004**   41:14
**2005**   8:18
**2006**   48:10,11 79:13
**2008**   44:15 80:7
**2009**   80:12,14 81:3
  86:8,20 88:14 89:16

  90:22 113:21
  119:20 125:11
  126:17 131:17,20
  132:5 135:25
  143:20,21,25
**2010**   55:13 56:1
  68:7 80:7 90:13,14
  90:15 91:17 92:14
  111:13 135:3 144:1
  144:2,5,6
**2011**   29:11 52:25
  61:22 64:18 68:8,10
  68:22 69:13,15
  72:16 91:1,6
**2012**   29:11 34:16
  36:20 37:2 39:2
  45:3,4 63:15 64:21
  65:20 67:13 68:11
  92:7,10,15,23
  100:24 101:1
**2013**   12:6,10,11,20
  22:16 25:6 27:23
  43:24 53:2 54:10,11
  64:24 65:5 72:18
  91:24
**2014**   34:6 49:1
  72:22 74:19 146:19
  147:23 148:8
  150:25
**2015**   1:21 154:13
**21**   15:20,21,21
  40:14 41:6 61:6
  125:5,11
**2180**   19:12
**21st**   80:14
**22nd**   86:8
**23**   154:13
**231**   65:19
**231,000**   65:18 66:1
**231,683**   65:7
**235**   144:10
**235,000**   65:18
**23rd**   80:12
**240,000**   144:10
**2400**   3:4
**25**   86:22

**25,000**   86:18,19,21
  87:3,5 113:23
  131:19 132:6
**250**   79:17 83:21,22
**26**   3:4 70:6 91:24
**27**   26:5,16
**27th**   55:13 56:1
**290**   1:19
**293**   94:22
**2nd**   126:17

| 3 |
| --- |

**3**   124:17
**30th**   52:25
**325**   148:14
**325,000**   144:22
**33**   132:5,9
**34**   132:9
**341**   96:13 97:6 98:4
  99:3,12,17
**34482**   17:11
**35**   31:5
**350,000**   18:9
**352,000**   69:13
**38**   66:19
**397**   154:3,10
**3rd**   86:20 131:17,20
  132:3,5

| 4 |
| --- |

**4**   36:16
**42**   153:6
**450**   148:16
**4667**   20:6,11,15
**4797**   67:6,10
**4831**   19:17
**49**   17:10
**4th**   100:24 111:13

| 5 |
| --- |

**5**   17:22,24 18:7
  21:10,15,22 22:1,9
  153:7
**50**   75:24 76:20,23
**50,000**   80:16,17
  81:7,11,24 85:25
  86:14 113:23
  125:13,15

**50/50**  46:14 76:12
**522**  17:20,24 18:7
21:10,15,22,25 22:1
22:3,9
**523**  60:1 99:6 100:2
100:10 149:5,7,10
150:13
**53,000**  129:17
**54**  110:6 153:20
**55**  109:18 110:3,5
**5570**  35:12,13 37:6
**56**  110:6 134:15,15
**580**  154:24
**582,000**  69:19
**587,977**  68:25

**6**

**6**  153:11
**6,000**  12:17,18
**6,500**  12:22
**60,000**  47:21
**64**  12:19
**65**  12:19
**66,000**  70:3
**6th**  34:5

**7**

**7**  26:7 43:21 63:18
84:22 125:2
**7,350**  21:23 22:6
**7,650**  21:16,22,23
**70**  87:13
**70,700**  67:13
**72**  153:7
**727**  56:24 59:25
60:2,6,11,13,22
61:15 71:20 98:14
98:21,22 99:6
104:24 149:4,5,6
150:2,10 151:23
**75**  86:23 88:6 143:1
153:8
**75,000**  80:18 83:13
83:23 86:22 87:14
88:5 91:18 95:14
97:12 101:17
105:18,19 106:25
107:6,12,14 111:9

112:23 114:6 115:8
117:22 118:12
119:24 121:24
126:20 135:15
137:20 138:18,22
139:12 140:11,14
140:18 141:7 143:2
**77**  153:10

**8**

**8**  93:16 131:14
153:5
**85,000**  49:15
**86,507.78**  34:11
**86,507.78.**  34:10
**88-18**  3:11
**8:30**  93:16

**9**

**9:30**  93:16

**a**

**a.m.**  1:22
**aaert**  154:10
**ability**  131:5
**able**  69:25
**abraham**  1:6,6,14
4:4,15 5:9,10,10,20
7:9,11,14,16,19,20
8:4 14:18 26:13,20
27:1,3,3 28:15,16
28:18 29:8 34:4
36:2,14,21 42:19,23
49:25 51:20 55:24
57:17,22 59:1,8
62:22 63:2 68:23,24
70:22 71:18 78:24
79:9 80:20 81:23
82:11 83:12 85:7,25
86:15 88:13 91:16
95:23 100:19
101:18 105:18,19
107:12,14 108:23
110:13,20 111:17
112:17,22 113:21
114:17 115:2
118:15 119:2,9,15
119:24 124:7,21
125:12,16,20,24

131:21,24 135:9
137:7,11,14,19
145:7,12 146:22
147:3 153:5,13
**abraham's**  39:18
86:13 119:9,13
124:25
**abrahams**  94:6,12
94:13 127:1
**abram**  68:22
**abramin**  27:4,14,16
27:24,25 35:15 36:4
36:7 41:11,20 55:8
55:22
**abrams**  77:8
**absolutely**  117:5
145:11 150:15,17
**accept**  99:1
**accepted**  52:3
**accepts**  99:2
**account**  14:12 19:4
19:5,6,7,10,13,15
19:22 20:5,6,11,15
20:16 40:8 68:14
76:2,4,6 87:4,9,10
106:14 115:21
118:12 119:4,7,9,13
122:7 128:22
137:22 138:6,24
139:2,5 140:2,4,15
140:20,23,24 141:1
141:4 142:6,16
149:12
**accountant**  28:14
28:19 29:22 32:3
36:17,19 39:13,19
39:20 65:24 68:15
**accountants**  14:10
28:10 38:20
**accounts**  19:25
20:19 28:12,12 40:7
113:1 119:2 128:23
128:24 129:1,3
150:21
**accurate**  10:3 31:9
31:13,16,20,23 32:1
33:7,16,20 42:10

154:4
**acre**  17:10 18:10,16
**act**  39:12
**action**  99:25 122:16
125:3 126:5 131:15
**actions**  136:1
**active**  24:21 26:21
27:11 29:13 30:10
**activities**  12:2
**activity**  27:5,7
**actual**  44:15
**add**  82:10 98:12
**added**  105:11
**addition**  106:25
124:19
**additional**  86:19,21
**additionally**  107:10
**address**  36:10,10,11
77:24
**adjourned**  152:16
**administers**  16:25
**admissibility**  6:3
9:17 123:14
**admissible**  118:4
**admissions**  25:23
**admit**  56:5,14
**admitted**  6:6 54:2,4
54:5 58:12,14 63:6
123:21
**adv**  1:9
**adversary**  5:8 13:8
**advise**  97:7
**affairs**  10:13 11:14
12:5 13:1,4,10,15
13:22 14:5,19,24
30:14,20 31:9,12,19
31:25 32:4 34:5,19
41:14 42:4 56:6
61:5
**affidavit**  118:3
**afford**  48:8 150:25
**agency**  142:4
**agent**  151:21
**ago**  8:24 28:3,23
96:2 110:13
**agree**  31:15 58:5
60:4,5,25 111:6

151:16,16,18
**agreed** 9:17 51:2
58:4 115:20
**agreement** 73:8
88:12 108:17 111:7
142:4 149:13
**ahead** 95:6,8 98:11
104:18 108:7
**ahs** 82:25
**alexander** 112:18
124:8,21
**alfonse** 1:18
**allegation** 26:6
**alleged** 100:2
**alleging** 100:9
**allen** 7:4
**allowed** 18:6 63:22
119:4,6,8
**allows** 74:13
**alman** 145:7
**alright** 82:10
**alternative** 120:16
**ambient** 24:14
27:19,21 41:21,24
50:25 52:25 53:4,5
53:6,9,10,14 55:2
72:11,16 73:1
**amend** 29:13 33:3
**amended** 10:8
12:25 13:1,3 24:1,5
24:8,12 25:5,12,22
26:7,8 32:24 33:2,6
34:4 41:14 44:24
107:8,9,10,10
122:15 123:17
124:5
**amendment** 13:13
58:7 100:13
**amendments** 58:5,6
**american** 89:14,15
110:7,12 111:21
**amount** 11:24 21:9
82:20 86:14 94:11
101:19 125:13
127:13,15 131:19
148:10

**amounts** 21:23
**amstan** 15:25,25
24:9,11 26:13,19
27:1 29:12 30:10
35:11,13 36:11,12
36:24 37:9 38:3
39:7,18 40:19,19
41:8,8,20 44:12
45:2,3 52:6 61:6,7
63:16 66:10 69:3
**amy** 1:6 4:15 5:10
62:22 63:1 137:6,11
137:14 153:13
**answer** 18:18 25:21
26:6,16 31:1,6 32:1
35:3 57:4 59:11
120:9 144:3 151:10
152:11
**answering** 140:3
**answers** 34:25
43:15
**anybody** 23:6 62:19
82:12,25,25 83:23
84:1 85:21 127:25
128:2 143:11
148:23 151:24
**anybody's** 142:12
**anymore** 59:17,18
60:18
**anyplace** 142:15
**apologize** 7:4 11:12
30:13 100:21
**appear** 37:10
**appearance** 7:7
**appearances** 4:6
**appearing** 7:5,8
**appears** 149:21
**appointed** 43:11
**approach** 51:17
123:10
**approached** 73:6,14
**approved** 116:9
**approximately** 53:2
68:6 145:19,20
**april** 68:7 74:21
**argue** 108:5

**arguing** 5:14
120:16 135:6
**argument** 55:14
113:12 117:11,14
120:7,22,23 142:3
142:15 150:9
**arique** 58:16
**arrive** 93:21
**arrived** 93:19,20
**article** 61:6
**asian** 16:1 27:20,22
40:20 41:8 50:23
51:23 52:18,19 53:1
53:4,4,6,8,10,11
54:7 61:7 72:9,10
73:16 74:4,16 75:17
**aside** 149:15
**asked** 28:10 30:2
37:3 49:25 63:20,23
65:2 74:23 80:18,19
81:5 86:1 88:16,22
93:9 99:12 114:19
115:12 119:2 133:2
133:6 135:8 136:5
136:10 139:18
140:21 141:12,13
143:5
**asking** 23:22 32:20
35:6 57:1 88:18
110:19 118:6
135:17 138:9
**asks** 11:24 14:1,9
35:8 40:5
**asset** 74:5 95:1
**assets** 16:14,15
26:21 43:10 57:24
61:11 64:6 71:10
95:4 129:9,20
**assign** 74:13
**assisting** 119:10
**assume** 116:13
**assuming** 16:14
115:23
**astutely** 57:25 61:2
**atima** 124:8,20
**attached** 10:12
40:16,17,24

**attempts** 136:2
**attend** 91:25 93:13
95:21,22
**attended** 22:18
**attention** 51:6
122:14 132:12
**attorney** 10:18 15:3
18:3 25:11,11,25
29:11 32:9 90:15,16
90:17 132:21,25
133:1,6,7,10,14
142:4
**attorney's** 101:11
143:12
**attorneys** 3:3,10
12:24 13:2 14:15
18:20 24:19 25:15
27:12 33:3
**august** 12:10,20
43:23,24 54:11 65:3
80:12 86:20 113:21
114:6,22 131:17,19
132:3,5
**authorize** 25:25
**authorized** 10:20
**automatically** 74:12
**avenue** 91:8,9

|  **b**  |

**b** 1:23 7:20 9:20,23
10:3 16:5,7 19:23
20:10 24:1,5,6,8,12
26:9,24 31:8,10
62:17 74:13,15
81:19 137:14
153:18
**bachelor's** 8:4,6,15
147:3
**back** 15:18 16:4
19:23 20:15 25:17
28:23 29:13 30:13
31:5 40:22,25 41:22
44:15 52:9 74:15
77:9 80:4,6 82:9,20
82:23 83:4,18 84:8
86:7,9 87:6,18 88:6
88:8,13,15 94:23
97:14,15 103:10

111:6 114:1,6,11,12
119:20 122:2 123:1
127:11,13,15,16
132:20 134:15,16
135:8,10 140:12,14
**backing** 47:4
**backwards** 87:7
**balance** 86:23
102:15
**bank** 19:5 28:12
102:2 106:14
118:12 119:1,4,6
128:7,12,15,21
131:18 137:22
140:4,15,20 141:4
142:25 149:12
150:21 151:4,5
**banker's** 81:12
**bankruptcy** 1:1,17
1:25 10:11 12:3,9
12:21 14:3,11 16:22
16:24 17:5 22:11
23:13 43:21 44:22
44:23 48:13,17
52:22 54:11 55:3
58:2 91:20,21 92:7
92:24 93:7,10 94:17
95:18 97:21 100:24
101:2 146:2 147:11
147:14
**base** 127:14
**based** 125:21
**basically** 129:22
142:3
**basis** 13:9 98:2
145:7
**bate** 109:19,20
134:15
**beginning** 75:6
120:11 125:4
126:15
**behalf** 25:22 26:1
64:4 149:22
**behavior** 98:19
**behold** 142:16
**belabor** 41:13 63:11
134:21

