UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

Stanley Abraham,
Amy Abraham

                     Debtors.
-------------------------------------------------------------x
Janet Stuart,

                    Plaintiff,
v.

Stanley Abraham,

                    Debtor/Defendant.
-------------------------------------------------------------x

Case No. 813-74398-reg

Chapter 7

Adv. Proc. No. 813-8165-reg

## <u>DECISION AFTER TRIAL</u>

This matter is before the Court pursuant to an adversary proceeding commenced by

Janet Stuart (the "Plaintiff") against Stanley Abraham ("Stanley") under 11 U.S.C. §§

523(a)(2)(A) and 727(a)(4)(A).  The Plaintiff seeks to have deemed nondischargeable under §

523(a)(2)(A) an alleged $75,000 loan to Stanley.  She also cites to numerous omissions and

inaccuracies in the Debtors' bankruptcy filings as a basis to deny Stanley's discharge in its

entirety under § 727(a)(4)(A).

With respect to the § 523(a)(2)(A), the Court finds that the Plaintiff has failed to prove

by a preponderance of the evidence that Stanley made any misrepresentation to her that she

relied upon when she made the alleged loan.  The alleged misrepresentation is supported only

by the Plaintiff's own uncorroborated testimony.  And, the Plaintiff's own testimony belies

1

any reliance on her behalf on Stanley's alleged misrepresentation.  Thus, the Court finds the alleged debt should not be excepted from discharge pursuant to § 523(a)(2)(A).

With respect to the § 727(a)(4)(A) claim, the Plaintiff alleges that a variety of inaccuracies and omissions from the Debtor's bankruptcy schedules and Statement of Financial Affairs ("SOFA") warrants denial of Stanley's discharge.  Specifically, the Plaintiff alleges that Stanley knowingly and fraudulently made a false oath in connection with this case in that he failed to disclose: (a) ownership interests in three businesses, (b) all of the profits and/or income from these businesses and other sources, and (c) the identity of his accountant and the location of his books and records for himself and the businesses he owned.  Stanley admits that there were inaccuracies in his schedules and SOFA but argues that: (1) he disclosed his business ownership interests in the initial schedules and statements, albeit not in response to the questions and in the places that he should have; (2) subsequent amendments to the schedules and SOFA cured these deficiencies, at least in part; (3) the omissions were inadvertent and in any event were *de minimis* and caused no harm in this case, and (4) the chapter 7 trustee reviewed his tax returns and, therefore, the necessary disclosures were made to the trustee regarding his income.

The Court finds that Stanley acted with reckless disregard for the truth when he failed to fully disclose his ownership interests in various entities, failed to identify his accountant and the location of his books and records, and omitted 2011 and 2012 income from his SOFA. Stanley did not meet his burden of proving that the omissions were unintentional and offered no credible reason for these omissions other than carelessness.  Considering the number and materiality of the omissions in this case, the Court finds that the Plaintiff has sustained her

burden of showing that Stanley exhibited a reckless indifference to the truth of his bankruptcy disclosures.  Accordingly, the Court denies his discharge pursuant to § 727(a)(4)(A).

The Court notes that the same disclosure failures with respect to Amy's 2011, 2012 and 2013 income that warranted denial of Stanley's discharge may also have provided the basis to deny Amy's discharge.  However, Amy was not named in this adversary proceeding. Due process and the Bankruptcy Code prevent this Court from entering any relief against Amy in this regard.

## PROCEDURAL HISTORY

On August 23, 2013 (the "Petition Date"), Stanley and his wife, Amy Abraham, ("Amy") (collectively, the "Debtors"), represented by counsel, filed a joint voluntary petition for relief under chapter 7 of the Bankruptcy Code.  On Schedule F, Stanley lists the Plaintiff as an unsecured, non-priority creditor holding a claim of $1,083,820.45. (Joint Trial Ex. A.)

On October 11, 2013, the Plaintiff, acting pro se, commenced this adversary proceeding against Stanley.[1]  On February 21, 2014, the Plaintiff, now represented by counsel, filed a motion for leave to file an amended complaint to more specifically allege causes of action under §§ 523(a)(2)(A) and 727(a)(4)(A).  The motion was unopposed and leave to file the amended complaint was granted.  On March 27, 2014, the Plaintiff filed the amended complaint ("Amended Complaint"), and on April 2, 2014, Stanley filed an answer to the Amended Complaint.

---

[1]    As previously noted, Amy is not a defendant in this adversary proceeding and no objection to her discharge has been interposed.

On March 5, 2015, the parties filed a Joint Pre-Trial Memorandum.  A trial was held on March 10, 2015 at which both the Plaintiff and the Debtors testified.  Pursuant to the Joint Pre-Trial Memorandum, Joint Exhibits A through Z, and Stanley's Exhibits C and D, were admitted into evidence without objection.  On April 10, 2015, the parties filed the Joint Post-Trial Memorandum at which time this matter was deemed submitted.

## **FACTS**

The Joint Post-Trial Memorandum sets forth certain agreed facts.  Additional facts are developed from the trial testimony and exhibits.  In this case, the facts relevant to the §§ 523 and 727 claims are entirely distinct and as such the Court will present the facts relevant to each claim separately.