**believe** 8:18,22 10:5
10:5 12:10 13:2
18:8 19:18,20 22:15
23:11 27:23 32:12
32:16 33:2,13 36:21
37:18 43:23 44:7
48:18 55:21 56:2
59:23 60:12,20
65:15,19,24 68:2
72:22 92:21 96:22
103:19 144:5 149:7
149:16,18 150:10
150:14,16,18,23
151:25
**believed** 47:5,10
113:16
**believes** 98:24
**belongs** 17:5 20:11
20:16 21:3
**benches** 94:4
**benefit** 16:25
117:18,18 127:9
137:23
**best** 43:1 57:20 64:2
65:10
**better** 54:22,23
**beyond** 105:22
111:15,16 127:9,14
**big** 143:9,10
**binder** 81:13 95:23
**bit** 9:13,15 15:18
110:5
**blank** 60:25
**block** 17:10
**blvd** 3:11
**bmw** 20:23,24
21:10,14,22 49:17
50:10
**bmws** 49:15
**board** 46:15
**bonds** 71:14 129:7
**book** 9:16 33:24
61:24 66:23,24
112:16
**bookkeepers** 14:10
**books** 14:12 29:2,8
29:15,16,19,24,25

30:3,22 31:3 32:7
40:7,7
**border** 99:9
**borrow** 102:1,7
115:6 142:8,20
144:8
**borrowed** 111:7
121:10,12 127:13
142:18
**borrows** 103:5
**bother** 122:1
**bottom** 21:15 125:2
**bought** 44:16 48:10
49:21 50:13 71:4
**bounded** 112:16
**box** 14:7,13
**boxes** 100:2
**breach** 2:25 154:3,9
**breadwinner**
143:16
**break** 122:25
**breaks** 21:14
**brian** 3:9,14 7:8
101:10
**brief** 6:15 72:3
105:1 107:16
**briefly** 64:17
112:23 122:11
146:24
**bring** 51:4 97:25
98:1 132:12
**bringing** 56:12
97:21 136:1
**broke** 90:1
**broker** 9:5,6 90:2
**brokerage** 129:1,3
143:23
**brooklyn** 3:5
**brought** 5:9 13:8
98:1 100:1
**build** 142:18
**building** 61:17
93:18 130:19
143:13
**bump** 114:24
**business** 8:19,23
11:22 12:1 24:9

26:14 38:4 47:4,12
47:22 50:22 54:8
58:1 63:16 65:7,9
66:3,4,6,8,9 68:1
69:18,20 72:8 73:4
75:24,25 76:3,4,10
76:15,18,21,24
79:24 139:17 141:3
141:7 144:24,25
**businesses** 11:4
26:10,11 27:5,7
28:25 29:2,4,9 30:3
30:11 65:7
**businessman** 103:6
**buy** 9:9,10 48:9
49:19
**buyers** 9:8,12

**c**

**c** 3:1 4:1 16:4,8,9,11
16:21 20:15 21:18
30:18,19 36:23
37:24 39:11,13 40:5
40:10 51:10,11,12
51:13 54:5 55:7
56:14,19,21 63:6,16
69:16 73:17 74:1
108:8 109:5 153:20
154:1,1
**call** 7:1 23:5 62:24
63:1 71:22,22 80:25
89:14 111:17
112:25 114:24
115:1 118:15
129:12 135:22
136:25 137:5,6
**called** 22:25 23:4,17
85:25 94:6,10,12,13
115:2,3,5
**calling** 62:21
**calls** 77:7
**candid** 117:25
**canvas** 61:1
**cap** 144:8,23 151:5
**capital** 76:17
142:25 145:9,12
**captioned** 125:3

**car** 20:25 21:1
  49:18
**card** 103:1,14 104:3
  104:17
**cards** 101:24 102:3
  102:6,8,10,11,17,19
  102:25 103:5,13,18
  103:20,20,22,25
  104:1,5,8 122:2,3
  130:25 131:8
  149:22,23
**cared** 18:23
**cars** 49:25 50:7
  59:7 122:5
**case** 1:3 5:24 6:24
  10:11 22:25 23:4
  25:6 40:6 42:3
  43:11,22 56:24
  57:20 58:19 59:1,6
  59:16 60:1,7 62:19
  62:25 71:20,22
  92:10,20 93:6,10
  94:6,12,13,19 95:1
  97:9 98:2 99:24
  100:16,24 101:2,20
  110:11 111:4
  130:17,17 137:1
  145:10 149:4
**cases** 94:8,9,11
  121:18
**cash** 71:14 104:4,5
  106:1 128:5
**cashed** 86:4,8
**cashier's** 81:23
  83:15
**categorized** 66:16
**cause** 125:3 126:5
  131:15
**caused** 119:4 136:8
**cavalier** 58:25
  150:18
**cell** 47:11
**central** 1:20
**cert** 154:3,10
**certain** 6:3 56:13
  119:10

**certified** 154:3,10
**chagrin** 57:19 119:3
**chance** 99:2
**change** 12:17 27:21
  48:3 72:18 100:3
  102:16
**changed** 27:16 53:1
  53:14,18 72:14,15
  101:23,24 129:18
**changes** 34:23
**chapter** 43:21,21
  63:18
**charge** 82:1,3,5,16
  84:5 126:9,13
  127:12
**chase** 19:4
**check** 45:6 50:20
  81:12,23 83:16
  85:25 86:4,7,8,10
  115:4,9 125:12,15
  125:25 132:6 140:1
**checking** 19:4,24
  100:2 128:22
**checks** 107:19
  119:15 120:13
  124:20,24 133:9
  139:18
**chief** 60:7
**children** 149:20
**choose** 39:10 49:12
**church** 75:3
**circumstances**
  98:16,20
**citibank** 87:4 113:1
**city** 19:5
**claim** 5:7 73:16
  95:6 100:2 107:7,12
  120:19 150:8
**claimed** 16:11,21
  18:24 21:10,14 22:8
**claiming** 16:18
**claims** 106:25 112:3
  120:23
**clarify** 38:24 75:12
  75:18 105:7 127:4
**clear** 35:3 72:7
  111:16 149:9

**clearly** 55:25 63:10
**clerk** 4:2,4,6 7:2,7
  7:13,15,17,21,23
  54:12,19,23 77:12
  77:15,18,25 95:20
  123:3 137:9,12,15
**clerk's** 91:21 94:19
**client** 64:4 87:13,19
  87:24 88:2,5,5
  98:24 107:23
  113:11 117:12,14
  118:11 120:23
**close** 28:9,10 47:21
  105:14 129:21
  145:21
**closed** 37:1
**closing** 56:10 99:17
**cloud** 97:17
**coffee** 28:1
**collateral** 85:12
  116:19
**collecting** 144:7
**colors** 99:4
**columbia** 78:4
**column** 20:2 21:13
  35:8,11 36:10
**come** 23:3,13 25:17
  64:3 77:9 80:8
  91:19 103:14 123:1
  130:18 135:16
**comes** 30:15 151:7
**coming** 62:14 70:11
  138:22
**comma** 58:13
**commenced** 10:11
  10:12 92:12
**commencement**
  40:6
**commercial** 9:14
**committed** 143:11
**committing** 143:8
**community** 20:3
**companies** 35:20
  45:11,19,20 68:1
  103:14
**company** 28:6
  45:10 46:2,4,8,13

51:24 55:14,16 90:5
  110:8 111:13,21
**complaint** 25:5,13
  25:22 26:7,8 97:21
  97:25 98:1,5,25
  99:14 100:7,9,13
  101:19,20 107:8,9,9
  107:10 112:5,17
  120:25 122:15
  123:17 124:6
  131:22
**complaints** 112:3
**complete** 35:10
  41:19 58:25
**completely** 47:2
  58:7 63:20
**composure** 98:19
**computer** 74:12
**conceals** 96:7
**concede** 131:20
**concerning** 11:18
**conclude** 119:23
  142:9
**concluded** 152:17
**conclusions** 151:14
**conduct** 60:7
**conducting** 139:3
**conduit** 112:23
  113:13 117:15,15
  149:17
**conference** 2:1
**confirm** 63:22
  65:24
**confused** 126:2
**consequence**
  151:19
**consequences**
  127:19
**considered** 140:13
**considering** 71:18
**consistent** 49:9
  117:13 121:15
**conspired** 142:10
**consulted** 59:21
**contact** 46:14
**contains** 25:22

contemplating 130:13

content 96:18

contents 132:15

continue 70:20 93:10 104:25 122:9

continuing 63:12

contributed 46:10 76:17

convermat 67:16,19 67:24 68:1

conversation 115:11

conversations 125:21

converted 52:24

converts 98:6

copies 124:12

copy 6:1 10:3 25:7 86:7 123:23

corp 39:8,17

corporation 28:4,9 35:24 36:1 39:5,10 39:14 44:15,17 50:21 67:16,24 72:7 110:14 153:20

corporations 14:1 15:20 24:17 28:13 33:14 35:5 55:8

correct 4:12 6:7 8:16 10:8 11:23 12:25 21:8 25:23 35:5 37:11 38:3,10 39:22 56:15 57:21 62:15 68:22 72:10 72:19 75:21 76:11 76:22 83:6 84:14 101:12,21 105:12 110:14 113:24 117:16,19 118:14 121:2 124:6,18,21 124:25 130:21 132:16 134:23 135:4 146:6,8 147:24 148:1

corrections 132:21

correctly 144:6

cost 145:17

counsel 9:17 37:3 56:17 59:22 96:1 99:23 111:25 124:12 126:4 136:19

counsel's 97:14 150:9

country 154:23

couple 18:9 84:25 139:6 152:11

coupled 111:8

court 1:1,17 3:4 4:3 4:5,7,10,21,23 5:4 5:12,14,16,22,24 6:2,5,9,13,15,21,24 7:12 8:1 18:17 24:16 32:14,23 33:6 33:11,16,19,22 34:1 36:16,24 37:3,6,9 37:13,25 38:4,7,10 38:15,25 39:3,7,21 39:25 40:3 41:2,4 42:14,16,20,24 43:5 43:10,15 44:8,20,24 45:2,7,12,15,18,21 45:24 46:4,6,10,12 46:17,19,24 47:2,7 47:14,18,22,25 48:2 48:5,9,12,16,20,24 49:2,4,11,15,19,23 50:13 51:5,7,8,12 51:14,18,22 52:4,6 52:10,14,17,19,21 53:3,11,20,23,25 54:3,16,21,24 55:11 55:14,18,25 56:4,8 56:11,14,17,19,21 57:1,8,11,14,16,23 58:3 59:3,5,10,13 59:14,23 60:4,8,10 61:9,13,17,20 62:7 62:12,14,18,23 63:3 63:6,9,11,13 64:5,8 64:12,19,21,24 65:1 65:4,6,12,14,21,25

66:3,8,11,14,18,21 67:1,9,12,15,18,20 68:5,8,11,15,19,24 69:2,5,7,10,13,17 69:19,24 70:1,3,9 70:15,17,20 71:21 71:24 72:1,4 73:23 75:10,13 76:10,13 76:15,17,20,23 77:1 77:3,5,8 81:25 82:3 82:5,11,14,16,18,22 82:25 83:3,8,12,17 83:20,22,25 84:3,5 84:9,13,17 85:4,12 85:18,21 86:2 87:11 87:17,21,23,25 88:4 88:10,20,22 89:7,10 89:13,16,20,22,24 90:3,18,21,24 91:2 91:5,10,12,14 92:3 92:7,12,15,25 93:3 93:6,8,11 94:17 95:1,5,8 96:1,15,20 97:1,5 98:11,15,18 98:20 99:5,8,17,20 100:3,6,12,12 101:19 102:3,6,9,12 102:15,17,19,21 103:1,3,5,10,14,19 103:22,25 104:9,12 104:23 105:4,10,25 106:5,9,12,14,17,19 106:21 107:4,11,19 107:22,25 108:1,5 108:16,25 109:4,7 109:10,12,15,20,23 110:1,4,7,10,15,19 110:23 111:1,3,8,10 111:12,18,23 112:5 112:9,12,14,19 113:2,8,10,14,18 116:2,6 117:10,17 117:21,24 118:1,3,6 118:8,11,18,20 119:6,12,17,23 120:1,3,5,21 121:3 121:5,7,11,15

122:16,25 123:4,12 123:16,19,20,21 124:14 125:6,9 126:2,4,7,13,19,22 126:24 127:2,18,23 128:2,5,8,10,12,17 128:20,23 129:1,4,7 129:9,14,16,19 130:4,8,10,11,13,14 130:16,18,20,23,25 131:3,5,11 132:1,24 133:2,6,10,11,13,15 133:22,25 134:2,11 134:14,19 136:19 136:22,24 137:1,5,8 138:11,14 139:11 139:15,20,23 140:3 140:6,9,11,15,20,24 141:1,6,11,15,18,20 141:22,25 142:22 143:1,6 144:8,11,16 144:19,21,23 145:3 145:5,8,9 146:5,9 146:12,14,20,23 148:10,15,17,22,25 149:2 151:13,15 152:7,9,14,16

court's 6:20 51:4 62:4 152:16

courthouse 1:18 101:15

courtroom 101:11

cousins 28:6

cpa 36:14

create 30:5

creates 16:24

credible 102:24 103:6

credit 101:24 102:3 102:6,8,9,11,17,19 102:25 103:1,5,13 103:14,17,18,19,20 103:22,25 104:1,3 104:17 122:2,3 130:25 131:8 144:14,14 145:7 149:22,23