*1. Section 523(a)(2)(A)*

The Plaintiff is a seventy-eight year old retired nurse who holds a Master's Degree in Public Health from Columbia University.  Stanley is a licensed real estate broker who received a degree in Finance from the State University of New York, Old Westbury.  Amy has a degree in Marketing from Hofstra University.  (Trial Tr., 147:3-10.)  As of the Petition Date, Amy had been a lease manager for Monarch Realty Holdings LLC ("Monarch") for approximately a year and a half.  (Joint Trial Ex. A, Sch. I.)  Amy and her father, Thomas John ("Mr. John"), were friends of the Plaintiff since 2001.  The Plaintiff and Stanley both worked at Amy's father's real estate company, American Gardens.  (Trial Tr., 89:10-15.)

The Plaintiff had a history of lending considerable sums of money to Mr. John.  The record reveals various transactions between 2008 and 2010, where the Plaintiff sent wire transfers or wrote checks to Mr. John. (Joint Trial Ex. Y.)  During that time, the Plaintiff also

transferred $75,000 to Stanley in two separate transactions: (a) on July 21, 2009, Stanley

endorsed and deposited a $50,000 cashier's check from the Plaintiff into his personal

checking account (Joint Trial Ex. N, Ex. B); and (b) on August 3, 2009, the Plaintiff sent an

additional $25,000, via wire transfer, to Stanley's personal checking account.  (Joint Trial Ex.

N, Ex. A.)

 Ultimately, neither Stanley nor Mr. John repaid the Plaintiff's loans and the Plaintiff

pursued collection efforts.  On June 29, 2010, represented by counsel, the Plaintiff sent a

demand letter to Mr. John (*Id.*, Bates No. JS000001), averring among other things that: "[on]

on numerous occasions, you [Mr. John] have requested and [the Plaintiff] has issued checks in

your name and the name[] of…and Stanley Abraham." (*Id.*)  In August of 2010, the Plaintiff

commenced a civil proceeding in state court against Mr. John, Stanley and another defendant,

Annamma Alexander ("Alexander"), to whom she had transferred funds.  (Def.'s Trial Ex. D.)

The Plaintiff's amended verified complaint alleged:  "[T]he Defendant John requested that the

Plaintiff issue checks to Defendant[]… and Stanley Abraham who negotiated and tendered the

checks for payment." (*Id.*)  In the state court action, the Plaintiff alleges a series of

approximately 23 loans to Mr. John beginning in February of 2008 and ending in November

of 2009, all allegedly bearing 10% interest.  (*Id.*)  Some of the alleged loans were to Mr. John

individually, some were to Mr. John and Stanley jointly, and some were to Mr. John and

Alexander, jointly.[2]  (*Id.*)  The complaint also alleges that Mr. John incurred charges on the

Plaintiff's credit cards on seven separate occasions which he promised to repay but did not.

---

[2] The sixteenth cause of action of the state court complaint alleges that the Plaintiff
loaned $50,000 to Mr. John and Stanley jointly.  That is the only cause of action that mentions Stanley
specifically.  Despite this, the facts developed in this case show that there were two transfers to Stanley
totaling $75,000.

(*Id.*)   In total, the demand in the state court complaint was $1,083,291.45, plus bank and wire fees, overdraft charges and late fees.  (*Id.*)  The state court action was pending when Stanley filed this bankruptcy and it appears that the Plaintiff has not pursued that action during the pendency of this bankruptcy case.  The Plaintiff's claims against Mr. John, Stanley and Alexander were never reduced to judgment.

In the trial of this adversary proceeding, the Plaintiff testified as follows concerning the circumstances surrounding the $75,000 she transferred to Stanley:

> "Q: You say you lent money to Stanley Abraham twice, in July and in August of 2009?
>
> A: Yes.
>
> Q: The first time $50,000, the second time $25,000…you state it's a loan, correct?
>
> A: It is a loan.
>
> Q: And you expect it to be paid back?
>
> A: Yes.
>
> Q: When?
>
> A: September.
>
> …
>
> Q: What did you think the money was … for?
>
> ...
>
> A: That he wanted to expand his real estate.
>
> ...
>
> Q: Please tell me what transpired. Did he send you a letter? Did he call you? Did he bump into you on the street?
>
> A: Telephone call.
>
> ...
>
> Q: Well, what did he say when he called you?
>
> A: That he would like to borrow -- he knew I was lending money to…his father-in-law and he would like me to loan him $75,000.
>
> Q: And so you wrote a check?
>
> A: Yeah.

Q: Was that the extent of the conversation?

A: I asked him what for.

Q: And he said?

A: Real estate.

Q: Real estate? Just those two words?

A: He's expanding his real estate.

Q: Three words. Anything else?

A: That was enough for me. I knew him. I trusted him."

(Trial Tr. 113:20-25, 114:1-25, 115:1-18.)

Stanley did not sign a promissory note nor was the agreement otherwise documented, (Trial Tr. 83:8-16), and a lawyer was not involved in the transactions, (Trial Tr. 85:14-16). Amy testified that the $75,000 transfer to Stanley was intended to be a loan to Mr. John but was directed to Stanley because Mr. John's checking account was frozen. (Trial Tr., 138:17-24, 139:1-9, 139:24-25, 140:1-25, 141:1-5.) Although Stanley did not testify about the circumstances surrounding the loan, he does not dispute that he received the $75,000 from the Plaintiff and that he did not repay the money. (Trial Tr. 87:25, 88:1-9.)