**creditor** 145:9
**creditors** 11:19
  17:1,7 22:12,15,18
  22:21 23:1,3 24:2
  30:15 91:22,23
  92:20 93:13 96:5,6
  96:14
**criminal** 149:21
**cross** 42:14,17 43:3
  72:1 101:6 123:25
  146:23 147:1
**curious** 46:19
**current** 21:12 55:12
**currently** 50:21
**custom** 82:2,17,19
  127:12

**d**

**d** 4:1 17:22,24 18:7
  21:10,15,22,25 22:1
  22:3,9 122:18,20
  123:11 153:1 154:3
  154:10
**d'amato** 1:18
**damage** 103:17
**date** 12:8,21 26:11
  32:10 55:15 80:13
  87:17 88:5 131:19
  132:5 152:9 154:13
**day** 10:11,25 45:3
  52:13
**deadline** 100:1
**deal** 6:10 70:18
  85:22,23 100:4,13
  118:24
**dealing** 99:13
**debating** 75:7
**debt** 104:6,6 108:18
  131:10
**debtor** 4:22 5:3
  11:25 14:12,21
  15:22 40:8,14 60:21
  63:24 69:14 83:1,12
  85:7 91:3 96:5 97:6
  98:9 99:6,24 104:18
  110:16 113:5
  118:23 126:20
  129:21 130:23

143:7 149:11,16
  150:6
**debtor's** 98:6,15,17
**debtors** 1:7 11:18
  12:1 118:2 150:6
**debts** 17:6 26:13
  85:1
**deceive** 42:23 57:23
  58:24 61:11
**december** 54:9
  72:21
**decide** 75:4 82:20
  98:21 120:21 148:7
**decided** 27:8 84:7
  94:18 121:25
**decision** 58:16,17
  58:21 60:24 149:3
  150:12
**decisions** 57:9
**declaration** 11:18
  14:20 31:7,10
**declarations** 10:13
  10:15
**declared** 32:10
**declined** 64:1
**deducting** 21:13
**defendant** 1:15 4:19
  4:24 7:9 26:11,19
  59:2 78:24 80:9
  90:10 93:19 99:23
  124:19 125:12,19
  131:18 132:10
**defendant's** 4:20
  31:8 51:11 54:5
  90:7 100:23 108:9
  109:11 122:16
  123:11 133:23
  134:3
**defendants** 3:10
  90:17 93:5 124:20
  125:19 153:19
**defense** 62:5 137:6
**defraud** 42:24
  142:10
**defrauded** 120:18
**degree** 8:4,6,13,15
  24:23 58:1,14 78:4

78:6 119:9 147:3
**demand** 91:16
**demanded** 84:9
**demonstrates** 59:24
**demonstrating**
  111:20
**denials** 25:23
**denied** 31:6,12
**deny** 31:22
**denying** 31:12
**department** 51:16
**depending** 60:2
**deposit** 50:20
**deposition** 122:17
**desabier** 58:16
**describe** 79:20
**described** 31:8
**description** 31:10
  153:19
**desk** 91:11
**details** 73:7 141:10
**determine** 59:15
**develop** 97:18
**dictum** 58:23
**didn't** 84:25 92:3
  143:2
**difference** 24:5
  41:15 108:2 130:4
**differences** 6:2
**different** 33:11,17
  34:11,12 42:4,7
  45:9 51:15 87:25
  119:5
**difficult** 142:5
**digits** 35:9
**direct** 8:2 55:21
  62:19 63:21 77:20
  137:17
**directed** 124:24
**direction** 87:7
**directly** 58:17 63:14
  142:9
**director** 14:2 78:19
**dirt** 98:9
**disagree** 151:17,19
**disagreeing** 151:20

**disappear** 150:14
**disapproved** 116:10
**discharge** 5:11 13:9
  63:25 99:25 100:1,7
  100:10
**dischargeable**
  58:24 97:22
**disclaimed** 57:24
**disclose** 14:10 26:23
  29:6,7 43:9 56:7
**disclosed** 26:19,25
  44:8 60:19 61:7
  64:7
**disclosure** 61:4
**discovery** 95:4
  108:9 134:3
**disjointed** 72:1
**dismissed** 92:10
**disregard** 58:25
**disregarded** 39:24
**dissolved** 24:9
  28:11 55:12
**distributors** 27:20
  27:22 51:23 53:1
  54:7
**district** 1:2
**diversify** 47:11,12
**division** 55:8 68:2
  153:20
**docket** 10:7 95:2
**docs** 153:20
**document** 9:25
  11:12,13,13,15,17
  11:18 15:1,3,7,9,17
  15:19 25:25 26:1
  33:7 40:25 41:16,16
  41:25 81:17,19,20
  97:16 123:15 124:2
**documentation**
  30:4
**documented** 131:21
**documents** 25:8
  29:23 32:17 53:24
**dod** 68:12
**doesn't** 63:21
**doing** 28:2 45:25
  50:21 57:2 65:7

66:4,6,8 73:3,4
85:11,17 97:1 138:3
143:22,23
**dollar** 68:12
**dollars** 59:7 104:16
106:6,7 118:21
127:5,23 150:19
**downfall** 141:3
**draw** 122:14
**drop** 149:7
**due** 100:1 126:19
126:20,21
**duties** 9:7

### e

**e** 1:23,23,24 3:1,1
4:1,1 7:19 24:1,1
77:17 153:1,2,18
154:1
**earlier** 62:21 121:9
127:4,11
**early** 27:23 144:6
**earn** 8:17 45:21,24
46:25 47:2 84:19,25
128:8,10,12 143:19
147:9
**earned** 32:10 44:25
45:4,18 46:3,6,20
47:7 127:20
**earning** 26:21 50:17
**earnings** 43:20,25
44:21 143:19
**easier** 5:14
**eastern** 1:2
**ecf** 63:23
**education** 78:3
**efforts** 43:9
**ei** 37:11
**eight** 67:11 78:2
**eighteen** 12:7
**ein** 35:10 36:3 37:4
37:9,19,20,21 41:19
41:20
**eins** 35:21
**either** 39:10,13
41:25 141:25 143:6
147:20 149:10

**elect** 39:11
**electronic** 15:2
154:10
**else's** 84:14 128:2
**employees** 70:7
**employer** 36:7
67:16
**employment** 11:21
11:25 34:9
**encompassed** 98:25
111:11
**enter** 64:10
**entered** 81:17
**entire** 134:22
**entirely** 21:3
**entities** 26:20 39:24
60:19
**entity** 27:16,17 38:2
38:4 45:8 52:21
53:3,11,12 55:12
72:11
**entrusted** 104:7
**entry** 17:9,14
**error** 100:1 132:11
**errors** 132:19,22
**esq** 3:7,14
**essence** 55:24
**essentially** 149:18
**establish** 57:12 85:5
96:1 112:20
**established** 60:14
97:9 137:21
**establishing** 111:12
111:14
**estate** 8:25 9:3 16:1
16:22,25 17:6 24:11
29:12 40:20 41:8
61:7 68:2 81:6
85:15 89:8,11,17,21
90:5,22,25 114:16
115:14,15,16,19
116:12,14 120:24
120:25 125:22
130:3,5,10 135:20
135:23 136:15
143:23 148:18

**estates** 17:10
**events** 96:24 136:8
**eventually** 93:21
**everybody** 99:2
**everybody's** 4:11
134:12
**evicted** 37:1 45:4
65:19 68:18
**evid** 153:19
**evidence** 26:12 51:3
52:3 54:2 112:25
149:15
**evidentiary** 111:4
**exact** 33:8 47:21
65:23 148:12
**exactly** 12:19,23
16:20 23:11,15,16
25:9 27:13 28:3
30:24 33:2,9 43:23
114:14,15
**exam** 153:4
**examination** 8:2
42:17 72:5 75:15
77:20 101:6 123:25
137:17 147:1
**examining** 43:3
**excellent** 144:14
**exclude** 5:12
**excluded** 4:11,16,25
**excuse** 54:16 61:6
80:22 82:18 83:10
89:22 95:25 127:6
**exempt** 16:11,22
17:3 18:6 22:8
73:17 74:5
**exempting** 16:20
**exemption** 16:18
17:12,15 18:24 21:9
21:13 22:4 146:5
148:17
**exemptions** 21:14
74:13
**exhibit** 9:18 16:6,7
24:1,1 25:3,5,17,19
25:21 27:2 30:13
31:5 33:24 34:4
40:22 41:4,15 51:5

51:10,11 54:5 55:7
56:14,19,21 62:7,9
63:6 67:4 73:22
81:14,15,18,19 87:6
87:7 95:24 108:8,12
108:25 109:4,5,6,23
110:1 112:15,16
122:16,18,20
123:11 133:19
**exhibits** 6:1,3,5,9
9:16 51:2 61:23
62:5,14,17,23 63:4
63:4 67:2 70:14
**exist** 52:21 55:16,17
55:18
**existed** 52:25 55:15
**existence** 61:8
**expand** 114:16
**expanding** 115:16
115:19
**expect** 114:1,9,11
140:11
**expectations** 114:10
**expected** 113:4
114:11 116:23
**expense** 39:16
**expenses** 68:21
**expert** 39:12 116:1
116:4
**explain** 129:13
**explained** 127:11
**explains** 40:2
**exports** 27:4
**extend** 81:5
**extent** 115:11
**extra** 82:21,22

### f

**f** 1:23 26:14 95:24
154:1
**fact** 58:3,10 96:7
98:3,25 99:24
114:10 149:5 152:5
**facts** 60:14 151:18
151:19
**factual** 60:22 96:19
**factually** 88:1

**failing** 58:1,1
**failure** 19:2 92:10
**fair** 42:9 116:22,24
 134:23
**faith** 130:20 131:1,5
**false** 13:9 58:11
 59:19 97:10 150:3
**families** 145:18
**family** 79:19 82:15
 82:24 102:23
**far** 36:9 85:11
 123:15 124:3
**father** 79:2,3,5
 85:24 90:8,9 110:22
 112:24 115:7,7
 118:13,22 119:10
 120:7,12 121:12
 122:6,6 138:1,7,23
 138:24 139:2,3,11
 139:12,24 140:17
 140:21 142:8,17,18
 142:21 144:7 145:7
 145:13,20 150:15
**favor** 60:6
**federal** 1:18,19 22:3
**feels** 98:24
**fees** 102:2,2 103:12
 105:11
**felt** 130:12
**fifteen** 21:11,12
**figure** 28:6 58:18
 64:16 108:1 120:22
 121:17
**file** 16:24 25:25
 29:12,14,17,20 30:2
 37:3 38:7,7,12,22
 39:13 43:21 48:25
 70:25 92:9,10 95:5
 99:14 146:2
**filed** 10:4,6,9,15
 11:2 12:3,8,11
 13:13,16 17:3 22:11
 24:2 25:5,13,21
 26:3 33:7,12 34:5
 35:20 36:4,25 37:18
 37:18 39:4 41:13
 42:3 52:22 54:11

 55:3,15 58:10 64:24
 65:3 69:15 92:7,9
 94:24,24 97:21
 147:12,15
**filing** 10:12 23:12
 26:11 39:11 44:22
 45:18,23 53:2 58:2
 91:20 98:22
**filings** 107:4 111:8
**fill** 94:21
**filled** 14:7
**finance** 8:14,15
 24:23
**finances** 28:24
**financial** 10:13
 11:14 12:5 13:1,4
 13:10,15,22 14:5,19
 14:23 19:25 30:14
 30:19 31:9,11,19,25
 32:4 34:5,19 41:14
 42:4 46:16 56:3
 61:5 119:14
**find** 9:7,8,20 11:16
 27:2 30:16 41:15
 52:4 55:23 73:5
 94:19 143:11 148:2
 149:6
**findings** 151:12
 152:4
**fine** 6:17 14:18 54:2
 61:20 63:3 82:21
 85:11 110:23
**finish** 18:18 32:14
 43:5 61:17
**finished** 116:6
**firm** 89:11,13
**firms** 30:21,25 40:5
**first** 7:1,10 8:19,23
 10:9 20:5,15 49:21
 51:3,16 52:6,10
 80:2,5 82:6 94:6
 102:13,22 113:23
 117:15 131:7 135:2
 136:13
**fits** 59:16 60:21
**five** 78:23 107:10

**flip** 25:18 34:23
 81:13 87:6
**floor** 3:11 93:18
**florida** 17:11 19:3
 71:3
**flow** 109:2
**focus** 51:17 104:24
 107:24 149:4
**focusing** 52:18
 71:19
**folks** 83:17
**follow** 72:3 75:12
**following** 17:17
**follows** 16:5 31:11
**food** 40:20 41:9
 52:19 53:9
**foods** 16:1 27:20,22
 50:23 51:23 53:1,10
 54:7 61:7 72:9,10
 73:16 74:4,16 75:17
**ford** 21:7 22:8
**foregoing** 154:4
**forget** 58:5 83:20
 119:23
**forgot** 27:11
**form** 57:15,22 67:6
 67:10 81:11 151:17
**format** 55:10
**forms** 94:21,22,23
 116:19
**forth** 132:20
**forward** 23:13
 25:10
**found** 27:14 103:16
 131:8
**foundation** 51:3
 123:15 124:3
**founded** 72:16
**four** 35:8,18 129:20
 151:10
**frame** 73:12
**framework** 142:14
**franchise** 38:6
 44:13 66:10 67:8
**frankly** 57:18 127:5
 142:14