### 2.  *Section 727(a)(4)(A)*

#### a)  *Businesses*

Stanley is the sole owner and officer of (1) Amstan LLC ("Amstan"), (2) Amstan Real Estate ("Amstan Real Estate") and (3) Asian Foods & Produce Distributors, Inc. ("Asian Foods"). Amstan was formed on September 24, 2008 as a domestic limited liability company and is presently an active corporation. (Def.'s Trial Ex. C.) Stanley testified that Amstan owned and operated a Subway franchise and had economic activity until late 2012 when it

closed.  (Trial Tr., 38:3-6, 44:12-17; Trial Tr., 44:18, 45:3-6.)  Stanley testified that he earned little income from Amstan but at times paid himself by check when he could. (Trial Tr., 45:2-6, 50:17-20.)  According to the Debtors' joint 2011 and 2012 income tax returns, Amstan generated $587,977 in gross receipts from operation of the Subway franchise in 2011, and $512,356 in 2012. (Joint Trial Ex. Y.)

Amstan Real Estate was formed on September 30, 2009 as a domestic limited liability company and is currently and active corporation.  (Def.'s Trial Ex. C.)  There was no evidence submitted regarding the purpose or history of Amstan Real Estate, and tax returns for neither 2011 nor 2012 were filed for this entity.  (Trial Tr., 29:10-14.)

Asian Foods was incorporated on May 17, 2013 to distribute rice wholesale.  (Trial Tr., 50:21-23.)   It is formerly known as Ambient Pharmaceuticals & Services Inc. ("Ambient"), which was incorporated on September 30, 2011.  (Trial Tr., 27:19-23, 52:21-25, 53:1-2.)  Ambient's 2012 tax returns show $0 in receipts, (Joint Trial Ex. Y), and it does not appear that Ambient ever conducted business.  According to Stanley's testimony at trial, although a personal friend made a post-petition investment of $60,000 for 50% interest in Ambient's successor, Asian Foods, in December of 2013 or January of 2014, (Trial Tr., 46:4-15, 47:1-21, 72:20-22), Asian Foods has yet to become profitable. (Trial Tr., 53:8-10, 54:7-10.)

Pre-petition, Stanley also owned an entity called Abramen Imports, Inc. ("Abramen"). Abramen was incorporated in July 8, 2003 (Def.'s Trial Ex. C) to import coffee from India. (Trial Tr., 27:24-2, 28:1-8.)  Vinod Abraham was listed as the registered agent of Abramen (*Id.*), however before it began any operations, Abramen was dissolved by declaration on January 27, 2010.  (*Id.*; Trial Tr., 28:9, 55:7-13.)

8

Accordingly, as of the Petition Date, Stanley owned 100% interest in Amstan, Amstan Real Estate and Asian Foods, none of which at that time had any economic activity.  Abramen was dissolved as of the Petition Date, but it was an entity in which Stanley owned an interest within six years of the Petition Date.

In response to Line # 13 of Schedule B, which requires a debtor to disclose "stocks and interests in incorporated and unincorporated businesses," Stanley answered: "NONE." (Joint Trial Ex. A., Sch. B.)  After the § 341 Meeting, on September 27, 2013, Stanley filed an amended Schedule B, disclosing his interest in Amstan, but not Amstan Real Estate or Asian Foods.  (Joint Trial Ex. E.)

In response to Question # 18(a) of the SOFA, which requires a debtor to disclose the "nature, location, and name of business," Stanley answered: "NONE." (Joint Trial Ex. A.) Several months after this adversary proceeding was commenced, on June 6, 2014, Stanley filed a first amended SOFA listing Amstan and Abramen in response to Question #18.  (Joint Trial Ex. R.)  A few days later, on June 12, 2014, Stanley filed a second amended SOFA adding Ambient in response to Question #18.  (Joint Trial Ex. S.)  Stanley never disclosed his interest in Amstan Real Estate or Ambient's successor, Asian Foods, in response to Question #18(a) on the SOFA.

However, in response to Question # 21 of the SOFA, which applies solely to partnership debtors and requires disclosure of the "name and percentage of partnership interest of each member of the partnership", Stanley listed Amstan, Amstan Real Estate, and Asian Foods.  (Joint Trial Ex. A.)  Stanley listed a 100% controlling interest in each business, the address, and provided a brief description for each entity.  (*Id.*)

*b)* ***Books and Records***

On the Debtors' 2011 and 2012 joint income tax returns, Vinod Abraham is identified as the Debtors' income tax preparer. (Joint Trial Ex. Y**.**) At trial, Stanley testified that he was in possession of the Debtors' books and records. (Trial Tr., 30:1-12.) Despite this, in the original SOFA, in response to Question #19(a) (list of bookkeepers and accountants who kept or supervised the books and records during the two years immediately preceding the petition date) and #19(c) (firms or individuals in possession of the books and records), Stanley responded: "NONE." (Joint Trial Ex. A.) In the first amended SOFA, filed on June 6, 2014, almost nine months post-bankruptcy, Stanley listed Vinod Abraham as the holder of the books and records and as the accountant of the Debtors. (Joint Trial Ex. R.)