**fraud** 58:24 120:19
**friend** 46:22 47:17
 47:17,18 53:3 73:11
 79:19 102:23,23
 148:3
**friendly** 79:22
**friends** 75:1 82:13
 82:14
**front** 9:16 81:14
 87:6 151:6
**frozen** 141:4,7
 150:22
**full** 58:9 129:23
 145:16
**fully** 39:5 85:2
**function** 16:18
**funds** 84:14,15,20
 117:18 118:17
 128:3
**further** 40:2 42:12
 57:24 71:17 75:9
 76:9 101:4 132:23
 133:16 136:17,24
 146:21
**future** 116:20

### g

**g** 4:1 28:15 36:14
**gaffney** 3:7 4:13,15
 4:18,24 5:7,23,25
 6:14,19,25 7:4,5,10
 7:24 8:3 24:22
 32:15,18,20 33:4,23
 34:2,3 37:14,15
 39:23 40:4 41:3,6,7
 42:12 43:2,13 49:25
 51:10 52:8,20 53:21
 53:24 54:1,18 57:25
 60:5,9 61:25 62:1,9
 62:16 64:9 66:24
 70:13 71:25 72:3,6
 74:1,3 75:9 77:6,21
 84:18 86:3 88:11,25
 90:4 91:15 92:5,9
 92:14,18,22 93:12
 95:2,9 96:4,10,24
 98:13,19 99:7,16,19
 99:22 100:5,9,16,18

101:4 106:3 108:13
108:15,20,22
109:13,16,24 110:6
111:20 115:25
116:4 122:18,20,22
123:13,20 124:11
134:9 136:20 137:3
138:9 146:8,10,24
147:2 148:9 151:12
151:14 152:6,15
153:5,7,10,14
**game** 98:11
**garage** 59:8
**garden** 19:5 110:12
**gardens** 89:15,15
110:7 111:21
**general** 136:7
**generally** 105:12
**generated** 74:11
**gentleman** 122:3
**getting** 54:12,14
85:16 104:20
129:22
**gift** 49:21 139:16
142:2
**give** 6:21 25:15,17
67:1,3 72:20,23
75:17 81:11 82:21
82:23 85:25 96:20
102:12 106:1,10
120:6 124:11
126:17 138:6
139:15,15,16,20,25
150:15
**given** 22:12 43:17
103:23 104:5
110:25 126:14
127:24 140:17
**gives** 17:15
**giving** 121:11
**glass** 84:24
**go** 4:5 5:22,24 15:18
29:13 30:13,18 31:5
34:23 41:19,22
42:20 52:15,17
54:24 55:10 57:1
62:23,24 64:2 74:15

76:1 84:19 94:19
95:6,8 99:10 104:18
104:25 107:5,7
108:6 109:3 111:16
122:9 123:13
136:15 138:7
**god** 36:4
**goes** 63:25 75:2
100:14 119:20
**going** 5:2,5 7:1 14:9
15:17 18:18 20:15
25:17 26:7 27:25
52:11 62:19 65:9
72:23 77:24 87:8
94:15,18 100:3
104:14,24 106:23
107:22 112:25
114:5,6,12 120:24
123:23 125:22
137:5 139:25
142:12 143:11,14
145:13 146:20
149:3 150:2,22
152:3
**good** 47:14 70:15
77:22,23 101:8,9
104:7
**gotten** 61:25 118:23
**graduated** 8:21
**grant** 100:8
**granted** 100:11,12
**great** 67:18 130:20
131:1,5 144:14
**greater** 78:21
**gregory** 3:2 7:5
**gross** 11:24 12:14
67:12 69:1,13,22
**grossman** 1:24
**groundwork** 60:11
**guarantee** 144:15
144:17
**guarantors** 145:14
**guess** 19:1 20:20
32:9 47:10,17 79:17
106:23 144:18
147:21,21 149:6

**guy** 47:4 131:1
**guys** 61:14 87:12
121:17,19 122:25
141:20 149:2

## h

**h** 7:20 20:7,8
137:14 153:18
**habitual** 149:21
**half** 12:11 134:22
**halfway** 11:14,17
**hallucinate** 112:10
**hand** 5:25 7:15
77:13 129:20
137:10 149:24
**handed** 149:20
150:19
**hang** 44:20
**happen** 47:10 114:9
139:9
**happened** 27:13
44:18 67:22 75:19
93:6 94:12 96:24
137:25 139:7
**happening** 53:9
**hard** 145:25
**harlem** 78:21
**he'll** 126:17
**health** 78:5
**hear** 43:15 54:13,15
54:17 92:3 101:13
**heard** 5:18 137:19
149:10
**hearing** 54:18
**hearings** 99:24
**hearsay** 64:11
96:20,23 99:10
**held** 58:22 150:7
**hello** 141:21
**help** 9:10
**hidden** 61:8
**hide** 61:11
**higher** 103:3
**hillside** 91:8,9
**hired** 90:15,16
**history** 85:8,10
**hofstra** 147:8

**hold** 18:17,17,17,22
32:14,23 33:6 36:24
37:25,25 57:11 89:7
96:15 102:3 105:25
127:18 134:11,11
134:11
**holding** 32:6 58:22
**holdings** 45:10
**home** 48:7 70:2
78:21 94:22 144:14
146:1
**homestead** 146:5
**hon** 1:24
**honest** 13:11 102:24
103:6
**honor** 4:9,13 6:25
7:24 33:4 38:19
39:9 42:15 43:13
51:1 52:2,8,13,20
55:7,10,22 56:2,13
58:20,21 61:2,22
63:13,14 64:9 65:11
69:12 71:17 75:11
77:6 82:6,17 83:10
85:14 94:18 95:3
96:9,12 98:13 99:19
99:22 100:17
104:22 105:5
106:20 107:18
109:2,16,18 110:17
111:16 112:7 118:5
118:14 119:21,22
121:14 122:12
123:10,13 124:11
126:25 130:1
133:17,24 134:18
136:21 137:3 143:4
146:7 148:24
152:13
**honor's** 57:5
**hopefully** 47:24
**hostile** 7:25 55:21
**hotel** 104:4
**house** 47:25 48:7
49:16 70:25 71:1,14
74:18 75:5 85:1
122:5 144:18

147:23 148:4,7,11
148:15,18 150:23
**household** 22:4
143:16
**housekeeping** 61:24
**houses** 85:16
**huh** 13:25 16:12
20:1 30:17 74:7
**hundred** 117:7,9
141:16
**hundreds** 59:7
104:15 122:8
**husband** 5:4,8 20:2
20:9 50:2 85:2
137:20,20,21 138:3
138:18,21 139:4,18
139:20,24 140:9
141:11 143:19
**husband's** 4:18,25
138:6
**hyde** 71:2
**hypothetically**
117:20
**hypotheticals** 116:5

**i**

**idea** 55:4
**ideas** 46:15
**identical** 132:9
**identification** 36:8
**identity** 14:10
**ignore** 19:3
**immediately** 118:12
**implementing**
57:20
**import** 27:25 28:7
72:8
**importing** 50:22
**imports** 26:13,20
27:1,14,16,24 35:15
36:4,7 41:11,21
55:8,22
**inactive** 55:12,16
**inadmissible** 64:11
**include** 48:5
**included** 92:20
105:20 107:6,12

**includes** 33:13
**including** 12:1
101:17
**income** 11:21,24
12:6,13,14,21 34:8
34:13,18 35:20 38:2
38:16 39:16 44:10
45:7 48:20 49:11,13
64:6,6 67:12,13
68:24 69:13,22
145:25 151:3
**incorporated** 11:3
26:10
**incorrect** 108:19
**indebted** 101:18
**india** 28:1,6
**indiscernible** 60:13
**individual** 14:21
16:2,3 35:9
**individually** 6:11
**individuals** 30:21
30:25 40:6
**information** 10:23
44:7 74:12 140:2
**initial** 10:4,6 11:6
107:8 127:9
**initially** 76:16
**instance** 61:3 108:7
112:4
**integrity** 102:24
**intelligence** 58:14
**intend** 52:12 62:24
97:11 118:15
**intent** 42:19,23
57:23 58:24 61:12
96:7 98:6,15 150:10
151:8,25
**intentionally** 55:24
57:22 61:10
**interest** 24:16 40:15
73:16 81:25 82:1,3
82:16 83:3,7 84:5,8
84:12 103:1 104:16
122:1 126:8,9,11,12
126:13,16,18,19,20
126:21,24,25 127:9
127:11,12 128:10

128:13 129:22,22
130:5
**interested** 9:8 85:4
**interests** 11:3 15:23
**interrupt** 38:23
94:15 97:3
**introduce** 52:11,12
112:25 118:15
**introduced** 79:2,6
**introducing** 39:2
**introduction**
111:18
**introductory** 57:6
**inventoried** 142:7
**invest** 47:19 129:4
**invested** 53:4,8
75:19,21,24 120:2
**investment** 127:9
**investments** 125:22
128:9,16 129:12
**investor** 127:7
**inviting** 95:20
**invoices** 30:1
**invoke** 98:14
**involved** 85:18
**ira** 129:13,15,16
**irs** 36:8
**island** 84:23
**islip** 1:20
**issue** 59:13,19,20,20
59:21 60:11 71:20
85:6 88:1,7 97:14
98:14,15 99:11
100:4,14 113:3,7,10
124:20 139:18
140:22
**issued** 36:8 99:25
**issues** 6:10 59:14,17
59:18 60:17 74:25
121:20
**itemized** 11:4 68:20
**i'm** 96:22 101:13
104:20

**j**

**j** 77:17
**jamaica** 3:12

**janet** 1:11 7:6 22:20
23:18 77:7,14,17
94:2 110:8 139:25
140:21 153:10
**january** 55:13 56:1
72:21,21,22,22
78:15,17
**jewelry** 84:24
**job** 9:7 78:18 84:21
84:22 136:16
**jobs** 84:21
**joel** 3:7 7:4
**john** 79:4,5,18,19
79:21 82:3,11 84:2
85:25 90:6,7,9 93:3
101:25 102:24
103:9 105:7,16
107:1 110:22 111:6
111:12,21 112:17
115:20 117:21,25
119:1,8,10 124:7,19
124:24 125:12,19
125:20,23 126:1,10
127:7 128:19,20
129:21 130:20
131:18,22,23 132:5
132:10 134:24
135:7 136:2 141:24
149:21
**johns** 110:13
119:12
**joint** 4:22 5:3 9:18
18:9 19:9,10,14,16
19:17,19,22 20:2,18
20:19 24:1,1 25:2,5
25:17,18,21 27:1
30:13 31:5 33:24
34:4 41:15 61:23
62:4 69:15 70:13
73:21 81:14 112:15
112:16 133:19
**jointly** 18:13
**judge** 1:25 94:15,16
**july** 80:14 81:3 86:8
87:2 113:21 114:5
114:22 115:3 125:5
125:11 126:3

**juncture** 71:18
**june** 13:6 34:5
  41:14 111:13
  126:17 135:3
**junior** 144:24
**jury** 6:16 120:5

**k**

**k** 38:10,15 39:4
**keep** 18:20 29:2,21
  29:21,22,23 30:6,7
  48:12 63:21,22 69:7
  115:24 143:14
  146:3,3,20
**keeping** 14:12
**keeps** 29:22
**kept** 14:11 29:8
  102:14 103:13
  115:21 137:23
**kind** 73:4 75:7
  120:21
**knew** 23:18 60:17
  74:24 96:5 113:3
  115:6,18 139:7,7
  141:7,10 150:6
**know** 5:5 6:2 12:8
  12:23,25 14:15,16
  16:13,15,18 17:24
  18:1,6,21 19:2
  20:20,20,21 23:21
  24:19,20 27:11
  28:11 29:17 37:8,8
  37:21 38:11 41:22
  46:23 47:9,9,16
  48:22 50:15 53:22
  54:13 55:9 57:5,5
  59:8 61:2,9,11,21
  62:5 63:19 64:5,7
  64:14 65:11,23
  66:16,18 68:13,14
  68:15 69:5 72:25
  73:4,6,18 74:24
  75:2 78:24 79:1,12
  79:18 82:9 84:22
  85:11,15,16 86:6
  88:18,18,20 89:24
  93:25 94:16 97:8,20
  97:24 98:2 102:14

103:4,18 104:2,4,5
104:11,12,14,19,19
112:1 115:22 116:2
118:10 121:16,22
121:24 126:17
129:12 130:15
131:9 132:2,19,20
136:13,14 137:20
137:22 138:2,3,11
138:17,20,21,21
139:8,9 140:7 141:9
141:9,10,22 142:2
142:12 148:12,14
149:11,11,12,25
150:13,17 151:1,3,4
151:4
**knowingly** 58:12
**knowledge** 91:10
  116:1
**known** 50:24
**knows** 36:5 120:6

**l**

**l** 2:25 7:19 154:3,9
**labeled** 11:3,13
**lack** 115:25
**lacking** 58:7,8
**land** 17:9,10 18:10
  19:3 71:3
**large** 118:16
**larger** 105:20
  112:16
**late** 102:1
**law** 3:2 7:5 17:4
  22:3 49:20 58:10
  60:23 79:2,3,5
  85:24 90:8,9 110:22
  112:24 115:7
  118:13,22 119:2,10
  120:7,12 121:12
  122:6,6 142:17,19
  142:21 150:15,20
**laws** 49:21 50:14
  145:23
**lawsuit** 91:17 92:12
  92:15
**lawyer** 85:18 133:3
  133:5