*c)* ***Income***

Question #1 of the SOFA requires disclosure of gross income from employment and operation of a business for the current year to bankruptcy filing date, and for the two calendar years preceding the bankruptcy. In this case, that would mean 2013 year-to-date, plus 2011 and 2012. Stanley did not list any income in response to Question #1 for any of those years. For 2013 year-to-date, Amy reported income of $18,000 from Monarch, and $0 from "Wife Business Subway Restaurant." No references were made to Amy's 2011 and 2012 income. In response to Question #2 (other income), Stanley, without specifying the year to which he

was referring, listed income of $0.00 from Amstan and Abraham[3] Imports.  No "other income" for Amy was reported.

Amy submitted payment advises with her initial filings.  (Joint Trial Ex. B, C.)  The paystubs for approximately two months prior to the Petition Date (the 2013 calendar year) were included and they show that Amy had year-to-date income from Monarch, as of July 25, 2013, of $45,000.  (*Id.*)

According to the first amended SOFA, filed on June 6, 2014, Amy's "income from employment" for "2012-2013" was $86,507.78 and Stanley's 2012 "income from Amstan LLC" was $15,129.  (Joint Trial Ex. R.)  Still, no reference to Amy's 2011 income or Stanley's 2011 and 2013 income was made.  (*Id.*)   The Debtors filed a second amended SOFA on June 12, 2014, but the responses to Questions #1 and #2 were unaltered.  (Joint Trial Ex. S.)

The Debtors' 2011 joint tax returns show combined adjusted gross income of $34,037, which includes $27,750 from employment income[4], $20,149 from unemployment insurance, and a $13,863 loss from Amstan.  (Joint Trial Ex. Y.)  According to their 2012 joint tax returns, the Debtors' adjusted gross income for 2012 was $-99,751, which included $81,508 from employment income (including $68,507.78 income to Amy from her employment at Convermat), plus $35,262 from other income, $15,129 of business income and a loss of $-231,683 attributable to Amstan.  (*Id.*)

---

[3]        The Court assumes that this was a typographical error and the Debtor's intended reference was to Abramen Imports, not Abraham Imports.
[4]        The 2011 W-2 for Amy reported income of $3,750 from Convermat.  (*Id.*)  According to Stanley's 2011 W-2 from Amstan, his income was $24,000.  (*Id.*)

## DISCUSSION

Sections 523 and 727, respectively, govern an individual chapter 7 debtor's discharge and the dischargeability of individual debts.  The provisions of §§ 523 and 727 are construed strictly against the objecting party and liberally in favor of the debtor.  *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996); *see also Bethpage Fed. Credit Union v. Furio (In re Furio)*, 77 F.3d 622, 624 (2d Cir.1996).  The objecting party must prove the elements of §§ 523 and 727 by a preponderance of evidence.  *Grogan v. Garner*, 498 U.S. 279, 289, 111 S.Ct.  654, 112 L.Ed.2d 755 (1991).

### A.  Standing

A threshold issue the Court must determine is whether the Plaintiff is a creditor with standing to pursue the claims asserted in this adversary proceeding.  Stanley raised this issue in pleadings filed early in this case, and he maintained at trial that he acted merely as a "conduit" or "intermediary" for a loan between the Plaintiff and Mr. John.

The Plaintiff has standing in this case only if she is a creditor.  *See* 11 U.S.C. §523(c)(1) (section 523(a)(2),(4) and (6) claims can be asserted by "the *creditor* to whom such debt is owed. . ."), and 11 U.S.C. § 727(c)(1) (only "[t]he trustee, a *creditor*, or the United States Trustee may object to the granting of a discharge…").  The Bankruptcy Code defines a creditor as "an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10).  A claim is defined as a "right to a payment, whether or not such right is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5).  The Bankruptcy Code's definition of "claim" is expansive.

12

*Johnson v. Home State Bank*, 500 U.S. 78, 83, 11 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991) ("Congress intended by this language to adopt the broadest available definition of 'claim.'").

The Plaintiff asserts that she is a creditor by virtue of two transactions by which she transferred $75,000 to Stanley. The Plaintiff alleges that the two transactions were loans which Stanley promised to repay. Stanley does not dispute that he received $75,000 from the Plaintiff, but he contends that the $75,000 was intended for and was subsequently transferred to Mr. John. Therefore, according to Stanley, the loan was made to Mr. John and as such the Plaintiff lacks standing in this adversary proceeding.