**lay** 51:3
**laying** 60:11
**leading** 43:2,13
  46:7
**leads** 142:9
**learned** 91:19
**leaves** 129:24
**leaving** 149:15
**left** 28:22 56:23,24
  56:24 58:19 59:14
  60:22,23 109:19,24
**legal** 98:18,21 99:4
  142:5 154:22
**legible** 110:6
**lend** 79:25 80:2,15
  80:17,23 82:19
  86:17,19,21 113:20
  114:5 120:19
  125:20,23
**lending** 115:6
  131:22
**lengthy** 30:14
**lent** 80:8 81:7 86:15
  112:21 113:20
  125:19,24 127:8
  136:3 137:19
**lest** 119:22
**letter** 20:5 63:23
  114:24 134:7,22,24
  135:7,9
**letters** 90:17
**letting** 102:25
**level** 78:3 122:9,9
**liabilities** 43:10
  64:6
**liable** 59:25
**licensed** 8:25
**lie** 141:19
**limited** 22:6
**line** 11:2,3 12:5
  24:6,8 26:9 65:6
  66:19 70:6 74:15
  97:18 153:4
**liquid** 129:20
**liquidate** 18:21
**list** 11:6,19 12:6
  14:1,4 15:20,22

24:8,11,14 27:12
30:15,19,25 32:3,6
34:18 35:8 36:13
40:5,8,15 41:11
48:22 74:15 92:20
**listed** 16:16 17:4
  26:14 27:8 33:15
  35:1,10 41:24 50:2
  63:15 70:23 71:7
  74:6,8
**listened** 94:18
**listening** 61:2
**listing** 35:5
**lists** 16:13,21 17:14
  19:24 26:9 34:13
  40:19 41:8 74:4
**little** 9:13,15 15:18
  50:19 54:23 71:24
  87:12 98:9 106:23
  126:2 128:14
  143:10 151:23
**live** 122:4 146:12
  149:19
**living** 48:6,8 145:22
**llc** 24:9,11 26:13,20
  27:1 30:10 35:11,13
  35:22,23 36:12,24
  38:3,12 39:5,7,10
  39:17,18,21 40:19
  41:8,20 44:12 52:6
  61:6 63:16 66:10
  69:3
**llcs** 39:24
**loan** 49:17 65:17,21
  80:18 82:12 83:3,9
  83:10,12 90:17
  103:3 113:24,24,25
  115:8 122:1 127:12
  139:20 142:25
  144:12,15 145:2,14
  149:15 151:5
**loaned** 82:20 83:23
  83:25 85:7 102:13
  106:13 125:11,24
  127:4,10,16 128:6
  129:10 130:1
  131:18 141:7

144:23
**loaning** 113:4
　126:15
**loans** 49:18
**long** 8:24 28:3,18
　28:20,23 30:9 36:5
　36:5 73:7,9 74:22
　74:23 78:22 84:23
　85:3 110:21 148:4,4
**look** 17:9 20:21
　25:16 34:23 41:18
　41:23 47:16,20,24
　64:2 66:22 68:19
　73:21,23 74:1
　108:12,25 121:15
　139:13 151:9 152:1
**looked** 13:19 41:25
　57:21 94:1
**looking** 14:22 16:5
　20:20 21:17 26:6
　41:16,22 47:11,12
　64:17 69:4 73:25
　98:16 148:5
**looks** 21:16 42:8
　109:16
**loosely** 87:13
**lose** 65:8,25
**loss** 63:16 65:6,8,19
　65:21 66:7,14,15,15
　67:7 68:8,12 69:6
　69:10,16
**losses** 68:17,20
**lost** 65:16 66:7
　68:18 106:6
**lot** 17:10 25:8,10,14
　59:25 82:8 97:8
　104:18 130:2
**lots** 71:3
**low** 142:16
**lower** 93:18
**lying** 141:15 143:6
　143:8

**m**

**m** 1:18 7:20 137:14
　137:14 153:2
**ma'am** 77:18
　104:23 106:24

107:3 116:22 117:9
　123:6 124:18 125:4
　125:18 132:8 135:6
**mailed** 25:8,10
**main** 68:1 149:4
**maintaining** 64:10
**majority** 142:24
**making** 12:22
　106:25 112:2
**man** 58:13 59:6,8
**manage** 122:4
　145:25
**managing** 14:2
**manner** 60:12,21
　117:12 150:18
**march** 1:21 25:6
　74:19,21 90:16
　148:8 154:13
**marietta** 36:16
**mark** 14:13
**marked** 9:18 14:7
　23:25 25:2,18 33:24
　62:10 81:19 123:11
**market** 74:22 148:4
　148:16
**marketing** 147:6
**married** 49:21 79:7
　79:8,12
**masters** 78:4,6
**matter** 1:5,10 58:3
　58:10 92:25 142:5
**matters** 4:4
**mccaffrey** 3:9,14
　4:9,12,14,17,19,22
　5:1,13,15,17,21 6:4
　6:8,12,23 7:8,8
　38:19,21,23 39:1,4
　39:9,22 40:1 42:15
　42:18,21,22 43:3,7
　43:8,19 49:24 50:16
　51:1,6,9,11,13,15
　51:19 52:2,5,7,9,12
　52:15,18,23 53:6,15
　53:18 54:6,15,17,22
　54:25 55:1,9,17,20
　56:2,6,9,12,16,18
　56:20,25 57:4,10,12

57:15,17 58:20 59:4
　59:6,12 60:3,25
　61:16,19,21 62:3,8
　62:10,13,21 63:1,5
　63:8,10 64:18,20,22
　64:25 65:2,5,10
　67:3,11 69:9,12,14
　69:18 70:6,12,16,21
　71:17,23 75:11,14
　75:16 76:9 77:10
　87:15,19,22,24 88:3
　88:9 95:3 96:9,12
　96:17,22 97:3 98:8
　101:7,10 105:1,5,6
　106:22 107:16,20
　107:24 108:4,6,11
　108:14,19 109:2,6,8
　109:11,17,22 110:3
　110:5,9,12,17,20,25
　111:2,5,11,15,25
　112:7,10,13,15,21
　113:6,9,13,17,19
　116:7,8 117:16,19
　117:23,25 118:4,7,9
　118:14,19,25 119:8
　119:14,19 120:2,4
　120:10 121:2,4,6,9
　121:13 122:11,13
　122:19,21,23 123:9
　123:18,23 124:1,16
　125:10 127:3
　128:19 131:13
　132:23 133:16,18
　133:23 134:1,4,6,10
　134:13,15,18,20
　136:17,25 137:2,6
　137:18 138:13,16
　141:24 143:15
　145:6,11,15 146:7
　146:11,13,15,17,21
　148:24 149:1 152:8
　152:13 153:6,8,11
　153:13
**mean** 5:5 6:16 9:13
　12:23 14:14 15:25
　16:15,15 17:17 18:5
　18:14 20:20 24:18

25:14 26:4 28:4,10
　29:23 30:23 31:16
　32:2,19,22 38:20
　45:22,25 46:14 47:5
　49:6,6 52:15 54:10
　55:22 57:1 61:15
　64:12 66:5,13 68:13
　69:22 73:9,14 74:23
　75:2,18 99:8,19
　100:6,7 113:9
　119:20 120:18
　121:16 133:8
　135:18 139:13
　141:2
**meaning** 16:20
**means** 5:15 18:5
　31:14 64:15 106:6,9
　149:17
**meant** 61:10
**meeting** 22:12,15
　22:18,21 24:2,2
　91:22,23,25 93:13
　95:11,20 149:14
**member** 14:3 15:23
　39:24 40:1,16 82:24
**membership** 73:8
**mendelsohn** 63:17
　63:20 64:14 97:24
　98:5
**mendelsohn's** 64:11
**mentioned** 18:20
　19:1 27:12 29:11
　32:13
**messer** 3:2 7:5
**met** 79:19 101:10
　101:14
**middle** 81:3 115:3
**million** 84:3,13
　104:16 106:6,7,10
　118:21 121:25
　127:5,23 128:17
　129:19,20,21
　150:19
**mind** 57:2 140:18
**minds** 149:14
**mine** 46:22 47:17
　102:5 109:9 131:12

mineola 154:25
minute 25:18
miscommunication 32:9
misleading 58:11 150:4
missed 148:13
mistake 24:20 61:10 132:7
mistakes 57:18,21 143:9
mod 151:2,2,3
modi 102:23 103:8
modification 48:4 48:15 49:10 151:1
modified 148:13
moment 63:12 110:13 115:19,23 116:13 119:25
momentarily 112:23
monarch 45:10,13 45:16 67:21,23,25 68:2
money 45:18,21,24 46:6,7,10,17,18,20 46:21 47:3,22 48:12 50:18,19 55:5 65:8 66:7,11 72:20,24 75:17,19,20 76:1 79:25 80:2,8,23 81:4 82:12,20,23 83:3,14 84:8,9,25 85:2,5,7,22 87:20 88:8,16,19,19,23 95:16 97:14 102:7 108:2 110:21,25 111:7 113:2,11,20 114:5,12,19 115:7 115:21,22,23 116:11 117:12 118:22 119:12,18 119:20,21 120:6,19 120:24 121:7,12,13 121:14 122:4,6 125:11,19 126:15 127:8,8,10,10,12,15

127:16,20,24 128:1 128:10,11,14,20 129:10 130:1,13 131:18,22 132:10 133:9 135:1,6,8,10 136:2,5,11,14,15 137:22 138:6,22 139:2,16,25 140:1 140:14,18 141:12 141:13 142:6,8,10 142:15,17,20,22 143:3,5 144:12 149:11,19 150:13 150:16 151:20
monies 87:17 112:21 119:4 126:7
month 12:18,22 148:6 152:5,7,9
monthly 12:13
months 44:1,21 73:10,13,13 96:2
morning 77:22,23 101:8,9 132:22 133:2
mortgage 48:2,13 49:4,9 85:1,13 90:1 130:8 144:20,21 146:4 148:10 150:25 151:1,2,3
mortgaged 144:19
mother 49:20 145:13
move 19:4 54:21 77:25 100:16 117:10 121:16 150:24
moved 74:20 91:8 146:1,15,19 147:23 147:25 150:23
multiple 59:21

**n**

n 3:1 4:1 7:19 25:3 25:3,5,17 31:5 77:17 81:14,16 153:1,2 154:1
name 7:2,18 27:17 27:19,21 40:15 50:5

50:24 53:13 72:14 72:15,18 77:16,24 101:10 124:25 137:12 140:22 141:23
names 53:1 124:20
nancy 25:3 81:16
nature 8:23 15:22 55:23 75:22 79:20 136:7
nazzarro 58:16 59:16
near 94:4
necessary 55:9 150:10
neck 67:18
need 18:20 27:8 55:18 61:15 65:16 99:21 111:15 112:8 116:7 118:23 136:15,20 143:1,2 151:23 152:2
needed 75:4 130:25 135:15 140:1 148:7
nefarious 61:12
neither 26:20
never 23:20 28:1,4 28:7,11 36:24 42:25 46:6,20 47:7,8 55:6 73:2,2 82:25 94:17 95:5 113:4 117:14 119:18 120:14 122:4 127:20 139:14 140:13,13 140:18 141:13,21 141:22 142:1 143:4 143:5 144:25
new 1:2,20 3:5,12 8:8 24:25 27:19 36:16 47:13 53:11 71:2 154:25
nineteenth 131:15
nobody's 151:20
non 97:22 116:1,4
note 85:13 107:4 108:8,17,22 111:3,4 111:6,13 116:17

126:16 130:13 134:16
notice 2:1 22:12 55:11 91:21 100:23 101:1 108:9 125:18 134:3
notification 87:10
notified 92:23
notwithstanding 31:7
november 36:19 37:2 45:4 65:20 101:1
number 13:23 14:1 15:20 19:24 35:10 36:8 37:4,9,20 41:20 47:3 51:5 54:5 87:4 105:14,20 110:2 132:4
numbers 11:13 47:21
numerous 26:13
nursing 78:19,21

**o**

o 1:23 4:1 25:19,21 153:2 154:1
oath 58:11 123:6 132:15
object 43:6 62:16 108:23 111:18 112:1
objected 113:1
objecting 13:9 96:22
objection 5:2 6:7 43:2 53:20,22 56:17 62:15 63:7 64:10 70:11 96:15,18,21 111:22 115:25 116:14,15 123:14 123:22 124:4 138:9 138:14
objections 23:6,12
obligated 98:9
obligation 111:21
obscured 110:5

**obviously** 60:6
**ocala** 17:10,10
**occasions** 99:23
**occur** 138:5
**occurred** 72:18
**october** 94:23
**odd** 32:24 106:6
　118:21 121:25
　150:19
**offer** 51:2
**office** 3:2 7:5 43:18
　88:16 89:6,7,7,8,17
　89:19 90:22,25 91:5
　91:8,22 94:19
　101:11 135:20,23
　136:10 143:12
　150:20
**officer** 14:2
**oh** 4:23 10:10 15:21
　16:7 17:19 42:21
　49:2 54:22 67:1
　70:7,15 77:4 110:1
　110:1 133:22
　135:19 145:3
**okay** 4:5,10 5:13,20
　5:24 6:12,21,23
　7:12,21 9:24 11:20
　11:21 12:4 16:7,23
　17:2,8,19 18:10
　19:3,12 20:12,14,23
　21:19 22:2,5,7,11
　23:25 29:15 30:25
　31:5 32:5 33:22
　34:22 35:8 36:13,22
　37:14,21 39:3 40:3
　40:23 41:5 42:16
　43:25 44:12 46:19
　49:23 51:14 52:1
　54:22 56:18,20,25
　59:12 60:3 62:3,13
　63:5 66:18 68:5
　69:18 70:9,15,20
　71:23 74:2,10 75:8
　77:2,18 82:8 84:17
　86:2 87:21 88:10
　90:3 91:14 93:11
　95:6 100:5,13,16