The Court finds that the Plaintiff is a "creditor" with standing to assert these claims under §§ 523(c)(1) and 727(c)(1). Neither party disputes, and the documentary evidence shows, that Stanley received $75,000 from the Plaintiff. It is further undisputed that Stanley did not return $75,000 to the Plaintiff. Other than the self-serving testimony of Amy, Stanley has failed to offer any documentary evidence to rebut the Plaintiff's claim that the $75,000 was a loan to him. In fact, the Debtors themselves scheduled the Plaintiff as holding an undisputed, liquidated, non-contingent claim of over $1 million, presumably based upon Stanley having been named in the state court complaint. Although the liability and amount of the "claim" remains disputed, and Stanley's defenses to repayment are preserved, the Court finds that the Plaintiff has standing to pursue the causes of action asserted in this adversary proceeding.[5] The disputed nature of the claim does not divest the Plaintiff of standing to pursue a discharge objection. *See* 11 U.S.C. § 101(5) (the definition of "claim" includes

---

[5]    In light of the Court's denial of Stanley's discharge in its entirety, if the Plaintiff chooses to pursue her alleged claim against Stanley after this bankruptcy case is concluded, she is free to seek a determination as to the liability and amount of her claim outside of bankruptcy court, and Stanley is free to assert his defenses to such claim.

disputed claims); *see also McGrath v. Moreau (In re Moreau)*, 161 B.R. 742, 744-745 (Bankr.

D. Conn. 1993) (a creditor has standing even if the claim is disputed and subject to litigation

in state court).


**B. Nondischargeability Under 11 U.S.C. § 523(a)(2)(A) – False Pretenses, False Representation, or Actual Fraud**

**1. Applicable Legal Standards**

Section 523 of the Bankruptcy Code enumerates specific, limited exceptions to the

dischargeability of debts and provides as follows:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).  Section 523(a)(2)(A) lists three separate grounds for

dischargeability: false pretense, false representation, or actual fraud.  The plaintiff can satisfy

a claim under § 523(a)(2)(A) by establishing one of the three types of fraud.  *Indo-Med*

*Commodities, Inc. v. Wisell (In re Wisell)*, 494 B.R. 23, 35 (Bankr. E.D.N.Y. 2011) (citation

omitted).  The party challenging the dischargeability of a debt bears the burden of proof by a

preponderance of evidence.  *See Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006).

First, under the "false pretenses" prong, the creditor must establish: "(1) an implied

misrepresentation or conduct by the defendant; (2) promoted knowingly and willingly by the

defendant; (3) creating contrived and misleading understanding about the transaction; (4) and

wrongfully induced the [creditor] to advance money, property or credit to the defendant." *Voyatzoglou v. Hambley (In re Hambley)*, 329 B.R. 382, 396 (Bankr. E.D.N.Y. 2005). "False pretenses" is defined as "'conscious deceptive or misleading conduct calculated to obtain, or deprive, another of property.' It is the practice of any 'scam, scheme, subterfuge, artifice, deceit, or chicanery in the accomplishment of an unlawful objective' on behalf of the defendant." *Hambley*, 329 B.R. at 396 (citing *Gentry v. Kovler (In re Kovler)*, 249 B.R. 238, 261 (Bankr. S.D.N.Y. 2000)).

Second, to except a debt from discharge based on a false representation, the creditor must prove: "(1) the defendant made a false or misleading statement; (2) with intent to deceive; and (3) in order for the plaintiff to turn over money or property to the defendant." *Frishberg v. Janac (In re Janac)*, 407 B.R. 540, 552 (Bankr. S.D.N.Y. 2009).

Finally, actual fraud under § 523(a)(2)(A) refers to common law fraud, which requires proof: "(1) that the debtor made a false representation; (2) that at the time made, the debtor knew the statement was false; (3) the misrepresentation made with an intent to deceive; (4) that the creditor reasonably relied on that misrepresentation." *Citibank (South Dakota), N.A. v. Olwan (In re Olwan)*, 312 B.R. 476, 483 (Bankr. E.D.N.Y. 2004).

Although these are separate bases for relief, each has two common elements – an implied or express misrepresentation, and causality, or reliance.

*2. Analysis*

The Plaintiff alleged in the Amended Complaint and maintained throughout trial that Stanley represented to her that the $75,000 loan would be used by him to invest in or expand

his real estate business.  It was this representation that she claims to have relied upon and absent this representation, she contends, she would not have made the loan.  However, in the Joint Post-Trial Brief, the Plaintiff also argues that Stanley did not disclose to her (i.e., misrepresented) that the $75,000 was intended for Mr. John.  If she knew that the funds would be transferred to Mr. John, she argues, she never would have loaned the money to Stanley. The Court will address both of these alleged misrepresentations in the context of the Plaintiff's § 523(a)(2)(A) claim.

By all accounts the subject loan is undocumented, and the parties have presented opposing versions of the circumstances surrounding the loan.  Aside from her own self-serving testimony, the Plaintiff provided no evidence that Stanley represented to her that he would use the loan proceeds to invest in real estate.  Furthermore, even if the Court were to credit her testimony on this point, the Plaintiff has not shown that she relied upon this representation when she advanced the $75,000 to Stanley.  To the contrary, by her own admission the Plaintiff did not ask Stanley for any details concerning the type of real estate investment the money was to be used for, or any details for that matter.  Specifically, she testified that she "knew [Stanley]" and "trusted him" and "that was enough for [her]." (Trial Tr., 115:15-18.)  Although she may have known him personally, there is no evidence in the record to show that the Plaintiff had ever loaned money to Stanley before or that there was any course of dealings between the two.  The parties did not discuss a potential return on investment or interest rate, although she claims that it was only a one month loan.  The Plaintiff did not ask Stanley to sign a promissory note, take any form of collateral, or otherwise memorialize the substance of her conversation with Stanley.  The Court finds this to be incredible.