104:9 105:4 106:21
　110:1,4,20,20,20
　111:2,10 116:13
　118:8 121:15 123:4
　123:12,19 124:10
　125:9,18 127:2
　133:11 136:19
　137:15 139:10
　141:18 143:24
　144:1 145:5 146:23
　148:20 152:7
**old** 8:10,12 78:1,2
　154:23
**once** 56:21 115:2
**ones** 108:15 143:11
**ongoing** 110:21
**open** 8:19 9:18
　44:14 68:5 121:1,5
　121:6,7
**opened** 28:4 44:15
　84:23
**opening** 6:15,20
**opens** 15:22
**operated** 55:6 60:12
**operating** 66:15
　73:15
**operation** 11:22
　12:1
**opportunity** 6:21
　95:10
**oral** 57:13 149:14
**order** 58:23
**original** 24:6 26:25
　29:6 33:1,11,19
　34:19 58:6,6 61:5
　148:14
**originally** 33:14
　86:22 101:22 150:1
**outside** 5:17 128:17
**outstanding** 106:1,3
　107:7,13 118:21
　128:18
**overdrawn** 141:5
**overruled** 43:16
**oversee** 43:11
**overtly** 63:22

**owe** 126:22 136:14
　139:11,12,13
**owed** 26:13 95:14
　101:19 105:15
　111:13
**owes** 83:14 105:19
　106:7 107:14
　126:22 135:1
　139:14 140:18
**owned** 27:17 36:12
　60:19 71:5 76:10,13
　90:5 144:14
**owner** 39:21
**owners** 15:25 68:1
**ownership** 24:16
　26:9
**owns** 18:10,15
　20:23 26:11 56:22

**p**

**p** 3:1,1 4:1
**p.c.** 3:9
**p.m.** 84:22 123:2,2
　152:17
**package** 51:9
**packaging** 73:2
**page** 9:20 11:2,12
　14:19,23 20:23
　34:24 36:22 37:23
　41:2 81:20 109:18
　112:10,10 124:17
　125:2,3 131:14
　132:4,12,14 134:9
　134:22 153:4
**pages** 9:20 14:24
　67:11 87:7 95:20
**paid** 49:15 67:23
　83:1 85:1,2 87:17
　87:19 88:6,8,15
　94:22 97:13 104:6
　114:1,11,11
**paintings** 71:12
**panned** 28:1 73:2
**paper** 68:3,3 95:19
**papers** 6:16 54:19
　54:21
**paperwork** 127:6

**paragraph** 15:21,21
　26:5,7,15 31:5,6,7,8
　34:24 61:6,8 124:17
　124:18 132:8 135:2
**pardon** 80:22 89:2
　95:7 96:17 122:19
　138:25
**parents** 121:10
　145:1,4 146:1
**park** 17:10 71:2
**parole** 149:15
**part** 9:7 12:1 13:21
　15:14 16:6,7 19:2
　33:10 35:21,22
　37:16 38:16 50:20
　58:12,22 61:23 62:4
　63:9 65:1 70:9,10
　70:13,17 107:22
　108:8 112:5,12
　118:20 121:24
　150:11
**partially** 58:8
**particular** 75:22
**particularly** 25:9
　63:15
**parties** 58:4 151:8
**partner** 16:1 46:5,9
　51:25 72:9,20 75:3
　75:17,19
**partnership** 15:22
　15:23,24,24 16:2
　40:14,15,16
**party** 4:11,15 97:7
**passed** 12:11 99:15
**pattern** 63:12
**pause** 9:19 13:24
　16:10 25:4,20 67:5
　70:19 71:16 73:24
　77:11 101:5 122:10
　123:8 124:15
　133:21 134:5,17
　146:25
**pay** 45:5 49:4,7
　65:22 80:4 81:9
　82:7,9,20 83:4,17
　84:8,9,11 87:3
　88:13 101:25

103:10 104:5 111:6
114:6 122:2 126:11
127:13 129:23
130:10 135:8,9
150:25
**paying**  48:13,15
49:9,12 67:25 80:6
103:11,12,17 131:7
131:9,10
**payment**  116:20
145:18
**payments**  48:2
146:4,4 148:13
**paystubs**  32:16,18
32:21
**penalty**  14:20 31:11
**penny**  46:25
**people**  4:8 9:9,10
73:5 79:16 82:22
83:4 102:25 129:10
143:9
**percent**  75:24 76:10
76:13,20,23 82:7,9
82:10 117:7,9
126:11,18 141:16
149:19
**percentage**  15:23
40:15
**period**  44:3 84:4
118:16 120:25
150:16
**perjury**  14:20 31:11
143:8,11
**permission**  7:24
**person**  32:6 83:21
97:15,19 149:20
150:19
**person's**  141:23
**personal**  9:22,23
28:24 35:21,22
37:16,18 76:2
115:24,25 144:17
**personally**  14:14
43:25 144:15
**petition**  10:1,4,12
10:16,20,23,25 11:2
11:6 12:9,21 13:16

14:4 16:24 22:11
26:25 29:6 55:15
57:18 58:6 60:15
69:20 70:23 71:8
95:18 98:23 132:16
147:11,14
**petitions**  97:10
**ph**  7:4 15:25 24:14
27:4 28:15 58:16,16
58:16,21 63:17
67:16 102:23 124:8
145:7
**pharmaceutical**
41:21,24 72:11,16
73:1
**pharmaceuticals**
24:14 27:19,21
50:25 53:14 55:2
**phone**  47:11 135:22
**pick**  152:9
**picked**  54:14
**piece**  107:8,8
127:24
**place**  61:4 65:17
68:18 134:14
**plaintiff**  1:12 3:3
7:6 22:20 77:6,7
123:14 124:7,20,23
125:11 131:18
137:4 149:18
**plaintiff's**  6:25 7:10
108:8 109:15 134:2
**plane**  104:3
**planned**  39:2
**planning**  62:21
**play**  151:7
**played**  124:4
**plaza**  1:19
**plea**  61:9
**please**  4:3,6 7:2,13
7:17,21 9:18,21
25:18 26:15,18,24
33:25 42:20 73:23
77:12,15 81:10,15
95:23 104:23
105:13 108:12
114:23 123:5

124:17 125:2
131:14 134:19
137:9,12
**pllc**  3:2
**podium**  42:20
124:13
**point**  39:1 41:13
58:17 60:9 63:13
92:15 93:1 95:18
96:3,4 97:19,24
98:14
**pointed**  50:1 57:25
126:4
**points**  56:13 105:2
**pooling**  128:2
**portion**  144:2
**position**  61:14
78:22 87:22 144:24
**possession**  30:21
40:7
**possible**  105:2
107:17 116:16
**post**  45:18
**potentially**  63:23
**power**  142:4
**pre**  2:1
**preceding**  14:11
**precisely**  113:6
**predicated**  149:11
**prefer**  5:1
**presence**  118:1
**present**  85:21 96:14
**presiding**  4:2 123:3
**pretty**  60:25
**previous**  27:17
92:19
**previously**  50:24
**primary**  143:16
**printed**  109:25
**printouts**  51:16
55:8
**prior**  44:1 52:21
64:1 97:20
**probably**  73:14
104:24 113:15
151:10,23

**problem**  6:6 149:8
**problems**  99:10
118:1 119:1,1
143:10
**proc**  1:9
**procedure**  94:20
**procedures**  94:16
**proceed**  134:18
**proceeding**  5:8 13:8
55:23
**proceedings**  61:3
145:6 152:17 154:5
**proceeds**  96:13
**proclamation**  55:13
**produce**  27:20,22
40:20 41:9 50:23
51:23 53:1 54:7
72:9,10 73:16 74:4
74:16
**products**  46:2
**profession**  11:25
**profit**  63:16 69:6,16
**profitable**  47:24
54:8,9,10
**profits**  26:21
**profusely**  100:21
**program**  74:12
**promise**  108:17
**promissory**  107:4
108:7,22 111:3,4,6
116:17 126:16
134:16
**proof**  95:5
**proper**  39:20 53:15
**properties**  9:8
18:19,25 130:3,6
150:21
**property**  9:11,22,23
16:11,21 17:3,5,12
17:15 18:6,8 21:12
70:22 71:5 146:14
**proposed**  151:12
152:4
**prove**  120:13
**proven**  150:11
**provided**  63:17

**provides** 17:11 18:1
  22:4
**provision** 17:14,16
**public** 78:4
**purchased** 144:5
**purely** 21:1
**purpose** 55:19 60:1
  64:5,9 99:20 111:14
  111:19,20,23,24,24
  140:16
**purposes** 39:14
  111:10 139:18
**pursuant** 21:10,22
**put** 14:17 32:12,16
  46:17,18,20 61:4
  62:19,25 63:23 85:1
  98:22 150:23
**putting** 104:15

**q**

**quarter** 17:9 18:10
  18:15
**queens** 93:9
**question** 11:21
  13:23 14:1,4,9,9,13
  15:17 19:23 30:18
  30:18,19 31:1 34:6
  34:13,24 35:3 36:13
  36:13,22 37:9,23,24
  40:5,10,14 41:19
  43:5 57:5,9 59:23
  60:15,15,16,17,18
  60:20 75:12 87:25
  96:3,4 97:10 99:13
  105:7 113:11 116:2
  116:6 133:17 135:7
  136:6 140:3,4
  148:19 149:15
  150:3,3,4,5,5
  151:24
**questioned** 55:21
**questioning** 99:11
**questions** 42:12
  57:2 60:22,23 71:18
  97:18 132:23
  136:17 146:21
**quickly** 149:3

**quite** 57:18 127:5
  142:5

**r**

**r** 1:23 3:1 4:1 7:20
  33:24 34:2,4 40:22
  77:17 137:14 154:1
**raise** 7:13 77:12
  96:16 137:9
**raised** 97:23 99:23
**ran** 98:1 102:15
  131:9 141:2
**rarely** 104:4
**rate** 81:25 103:1
**read** 6:16 9:25
  13:15 15:9,11 26:1
  26:8,15,17 58:15,15
  59:19 95:18 147:11
  147:17
**reading** 52:23
  134:21
**real** 8:25 9:3 15:25
  24:11 29:12 40:19
  41:8 61:7 68:2
  70:22 71:5 81:6
  85:4,15 89:8,10,16
  89:21,23 90:5,21,24
  114:16 115:14,15
  115:16,19 116:12
  116:14 120:24,25
  125:22 130:3,5,10
  135:20,23 136:15
  143:10,23
**realizing** 119:3
**really** 13:7 18:23
  25:16 46:3 47:15,16
  48:8 59:9 60:2 85:5
  98:11 116:7 120:1
  141:10 148:13
  150:12
**realty** 45:10 67:25
  68:2
**reason** 6:19 118:10
  127:7 144:11
**reasonable** 43:9
  152:6
**recall** 8:20,20,24
  12:24 13:11 23:2

26:4 29:10 34:20
  94:11 135:24
  143:20
**receivable** 142:1,2
**receive** 25:15
  100:23 101:1
  110:21 115:20
**received** 11:25 38:1
  87:14,15 91:21
  117:22 137:21
  149:12
**receiving** 5:10 25:6
**recess** 123:2
**reckless** 58:25
**recognize** 51:20
  81:20 86:9 87:15
  124:2 134:7
**recollection** 25:12
**recommended** 75:3
**record** 7:3,18 46:24
  47:14,15,16 52:24
  54:4 58:4,12 59:15
  59:15,24 60:18
  61:18,19 62:4 63:9
  63:21 64:10,23 70:9
  70:10,17 72:7 73:19
  77:16 81:18 87:8
  97:17 98:23 100:7
  104:7 105:3 106:24
  107:3,17,22 112:2,6
  112:14 131:25
  137:13 149:9
  150:11,11 151:9,24
  154:4
**records** 29:2,8,15
  29:19,24,25 30:4,11
  31:3 32:7 40:8,12
**recross** 75:15
**redirect** 72:4,5
  136:20
**refer** 19:23 125:15
**reference** 112:18
**referring** 30:1 55:7
  108:22
**reflect** 107:3,4,6
**reflects** 58:4 73:19
  83:9 98:23,24 112:2

**reg** 1:3,9
**regaining** 136:2
**regard** 97:13 151:7
**regarding** 90:17
**regardless** 5:11
**regular** 84:21
**reiterate** 61:1
**reiterated** 99:1
**related** 28:16
**relationship** 26:19
  26:25 79:21,22
  110:22
**relative** 45:15 58:14
**relatively** 149:3
  150:2
**relatives** 148:3
**relevance** 99:9
**relevant** 97:6 98:3,4
  113:15
**relief** 5:9
**remember** 12:8,23
  13:3,11,13 14:16
  23:11,15,16,16 25:6
  25:9 27:13,15 28:3
  33:2,8,9 42:2 43:23
  94:10 141:3,5 144:6
  147:13,17,18,20,21
**rent** 74:18 75:5
  122:5 148:7
**rental** 48:20 146:14
**rented** 48:18 49:1
**renting** 48:7,16
  49:5 146:1
**repaid** 95:15 113:5
  116:15,16,23 117:4
  117:7 126:8
**repay** 131:6
**rephrase** 81:10
  138:14
**report** 35:19
**reported** 67:12
**reporter** 154:10
**represent** 9:12 22:3
  65:9
**representation** 15:2
  31:22 108:24