16

Similarly, the Court does not credit the Plaintiff's allegations that Stanley failed to tell her that the funds were intended for Mr. John or that she relied on such representation. The documentary evidence contradicts the Plaintiff's testimony. According to the verified state court complaint and June 29 demand letter, the Plaintiff alleged that *Mr. John* requested that she transfer funds to Stanley. The Plaintiff's lending relationship with Mr. John coupled with her representations in the June 29 demand letter and her verified state court complaint suggest that the Plaintiff knew or should have known that that the funds that she transferred to Stanley may have been intended for Mr. John's benefit. The Plaintiff's position that she would not have agreed to advance the funds to Stanley for the benefit of Mr. John is untenable. The Plaintiff continued to write checks to American Gardens and Mr. John during the time she transferred the $75,000 to Stanley. Indeed, the Plaintiff wrote checks to American Gardens for $15,000 on June 18, 2009 and to Mr. John for $25,000 on August 3, 2009. (Joint Trial Ex. Z.)

The Court notes that although Stanley was called to testify by the Plaintiff and was cross-examined by his counsel, at no time did Stanley testify as to the circumstances surrounding the loan. Stanley's counsel instead chose to elicit that testimony from Amy who is not a defendant in this adversary proceeding and admittedly was not a party to the subject transactions.

In the end, the Court is left with more questions than answers about the circumstances surrounding this transaction. Considering that it is the Plaintiff's burden to prove the elements of a non-dischargeability claim under §523(a)(2)(A), the failures of proof in this case prevent the Court from granting the relief sought by the Plaintiff. The Court finds the Plaintiff has failed to prove any misrepresentation by Stanley at the time she transferred the $75,000 to

him, and failed to prove that she relied upon such alleged misrepresentations when she advanced the funds.  As such any debt owed by Stanley to the Plaintiff should not be excepted from discharge under § 523(a)(2)(A).

This, however, is not the end of the analysis.  The Plaintiff also seeks to deny Stanley's discharge in its entirety under § 727(a)(4)(A).

### C.  11 U.S.C. § 727(a)(4)(A) – False Oath

### 1.  Applicable Legal Standards

Section 727(a)(4)(A) provides: a discharge will not be entered if "the debtor knowingly and fraudulently, or in connection with the case…made a false oath or account." 11 U.S.C. § 727(a)(4)(A).  A party objecting to a debtor's discharge pursuant to § 727(a)(4)(A), must establish that: "(1) the debtor made a statement *under oath*; (2) the statement was *false*; (3) the debtor *knew* the statement was false; (4) the debtor made the statement with *fraudulent intent*.; and (5) the statement related *materially* to the bankruptcy case." *Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 228 (Bankr. E.D.N.Y. 2000).

The petition, schedules and statements are unsworn declarations made under penalty of perjury and are, according to federal law, the equivalent of verification under oath.  Fed. R. Bankr. P. 1008; 28 U.S.C. § 1776; *Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 320 (Bankr. S.D.N.Y. 1994).  "Omissions as well as affirmative misstatements qualify as false statements for Section 727(a)(4)(A) purposes." *Adler v. Lisa Ng (In re Adler)*, 395 B.R. 827, 841 (E.D.N.Y. 2008) (quoting *Republic Credit Corp. I v. Boyer (In re Boyer)*, 367 B.R. 34, 45

(Bankr. D. Conn. 2007).  "A statement is false if (1) it omits even one asset or source of income; (2) necessary[ ] material information is repeatedly left undisclosed during a case's pendency; or (3) an affirmative misstatement[ ] is made and is not corrected during an examination or at any point during [the] case's proceeding." *Lisa Ng v. Adler (In re Adler)*, 494 B.R. 43, 75 (Bankr. E.D.N.Y. 2013).  This Court has previously found that ne single false oath or account is sufficient to deny a debtor's discharge.  *TD Bank, N.A. v. Nazzaro (In re Nazzaro)*, No. 10-74869, 2013 WL 145627, at *6-7 (Bankr. E.D.N.Y. Jan. 13, 2013).

"Courts may consider the debtor's education, business experience, and reliance on counsel when evaluating the debtor's knowledge of a false statement, but the debtor is not exonerated by pleading that he or she relied on patently improper advice of counsel." *Rockstone Capital, LLC v. Bub (In re Bub)*, 502 B.R. 345, 356 (Bankr. E.D.N.Y. 2013) (citations omitted).

The threshold of materiality is fairly low.  A false oath is material if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of [debtor's] property." *Agai v. Antoniou (In re Antoniou)*, 515 B.R. 9, 22 (Bankr. E.D.N.Y. 2014) (citation omitted). "Materiality does not require a showing that the creditors were prejudiced by the false statement." *Abramov*, 329 B.R. at 22 (quoting *In re Robinson*, 506 F.2d 1184, 1188 (2d Cir.1974)).