**represented** 12:20
39:17
**representing** 11:9
15:1 20:10
**request** 119:16
**requested** 21:9
86:22 118:1 124:19
**require** 56:6
**required** 88:6
147:16
**requisite** 150:9
151:25
**research** 73:4
**researched** 39:12
**researching** 28:5
**residential** 9:14
**resolve** 149:4
**respect** 98:17
**respond** 116:4
**response** 25:22
26:15 108:9 109:15
134:2
**responsible** 150:7
151:21
**rest** 121:16 137:5
148:25
**restaurant** 44:18
50:17
**rests** 137:4
**resume** 123:2
**resumed** 123:25
**retail** 38:5
**retain** 119:24
138:18
**retained** 137:22
**retire** 78:12
**retired** 78:10,18
85:3
**retract** 124:3
**return** 29:16,18,20
30:5 35:21 36:25
37:17 38:8 39:11
63:15 65:14 67:10
69:2,15 70:4 124:12
127:8
**returns** 29:12,14
30:3 38:14 39:2,15

39:18 61:23 62:12
62:13 63:11,15,17
63:22 64:1,16 67:15
127:20
**revealing** 64:5
**rice** 46:2 50:22 73:5
**right** 4:17 5:12 6:8
6:13 7:15 8:4,9 9:1
9:9,10 10:8,10,13
10:14,22,24 11:1,5
11:10,17,19,22 12:3
12:12,23 14:25 15:4
15:5,6 16:5 17:19
20:10,13,17 21:5,16
21:20,25 22:9,10,13
22:18,19 24:3,6,7,9
24:10,24,25 25:1
26:5 29:15 30:15
31:4,21,24 32:2,12
32:17,25 33:21,21
33:21 34:15,16,17
35:25 36:3,15,18
37:13,23 38:18 39:9
40:12,17,18 41:1,3
41:9,10 42:1,5,11
48:3,7 50:3,4 51:8
52:14 53:17,19
54:24,25 56:4,8
57:4 61:4,13 63:3,8
65:4 66:5,13 67:17
69:17 71:21 72:12
72:15,17,18 75:10
76:8,19,25 77:8,13
80:13 89:5 95:6
98:12 99:16 104:13
104:20 105:11
106:19 110:9
112:24 113:14,17
117:6,17 118:19
120:9,12,18 121:3
122:11,18,23
127:21,22 129:16
131:11 132:8,22
133:13 137:8,10
140:5,8,10,16,25
143:9,12,19 145:1
149:2 152:9,12

**risk** 116:22 117:1,5
129:23 130:2
**road** 154:23
**robert** 1:24
**rockstone** 58:21
59:6
**role** 99:5
**room** 96:24
**roth** 129:13,15,16
**roughly** 43:22
101:20 105:11
**row** 94:4
**royalties** 68:20
**rub** 98:8
**rule** 60:5
**ruled** 58:22
**run** 74:24 104:16
130:25
**running** 149:22

**s**

**s** 3:1 4:1 7:19 15:1
39:5,8,13,17 41:15
77:17 153:2,18
**safe** 147:19
**salary** 85:16
**salesman** 8:25
**sammy** 91:16
**sat** 94:17 121:17
122:8
**satisfy** 17:6
**save** 56:10 57:8
**saving** 57:6
**savings** 19:24 106:4
149:19
**saw** 22:23 88:16
94:1 136:4,8
**saying** 17:4 27:9
31:18 35:2 45:23
53:5 59:10,13 97:22
105:14 122:4
124:24 144:23
**says** 9:22 10:7 11:7
11:18,21 14:20
16:11 17:9 20:2,7
21:16 26:8,17 30:24
31:2,7 34:25 35:12
40:11,14 55:11,12

67:6 68:17 82:8,8
96:6,13 120:25
124:18 125:5,18,19
131:14,17
**schedule** 9:20,23
10:3 16:4,5,7,11,13
16:16,21 17:3,5,12
19:23 20:10,15
21:18 24:1,5,6,8,11
24:12 26:9,14,24
34:4 40:17,19 63:16
69:15,20 73:17 74:1
74:11,13,15
**scheduled** 142:1
**schedules** 10:12
11:19 18:4 26:12
32:24 38:1 44:25
48:21 50:2 56:23
58:11 59:19 60:16
68:19 92:11,20
97:10 150:3
**school** 84:23
**seated** 4:3 7:21
**second** 17:9,14
18:15 32:23 35:8
36:24 41:13 44:20
58:7 94:4 105:25
113:23 125:4
127:18 131:17
**section** 17:11,20,24
81:19
**secure** 116:20
**security** 35:9,18,19
37:7 129:22
**see** 4:23 6:19 14:20
19:24 20:2 23:9
24:13,15 34:6 40:16
40:21 41:19 47:10
74:6,8 87:11 89:6
93:23 103:17 125:4
130:2,17 132:8,22
136:8,9 149:7
**seeing** 25:12
**seeking** 5:9
**seen** 63:25 95:17
104:18

| | | | |
|---|---|---|---|
| **self** 115:24 | **shut** 54:13 | 96:2 102:21 104:15 | 115:2,20 124:7,21 |
| **sell** 9:10 89:21 | **sic** 27:4 68:22 95:23 | 106:5,6 113:4 122:1 | 124:24 125:12,16 |
| 130:10,19 136:15 | 105:7 110:13 | 130:11 144:24 | 125:20,20,21,23,24 |
| **sellers** 9:8,12 | 112:10 115:20 | 149:23,24 | 127:6 131:21,24 |
| **selling** 9:9 85:16 | **side** 143:13 149:10 | **somebody's** 143:8 | 136:2 139:1 140:1 |
| **send** 103:24 114:23 | **sign** 10:20 15:7 | **someplace** 150:24 | 153:5 |
| 143:11 | 116:17 147:14 | **son** 119:2 150:20 | **stanley's** 140:22 |
| **sense** 35:1 104:10 | **signatory** 76:6 | **soon** 93:20 | 145:7 |
| 104:19,21 118:21 | **signature** 15:2,2 | **sorry** 8:5 14:22 | **start** 46:8 76:13 |
| 122:9 149:23 | 86:9 132:18,19 | 17:13 21:2 32:15 | 144:9,24 145:17 |
| **sent** 62:1,5 132:24 | 147:16 | 42:21 52:5 72:4 | **started** 6:18 28:4,20 |
| **sentence** 125:4 | **signed** 9:25 10:15 | 78:16 101:13 118:7 | 54:9 73:15 103:16 |
| 131:17 | 10:25,25 13:16 15:3 | 131:3 137:2 | 126:15 |
| **separate** 51:9 88:7 | 15:9 18:3 58:12,13 | **sources** 119:5 | **state** 7:2,17 8:8 |
| 107:14 | 59:20 60:16 107:5 | **speak** 39:5 98:3,5 | 11:24 24:25 51:16 |
| **september** 22:16 | 145:2 150:5,6 | **speaking** 49:25 96:8 | 77:15 91:16 101:19 |
| 52:25 80:12 88:14 | **significant** 46:3 | 98:14 | 105:10,13,19 107:3 |
| 91:24 100:24 114:4 | **signify** 11:8,8 | **speaks** 96:7 | 107:11 113:24 |
| 114:7 135:25 | **simple** 57:9 120:1 | **specifically** 59:1 | 122:16 123:20 |
| **series** 25:23 | 150:2 | **speculate** 138:10 | 132:9 135:1 145:7 |
| **services** 50:25 | **sing** 102:23 103:8 | **speculation** 116:1 | **stated** 61:22 63:24 |
| 53:14 55:3 | **single** 39:23 40:1 | **speech** 96:21 | 64:4 135:2 |
| **seven** 80:5 84:22 | **sir** 7:7 59:10 62:18 | **speed** 87:11 | **statement** 10:13 |
| 131:7 | 77:5,23 78:9 86:11 | **spell** 7:17 77:15 | 11:14 12:5 13:1,3 |
| **seventy** 78:2 | 86:16 101:3 103:8 | 137:12 | 13:10,15,22 14:5,19 |
| **shape** 57:22 | 111:1 120:3 128:1,4 | **spent** 137:22 | 14:23 30:14,19 31:8 |
| **shark** 103:3 | 130:22 | **spoke** 39:19 135:13 | 31:11,12,19,25 32:3 |
| **sheet** 39:16 | **sit** 77:3,18 94:5 | 135:16,18 | 34:5,19 41:14 56:3 |
| **sheets** 40:24 95:19 | 128:6 137:15 | **spoken** 39:12 | 56:10 57:6,7 61:5 |
| **sherri** 2:25 154:3,9 | **sits** 128:7,12 | **stain** 84:24 | 63:19 69:16 75:18 |
| **shouldn't** 151:21 | **sitting** 36:6 94:3,4 | **stamp** 134:15 | 96:18 108:6 124:25 |
| **show** 14:6 26:24 | 97:6 | **stamped** 94:24 | 148:19 |
| 38:14,16 44:25 | **six** 14:3 43:20 44:1 | 109:19 | **statements** 6:15,20 |
| 66:19 68:20 69:20 | 44:21 56:7 107:11 | **stamps** 109:20 | 13:9 20:22 42:4 |
| 85:8 127:20 144:11 | 143:17 | **stan's** 145:4 146:1 | 118:15 |
| 151:16,17 | **sixteenth** 125:3 | **stand** 23:6,13 53:21 | **states** 1:1,17 |
| **showed** 38:1 68:8 | 126:5 | 77:12 99:3 123:5 | **static** 54:12,13 |
| 68:11,24 69:10 | **skeptical** 149:9 | 137:9 | **stating** 132:15 |
| 151:2,4,5 | **skip** 123:15 | **standard** 98:21 | **status** 55:2,12 |
| **showing** 67:7 | **social** 35:9,18,19 | 99:5 152:1 | **statute** 60:22 |
| 109:22 118:16 | 37:7 | **stands** 20:8 | **statutes** 21:25 |
| **shown** 48:21 | **sold** 76:23 148:18 | **stanley** 1:6,14 5:9 | **statutory** 17:4,11 |
| **shows** 11:7 15:1 | **sole** 39:21 | 5:10 7:9,10,16,19 | 17:14 |
| 46:25 52:24 64:19 | **solely** 5:9,10 111:14 | 68:22 78:24 80:20 | **stay** 5:1 |
| 65:6 70:3 83:13 | **solutions** 154:22 | 81:23 86:13 101:17 | **stayed** 92:16,17 |
| 151:25 | **somebody** 23:5 | 105:19 108:23 | 93:7,8,9 |
| | 46:20 62:24 74:24 | 113:20 114:17 | |

**step** 75:10 115:7
136:22 148:21,22
**stipulate** 87:12 88:7
**stock** 11:3 26:9,11
**stocks** 71:12 129:5
**stood** 120:10
**stop** 80:6 90:24
**stopped** 90:18,20
91:2 103:12 129:8
**store** 37:2 38:6
65:16 69:1
**story** 99:3 104:20
149:2 150:14
**straight** 150:25
**streamline** 112:1
**street** 3:4 114:25
**stuart** 1:11 4:4 7:6
22:20 23:18 77:7,14
77:17,22 78:1 81:13
84:19 86:4 87:12,19
88:1,12 92:21,23
95:10 100:20,21
101:8,17 105:9
108:12 110:8,12,21
111:7,9,13 112:17
113:3,16 120:18,23
122:14 123:9,24
124:2,6,17 125:6
127:4 131:14
134:21 136:18
137:19 138:5,11
139:1,25 140:2
141:6 143:7 150:18
153:10
**stuart's** 119:24
143:5
**stuff** 151:6
**sub** 30:18,18 36:13
36:22 37:23
**submitted** 51:6
**subpoena** 64:2
**substantial** 71:10
**subway** 36:11 38:6
44:13,17,18 50:17
66:10 67:7 68:5,6
120:15,17 121:1,5,6
121:8 142:18,23

144:5,9 145:17
**successful** 85:8
144:25
**successfully** 47:8
**successor** 27:16
53:5,6,12,16,17
**sue** 83:18 90:9 93:3
130:14
**sued** 90:18 97:19,20
106:5 130:16
**sues** 108:2
**suggesting** 23:22
**suing** 97:7 105:10
124:7 133:12
**suite** 3:4 154:24
**sum** 107:13 145:16
**summer** 79:13
**summons** 2:1 107:9
122:15 123:17
124:5
**suny** 8:10,11,21
**supervised** 14:12
**supplemental**
122:15 123:17
124:5
**supply** 73:5
**support** 149:20
**supporting** 30:4
**suppose** 92:18
**supposed** 27:24
88:13 89:21
**sure** 7:22 12:19
13:5,7 16:20 35:6
36:9 41:18 51:18
56:23 57:2 62:4
73:18 80:13 97:1,5
98:5 99:4,9 104:17
106:24 107:11
117:11 123:16
134:12 147:16
148:13 149:17
**sustain** 138:14
**sutphin** 3:11
**switched** 67:24
**sworn** 7:16 77:14
137:11