Fraudulent intent can be proven by either evidence of a debtor's actual intent to deceive *or* indicia of his reckless indifference to the truth.  *Adler,* 95 B.R. at 843.  Under the reckless-indifference-to-the-truth standard, courts consider the following three non-exclusive factors: (a) the serious nature of the information sought and the necessary attention to detail

19

and accuracy in answering; (b) a debtor's lack of financial sophistication as evidenced by his or her professional background; and (c) whether a debtor repeatedly blamed recurrent errors on carelessness or failed to take advantage of an opportunity to clarify or correct inconsistencies. *Bub*, 502 B.R. at 356 (citations omitted).

The Plaintiff bears the burden of establishing each element of § 727(a)(4)(A) by a preponderance of evidence. *See* Fed. R. Bankr. Proc. 4005; *see also Minsky v. Silverstein (In re Silverstein)*, 151 B.R. 657, 660 (Bankr. E.D.N.Y. 1993). "Once the plaintiff has made a prima facie showing that the [d]ebtor has made a materially false statement, the burden shifts to the debtor to 'disprove either the relevant badges or accumulated indicia of his reckless indifference.'" *Antoniou*, 515 B.R. at 24 (citing, *Adler*, 494 B.R. at 77–78). However, the overall burden of proof remains with the objecting party. *Adler*, 395 B.R. at 841 (citations omitted).

### 2. Analysis
#### a) False Oath

The first and second prongs of § 727(a)(4)(A) are easily satisfied. Stanley signed the petition and the accompanying declarations under penalty of perjury. He admits, and the documentary evidence confirms, that his schedules and statements contain false and incomplete information. First, Stanley did not disclose he held a 100% interest in Amstan, Amstan Real Estate, and Asian Foods on Line #13 of Schedule B as originally filed with the bankruptcy petition, and when he amended Schedule B one month into the bankruptcy case, he only added Amstan to on Line #13, not Amstan Real Estate or Asian Foods. Second,

Stanley did not disclose his ownership of Abramen[6], Amstan and Ambient on his SOFA until nine months post-petition.

Third, Stanley did not disclose the name of his accountant in response to Question #19 on the SOFA.  Stanley testified that Vinod Abraham served as his accountant for a number of years and the joint 2011 and 2012 tax returns list Vinod Abraham as the Debtors' tax preparer. He admits that the failure to list Vinod in response to Question #19 was an omission.

Finally, Stanley did not disclose his gross income for 2011, 2012 and year-to-date gross income for 2013 on the SOFA, despite the fact that his joint tax returns and W-2s reflected $24,000 in employment income from Amstan in 2011 and $15,129 in profits from operation of Amstan in 2012. The joint tax returns also show unemployment insurance of $20,149 in 2011 and $20,000 in employment income for 2012 that was not disclosed by either of the Debtors.  The 2012 joint tax returns reflect gross income from employment of $81,508; Amy's W-2s show gross income of $68,507.78.  This income was not accurately represented on the Debtors' SOFA and these omissions constitute false statements which may form the basis for this Court to deny Stanley's discharge under § 727(a)(4)(A).

## b) *Materiality*

Disclosure of Stanley's business interests is material to this bankruptcy case as it relates to his financial condition and business dealings, and could potentially have led to the discovery of estate assets.  Stanley's initial contention was that he "disclosed his relationship to both Amstan LLC and Abraham imports (sic).  Neither of these entities have any assets, are

---

[6]     Even though Abramen was dissolved in 2010, Stanley was required to nonetheless disclose it because Question #18 of the SOFA requires a debtor to list *all* businesses which a debtor holds any position as officer or director *within the six years preceding his bankruptcy*.

active nor earning any profit in the past several years and there is nothing of value to disclose." (Def.'s Answer, ¶ 27.)  Even though Amstan, Amstan Real Estate, Asian Foods and Abramen may not have had value at the time of the petition, Stanley was required to disclose those companies.  *See Abramov*, 329 B.R. at 134 (citing *Gannon*, 173 B.R. at 320 (A debtor is obligated to disclose worthless assets and unprofitable business transactions in the petition.).  In fact, it appears that the businesses were the sole source of Stanley's income for the years preceding his bankruptcy case which is highly relevant to his financial condition – information which is of upmost importance in any bankruptcy case.  Similarly, the location of his books and records and the identity of his accountant bear directly on a debtor's financial condition and/or business dealings and the potential discovery of assets of the estate.

### c)  *Knowledge and Fraudulent Intent*

Taken together, the Court finds that the totality of the omissions and inaccuracies in the Debtors' Schedule B and SOFA exhibit a reckless disregard for the truth and accuracy of those documents thus satisfying the "knowing and fraudulent" element of §727(a)(4)(A).  *Stevenson v. Taylor (In re Taylor)*, 461 B.R. 420, 423 (Bankr. E.D. Mi. 2011) (citing *Discenza v. MacDonald (In re MacDonald)*, 50 B.R. 255, 259 (Bankr. Mass. 1985)) ("[F]raudulent intent can be found based on the cumulative effect of a series of innocent mistakes which evidence a pattern of reckless and cavalier disregard for the truth.").  "[A] multitude of misstatements and omissions of fact [can demonstrate] a pattern of reckless disregard for the truth and intent of concealing information from the Court and its creditors." *Bank of India v. Sapu (In re Sapu)*, 127 B.R. 306, 317 (Bankr. E.D.N.Y. 1991).