**syosset** 36:16
**system** 54:12

**t**

**t** 7:19 77:17,17,17
153:2,2,18 154:1,1
**tab** 9:18 23:25 25:2
25:18 33:24 34:1
95:24
**table** 23:3 94:5,13
**take** 18:21 54:19
55:11 70:2 73:7,21
104:1 105:24 106:1
106:23 113:14
116:19 119:4 120:6
122:25 123:5
128:11 129:23
130:5 143:10
**taken** 45:5 50:19
123:2 142:24 146:6
**takes** 74:12 122:6
**talk** 15:21 66:17
**talked** 73:3
**talking** 14:24 69:23
80:24 83:11 104:12
121:17 125:7
**taught** 84:22,24
**tax** 29:17,20 30:2
35:9,21 36:25 37:17
38:8,13 39:2,11,14
39:18 41:23 61:23
62:12,13 63:10,14
63:15,17,22 64:1,16
65:14 67:10,15 69:2
69:15 70:4 127:19
127:19
**taxed** 39:24
**taxes** 35:20 48:5
**taxpayer** 35:10
**technical** 39:1
**technically** 99:25
**telephone** 115:1
**tell** 6:17 23:24
48:24 51:22 69:8
72:23 74:4 81:4
99:3,3 104:9 109:4
112:19 114:23
142:11

**telling** 46:1 119:18
121:18,21 142:7,13
149:25
**ten** 82:8,10 126:11
126:18 128:25
**tenant** 150:24
**tenants** 74:20 75:1
147:25 148:2,5
**term** 53:15 87:13
98:20
**terms** 88:12
**testified** 56:22
108:16 110:13
121:9 126:8,10
145:12 150:20
**testify** 5:18 117:21
137:19
**testifying** 96:24
118:11 129:25
140:6
**testimonies** 5:19
**testimony** 4:18,25
64:11 97:11,12,15
100:3,14 112:13
131:11 138:17
**thank** 7:23 75:14
77:1,18 124:14
136:23 137:15,16
152:14,15
**theory** 5:4 104:14
142:7,9
**thick** 112:7
**thing** 56:7 59:2
113:3 118:18
141:17
**things** 33:14 49:7,7
56:22 84:25 97:8
99:1 104:19 112:22
116:9,10
**think** 5:3 6:20 10:5
10:8 12:14,19 19:1
22:17 23:5 24:19
28:21 31:13 36:9
38:13,13 44:15
53:15,23,25 55:23
57:10,19,21 58:22
59:25 61:22,24

64:14 65:12 67:6,7
68:18 69:23 72:21
73:14 74:19 75:6
90:16 91:24 92:19
92:19 93:16 94:7
95:19 97:2,17 98:15
99:9,10,13,20
100:10,14 101:10
103:6 104:23
113:24 114:12
121:21 125:24
126:16 128:24
130:18 133:20
136:20 141:6
142:13 144:10
149:5 151:7 152:1
**thinking** 117:20
138:12
**thinks** 97:20
**third** 52:8,9,17 58:8
**thirds** 109:13,17
**thirteen** 102:18,19
**thomas** 79:4,5,18
79:19,21 84:2 85:24
90:6,7,9 101:25
103:9 105:16 107:1
110:13,22 111:21
124:7 125:25
126:10 127:7
131:23 132:5
134:24
**thorough** 15:10
**thought** 16:4 28:7
37:16 64:2 95:21
113:15 117:3 133:2
**thousand** 12:7
21:11,12 68:12
121:25
**thousands** 59:7
104:15
**three** 42:4 51:15
52:12 58:5 59:7
73:13 78:23 90:16
93:5 115:17 129:20
136:4 151:10
**ticket** 104:3

**till** 56:1 123:1
**time** 6:20 12:1,24
23:17 28:3,20 30:11
32:24 40:6 52:22
57:20 65:18 72:25
73:6,12,12,15 79:5
80:8 84:22 89:6
91:7,7,19 92:2
93:15 97:19,20,25
99:14 100:10
103:18 104:7
106:23 111:16
113:23,23 117:2,3
118:16,25 121:11
125:25 129:21
135:3,5 136:4,13,18
137:3 138:8,23
139:1,5,7,8 141:4
143:23 144:13
146:15 150:17
152:10
**timely** 98:2
**times** 25:14 32:13
59:21 82:24 107:11
115:2 136:5
**tissue** 68:3
**titled** 9:20
**titles** 50:5
**today** 45:24 64:3
106:2 119:3
**today's** 148:16
**told** 12:24 14:16
23:20 24:19 94:21
95:11,13,14,17 96:2
102:23 114:14,17
117:15 121:23
135:15 138:22
139:24
**top** 109:19,24
**total** 42:3 47:20
68:8 86:17 101:18
101:25 105:15
107:6,13 129:9,20
**totality** 98:16,20
**track** 46:24 47:14
47:15,16

**trade** 11:25
**transaction** 87:16
117:5 118:16 138:5
**transactions** 85:19
119:14 127:19
133:3,7,9 139:4
**transcribed** 2:25
**transcriber** 154:10
**transcript** 154:4
**transfer** 87:8,10
131:20
**transferred** 87:5
88:2,3 118:13
**transpired** 76:1
114:23
**traveled** 104:2
**treat** 7:25
**trial** 2:1,1 112:16
**tried** 57:19
**trouble** 119:3
**true** 10:3 21:7
22:25 31:9,13,16,20
31:23 32:1 33:7,16
33:19 42:10 132:16
154:4
**trusted** 103:8
115:18
**trustee** 16:25 23:1
23:20,24 24:3 43:10
63:18 64:7,8 94:5
94:14 95:11,14 96:6
96:8,13 97:7 99:1
141:22
**truth** 64:13 121:18
121:21 142:11,13
**try** 47:13 51:3
105:1 107:16 150:2
**trying** 27:25 28:5
35:4 46:1,1 52:4
56:12 57:12 58:18
59:8 64:16 71:18
72:8 73:5 96:1
108:1 109:2 112:1
112:19 120:22
143:4
**turn** 6:22 9:21 11:2
11:11 14:18 16:4

23:25 25:2 26:5
33:24 34:24 36:22
52:15 81:18 95:23
124:17 125:2
**turning** 13:22 37:23
**turnovers** 57:6
**twelve** 9:20
**twice** 113:21
**two** 12:2 14:11,24
20:18,19 21:14,23
21:25 42:9 58:6
64:1 71:3,7 73:10
73:13 84:4 87:6
95:19 109:13,17
112:21 115:15
120:8 122:5 128:17
129:21 131:23
134:22 136:4
**typed** 133:1
**typewritten** 40:24

**u**

**u** 77:17
**u.s.** 1:25 143:12
**u.s.c.** 17:18,24
**uh** 13:25 16:12 20:1
30:17
**ultimate** 69:10
**ultimately** 97:25
112:22
**unable** 47:2
**underlying** 60:14
**understand** 13:20
15:13 20:8 35:4
59:3 60:10 61:13
70:1 99:17 119:17
121:20 135:17
141:25
**understanding**
31:17 39:23 117:13
126:7
**understood** 140:17
147:20
**unemployment**
144:7
**unfortunately**
109:21

**unincorporated**
11:4 26:10
**united** 1:1,17
**university** 8:8 24:25
78:4 84:23
**unnecessarily** 97:18
**unusual** 100:6
**use** 28:24 36:19
50:7,10 61:3 72:8
87:13 88:4 102:6,21
102:25 103:18,25
104:3 115:24
116:10,13 117:18
119:4,6,8,9 120:6
120:14,14,17,24,25
122:2,7 123:23
125:22 138:19,23
138:24 139:2,5,19
140:22,24 141:1
143:3 150:21

**v**

**v** 1:13
**value** 21:12 26:23
64:12 71:10 111:4
**van** 50:10,11,14
**variable** 150:12
**varied** 9:13
**various** 105:8
**vehicle** 22:4
**vehicles** 71:7
**venues** 105:10
**verified** 112:3,17
122:15 124:6
**verify** 63:20,20
**veritext** 154:22
**versus** 4:4 112:17
**view** 64:13 97:23
150:1 151:20
**views** 99:5
**vinad** 28:15,16,18
29:8 36:14,21
**viper** 59:7
**voluntarily** 82:23
**voluntary** 10:4,20

**w**

**w2s** 67:16
**wages** 70:3,7
**wait** 5:17 63:4
**waiting** 95:15
**want** 6:17 9:9 18:22
19:23 26:17 38:23
39:11 43:15 54:1
56:14 61:18,24
63:11 71:22 82:9,10
82:21 96:21 97:3
98:8,12 99:11
103:17 104:25
105:7 113:18
119:22 127:14
134:21 145:20
151:12 152:2,5
**wanted** 5:25 47:10
47:13 51:4 53:21
62:3 73:1 74:24
81:5 84:8,8,10
98:14 114:16
118:22 127:10,16
**wants** 54:1
**waste** 6:19
**way** 5:18 39:19,20
42:8,24 54:8 57:21
59:9 96:12 98:6
99:4 109:13,17
151:16
**we've** 52:18 97:9
98:23
**wedding** 79:14,16
89:1,3,5
**week** 120:11
**weeks** 148:6 151:11
152:3,11
**went** 28:22 36:9
48:13,16 94:13
112:24 118:12,17
118:17,19 120:12
120:13 132:10,20
136:10 142:7
148:14 149:12
**westbury** 8:10,12
**wholesale** 46:2 68:3

**wife** 4:20 12:6
18:11,13 20:2,13,16
20:18,19,24 32:10
44:5 49:13 50:7
57:22 67:12 69:14
75:4 79:10,11 94:1
**wife's** 12:13 19:6,15
34:8 44:10 45:7
64:6
**win** 130:17
**wire** 87:8,10 131:18
131:20 132:3
139:25
**wires** 131:23
**withdraw** 43:7
**withheld** 57:23
**witness** 4:7 7:1,10
7:16,19,22,25 18:19
24:18 32:16,19,22
33:1,8,13,18,21
37:1,5,7,11 38:3,5,9
38:11,18,20,22 41:5
42:13 43:14,17
44:23 45:1,3,9,14
45:17,20,22,25 46:5
46:9,11,14,18,22
47:1,5,9,15,20,23
48:1,3,6,10,14,18
48:22,25 49:3,6,13
49:17,20 50:14
51:17 53:8,13,17,19
55:10 56:22 62:20
63:14 65:13,15,23
66:2,5,10,13,16,20
66:22,25 67:6,10,14
67:17,19,22 68:7,10
68:13,17,23 69:1,3
69:6,22,25 70:2,5,7
73:25 74:2 75:12
76:12,14,16,19,22
76:25 77:2,4,14,17
82:1,4,6,13,15,17
82:19,24 83:2,6,10
83:15,19,21,24 84:2
84:4,7,11,15 85:10
85:14,20,24 88:21
88:24 89:8,12,14,18

89:21,23 90:1,20,23
91:1,4,7,11,13 92:6
92:17 93:2,5,8 95:7
96:10 102:5,7,11,13
102:16,18,20,22
103:2,4,8,11,16,21
103:23 104:2,11,22
106:8,11,13,16,18
106:20 107:21
108:7,16,21 123:7
123:10 124:12
125:8 126:3,6,10,14
126:21,23,25
127:22 128:1,4,7,9
128:11,14,22,24
129:3,6,8,11,15,17
130:1,7,9,12,16,22
130:24 131:2,4,7
133:1,5,8,12,14
136:23 137:11,14
137:16 138:9
139:13,17,22,24
140:5,8,10,13,16,21
140:25 141:2,9,13
141:16,19,21
142:20,24 143:3
144:10,13,18,20,22
145:1,4 148:12,16
148:21
**witnesses** 4:8 77:5
94:14 116:1,4
136:24 153:4
**woman** 121:25
142:10
**won** 130:17
**word** 88:4
**words** 99:11 115:15
115:17 136:16
**work** 44:5 47:6 73:7
84:21 91:2
**worked** 28:7 45:9
45:10 67:23 84:21
85:14,15 89:9,9,10
89:16
**working** 44:6 49:14
57:25 70:8 78:8
85:3 90:19,20,24

91:3,5,12 129:13
141:8 142:14 144:3
144:6 150:20
**works** 38:11
**worried** 97:22
**worth** 59:7 144:17
148:15
**wouldn't** 118:4
**write** 124:24 135:9
**writing** 83:8,13
**written** 57:9 108:17
149:13
**wrong** 61:8 124:18
134:23
**wrote** 58:15,20
115:3,9 119:15
125:15 133:9
134:24 135:7

**x**

**x** 1:4,8,16 11:7,8
153:1,18

**y**

**y** 7:19 62:9,10,11,12
63:10 70:16 137:14
153:2
**yeah** 8:1 10:8 11:10
12:16 13:21,21
15:12 20:14 21:4,21
22:19 23:19 24:4
25:24 29:1,5 30:8
31:24 32:8,17,19
33:1 35:3,7 38:15
40:11,23 42:3,6,8
43:15 44:23,23
45:25 46:5,18,24
47:1 48:1,6,10,18
49:3 54:3,10 62:13
66:2 67:3 68:13,17
69:3 71:1 72:13
73:14,21 74:21
76:14 83:2 84:11
87:7 89:18 90:23
91:4,13 92:6,17
99:7 103:21 112:9
115:10 129:11
131:4 133:22

135:21 136:4
151:15 152:6
**year** 12:21 13:6
28:21 32:10,24 45:5
64:1 75:6 92:13
99:15
**years** 12:2 14:3,11
26:22 28:21,22 46:7
47:3 56:7 78:2,23
80:5 84:4 119:18
121:18 131:7
143:17,18
**york** 1:2,20 3:5,12
8:8 24:25 36:16
154:25
**young** 59:8
**younger** 28:21

**z**

**z** 108:12 109:6,7,23
133:19,20,20,22
**zebra** 109:6 133:19
**zero** 29:16 34:20,21