Stanley made repeated false statements even after having the opportunity to correct them in amended filings, and offered no credible explanation for his misstatements. *See*

*Virovlyanskaya v. Virovlyanskiy (In re Virovlyanskiy)*, 485 B.R. 268, 272 (Bankr. E.D.N.Y. 2013) ("If the debtor fails to provide evidence that the false statement was unintentional, or to provide a credible explanation, a court may infer fraudulent intent.").

Stanley failed to disclose all of his past and time-of-bankruptcy-filing business interests in response to rudimentary questions that elicited that information.  The SOFA question that elicits information on a debtor's accountant or person who might hold books and records of a debtor is similarly rudimentary and yet Stanley failed to disclose his accountant until nine months into this bankruptcy proceeding.  Most glaring is Stanley's statement that he made $0.00 in gross income for 2011, 2012 and 2013 when in fact we know that to be untrue, at a minimum, based upon tax returns for 2011 and 2012 which state otherwise.  The Court finds that these omissions should not be attributed to a lack of sophistication or understanding of the questions asked.  Stanley has owned several businesses since obtaining his degree in Finance and should be able to identify his assets and answer questions concerning his income and business holdings.

Stanley's various explanations for his false statements are insufficient.  He argues that he never concealed assets or intended to deceive his creditors, but that he unintentionally omitted and misstated the information.  Specifically, Stanley contends that the information regarding his business interests was disclosed elsewhere in his petition.  In fact, in response to Question #21 of the SOFA, Stanley disclosed that he held 100% interests in each entity and provided a short description of each business.  However, this does not absolve Stanley from his duty of full and complete disclosure.  "The obligation of full disclosure is crucial to the integrity of the bankruptcy process." *In re Riccardo*, 248 B.R. 717, 723 (Bankr. S.D.N.Y. 2000) (quoting *In re Hyde*, 222 B.R. 214, 219 (Bankr. S.D.N.Y. 1998), *rev'd on other*

*grounds*, 235 B.R. 539 (S.D.N.Y.1999)).  "The debtor is imposed with a paramount duty to

carefully consider all questions included in the Schedules and Statement and see that each is

answered accurately and completely."  *Riccardo*, 248 B.R. at 723 (quoting *Casey v. Kasal (In

re Kasal )*, 217 B.R. 727, 734 (Bankr. E.D. Pa. 1998), *aff'd*, 223 B.R. 879 (E.D. Pa. 1998)).

"[S]chedules are to be complete, thorough and accurate in order that creditors may judge for

themselves the nature of the debtor's estate."  *Riccardo*, 248 B.R. at 724 (quoting *Garcia v.

Coombs (In re Coombs)*, 193 B.R. 557, 563 (Bankr.S.D.Cal.1996)).  Thus, the Code places a

requirement on debtors to diligently complete each and every question on their schedules and

statements and answer accurately.

Stanley also contends that he subsequently corrected the false statements in his

amendments.  However, the argument that nine months post-bankruptcy and seven months

post-adversary proceeding, Stanley cured some of these deficiencies, is to no avail.  *Bub*, 502

B.R. at 356 (quoting *Aetna Ins. Co. v. Nazarian (In re Nazarian)*, 18 B.R. 143, 147

(Bankr.D.Md.1982) ("[N]o carelessness could excuse the Debtor's failure to amend his

schedules promptly when he had the leisure to do so.")).  Stanley remarkably never properly

disclosed his interest in all of his business interests even after these issues were raised in this

adversary proceeding.  And, upon closer examination of Stanley's schedules, he did not list

any of his companies as co-debtors on Schedule H, even though the companies' debts were

listed on Schedule F.  (*See* Joint Trial Ex. A.)

Stanley also explains that the chapter 7 trustee received copies of his tax returns,

which included the relevant information and, therefore, the necessary disclosures regarding

his income were made to the trustee.  (Trial Tr., 63:10-18.)  However, as of the Petition Date,

the Debtors' 2011and 2012 tax returns were complete and Stanley should have been able to

provide the Court with full disclosure of his 2011 and 2012 income.  But, he did not.  Separate disclosure to the trustee does not substitute for full and complete disclosure in a debtor's schedules and statements filed with the Court. *See Epic Aviation LLC v. Phillips (In re Phillips)*, 418 B.R. 445, 464 (Bankr. M.D. Fla. 2009) (quoting *In re Petersen*, 323 B.R. 512, 517 (Bankr. N.D. Fla. 2005)) ("Debtors must make full and complete disclosures on their bankruptcy schedules, and it is not up to a debtor to decide upon the relevance or value of assets or information before including it on his or her schedules.").

Thus, the Plaintiff has proven the elements of § 727(a)(4)(A), and the Court will deny Stanley's discharge.

## CONCLUSION

For the foregoing reasons, the Court finds the Plaintiff has not satisfied her burden of showing, by a preponderance of the evidence, the elements of § 523(a)(2)(A).  However, the Court will deny Stanley's discharge pursuant to § 727(a)(4)(A).  The Court shall enter judgment consistent with this Memorandum Decision forthwith.



**Dated: Central Islip, New York**
**August 4, 2015**

**Robert E. Grossman**
**United States Bankruptcy Judge**